**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

No. 03-600-L

| | | |
|---|---|---|
| CHEYENNE RIVER SIOUX TRIBE, et al.<br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Chief Judge Edward J. Damich |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**

Plaintiffs Cheyenne River Sioux Tribe et al., by and through their counsel of record, J. Crisman Palmer of Gunderson, Palmer, Goodsell & Nelson, LLP, herein file their Proposed Findings of Fact. The exhibits and/or witnesses that support each fact are identified in parenthesis following each fact as set forth below.

**I. PROPERTY LOCATION, OWNERSHIP, AND USES.**

1. The U.S. Army Corps of Engineers, Missouri River Division, has constructed six large multi-purpose dams in tandem along the main stem of the Missouri River. These dams now intercept the sediment from one of the largest and most productive sediment producing regions in the continental United States. On average, 135,000,000 tons of sediment per year was transported by the Missouri River as suspended load prior to construction of the dams. The amount of sediment now passing through the Missouri River system has been reduced to

virtually zero. (Aggradation and Degradation Aspects of the Missouri River Main Stem Dams, Alfred S. Harrison and Warren J. Mellema, May 1984, p. 1; John Garrison; John Remus; Eric Stasch).

2. The Oahe Dam – Lake Oahe project is one of the aforementioned dams located on the Missouri River near Pierre, South Dakota at 1960 River mile 1072.3. (Sedimentation in the Cheyenne River Arm – Lake Oahe, 1958-1991, January 1993, p. II-7, Bates No. US001459; John Remus; Eric Stasch).

3. The Moreau River is the second largest contributor of sediment to Lake Oahe from the tributary area, with an average of 1.9 million tons of sediment contributed each year. (1993 Lake Oahe Aggradation Study, pp. VI-3, Bates Nos. US002381; John Remus).

4. The Cheyenne River Sioux Reservation is located in what is now central South Dakota. The boundaries of the Cheyenne River Sioux Reservation are set forth in Section 4 of the Act of March 2, 1889, 25 Stat. 888 (1889), and include the Moreau River and the Moreau River Arm of Lake Oahe. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; Greg Bourland).

**A. Property Location.**

5. Rangeline monuments, installed by the U.S. Army Corps of Engineers, are utilized as follows to assist in property location identification. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; John Remus).

6. For purposes of trial, the parties agreed to select three representative parcels of property

along the Moreau River. These parcels of property are designated, “A”, “B”, and “C”. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004).

7. Parcels “A”, “B”, and “C” are located on the Cheyenne River Sioux Reservation upstream of the confluence of the Moreau and Missouri Rivers. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; Dick Anderson; Lyle Anderson; Pat Lawrence; Greg Bourland; Gregg Mowrer).

8. Parcel “A” is located between rangelines M-52.7 and 59.2. The legal description for parcel “A” is NW1/4 of Section 11, Township 15 North, Range 27 East, Black Hills Meridian, Dewey County, South Dakota. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; Dick Anderson; Lyle Anderson; Pat Lawrence).

9. Parcel “B” is located between rangelines M-47.8 and M-52.7. The legal description for parcel “B” is SE1/4 of Section 6, Township 15 North, Range 28 East, Black Hills Meridian, Dewey County, South Dakota. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; Greg Bourland).

10. Parcel “C” is located between rangelines M-41.4 and M-44.1. The legal description for parcel “C” is S1/2 of Section 22 and N1/2N1/2 Section 27, Township 16 North, Range 28 East, Black Hills Meridian, Dewey County, South Dakota. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; Greg Bourland; Edwina Mowrer; Gregg Mowrer).

11. The Corps property boundary is located between rangelines M-37.7 and M-41.4. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; John Remus).

12. Rangeline M-37.7 is located upstream of the confluence of the Moreau and the Missouri Rivers and about 2.3 river miles downstream of the Corps property boundary. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, August 2003, p. 1; Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; John Remus).

13. The Promise Bridge is located within the Corps property boundary between rangeline M-37.7 and the Oahe Reservoir. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; John Remus).

**B. Ownership.**

14. That portion of land within Parcel "A" described as S1/2NW1/4NW1/4, SW1/4NW1/4 of Section 11, T15N, R27E, BHM, Dewey County, South Dakota, is owned by Richard D. Anderson and Mary Jane Anderson. (Title Commitment No. 2003-407L(5), Ticor Title Insurance Company, November 4, 2004; Dick Anderson).

15. That portion of land within Parcel "A" described as NE1/4NW1/4, SE1/4NW1/4, N1/2NW1/4NW1/4 of Section 11, T15N, R27E, BHM, Dewey County, South Dakota, is owned by Charlotte Lawrence in trust with the United States of America. (Title Commitment No. 2003-407K(3), Ticor Title Insurance Company, April 18, 2004; Charlotte Lawrence; Pat Lawrence).

16. Charlotte Lawrence and Patricia Lawrence have a leasehold interest in the land within Parcel “A” described as NE1/4NW1/4, SE1/4NW1/4, N1/2NW1/4NW1/4 of Section 11, T15N, R27E, BHM, Dewey County, South Dakota. (Range Unit #293 Grazing Permit, Cheyenne River Agency, Bureau of Indian Affairs, United States Department of Interior; Pat Lawrence).

17. The land within Parcel "B" is owned by the Cheyenne River Sioux Tribe in trust with the

United States of America. (Title Commitment No. 2003-407H(3), Ticor Title Insurance Company, January 18, 2004; Greg Bourland).

18. Robert, Vivian and Thomas Smith have a leasehold interest in the land within Parcel "B." (Range Unit #200 Grazing Permit, Cheyenne River Agency, Bureau of Indian Affairs, United States Department of Interior; Robert Smith).

19. Mae Keller has a subleasehold interest in the land within Parcel "B." (Pasturing Authorization, Cheyenne River Agency, Bureau of Indian Affairs, United States Department of Interior; Robert Smith).

20. That portion of land within Parcel "C" described as SW1/4, W1/2SW1/4SE1/4 of Section 22, and N1/2NE1/4, NE1/4NW1/4 of Section 27, T16N, R28 E of the BHM, Dewey County, South Dakota, is owned by Edwina Mowrer in trust with the United States of America. (Title Commitment No. 2003-407E(1), Ticor Title Insurance Company, April 18, 2004; Edwina Mowrer; Gregg Mowrer).

21. That portion of land within Parcel "C" described as E1/2SE1/4SE1/4 of Section 22, T16N, R28 E of the BHM, Dewey County, South Dakota, is owned by the Cheyenne River Sioux Tribe in trust with the United States of America. (Title Commitment No. 2003-407E(2), Ticor Title Insurance Company, April 18, 2004; Greg Bourland).

22. Earl Bieber, Janet Bieber, Connie Edelman, Monica Hampson, Lavina Phillips, Preston Phillips, and the Cheyenne River Sioux Tribe have undivided ownership interests in trust with the United States of America in that portion of land within Parcel "C" described as NW1/4SE1/4

of Section 22, T16N, R28 E of the BHM, Dewey County, South Dakota. (Title Commitment No. 2003-407E(3), Ticor Title Insurance Company, April 18, 2004; Greg Bourland).

23. Gregg Mowrer and Edwina Mowrer have a leasehold interest in the land within Parcel "C." (Range Unit #346 Grazing Permit and Range Unit #395 Grazing Permit Cheyenne River Agency, Bureau of Indian Affairs, United States Department of Interior; Edwina Mowrer; Gregg Mowrer).

**C. Use.**

24. The land in question was characterized in 1956 by the Defendant as cattle country and its highest and best use was found to be for that purpose. (Real Estate Memorandum, MO 76, p. 4, September 15, 1956, Bates No. US003635; Eric Stasch; John Remus).

25. With respect to the general area of the land in question, in 1956, the Defendant found the land types include river bottom land suitable for alfalfa, cereal grains and corn production; river valley bench lands suitable for cereal grains, corn and wild hay production; river bottom brush and timber lands suitable for winter shelter and feeding lots for livestock and upland summer grazing lands. The river bottom lands were generally utilized in connection with upland grazing lands. The uplands were utilized for summer pasture and native hay and the bottom lands were utilized for hay and feed production and for winter shelter and feeding lots. (Real Estate Memorandum, MO 76, pp. 4-5, September 15, 1956, Bates No. US003635-36; Eric Stasch; John Remus).

26. In this area, bottom alfalfa lands were found to be in great demand for a dependable feed

production in connection with ranching activities. (Real Estate Memorandum, MO 76, p. 18, September 15, 1956, Bates No. US003649; Eric Stasch; John Remus).

27. Since the Defendant's findings in 1956, the property along the Moreau River has continued to be utilized for the same cattle ranching purposes. The river bottoms continued to be utilized for calving, shelter, winter grazing, and feeding sources. The upper lands also continued to be utilized for summer pasture and haying. (Dick Anderson; Mary Jane Anderson; Lyle Anderson; Pat Lawrence; Robert Smith; Edwina Mowrer; Gregg Mowrer; Bob Ducheneaux).

28. However, the manner in which these lands could be utilized was drastically altered following the significant sedimentation that resulted from the 1997 flooding/ice event. Specifically, the bottom lands could no longer be utilized as before for calving and shelter. As a result, the calving period has been altered, and at least one operation has had to switch the breed of cattle they raise. In addition, the native vegetation that once acted as a reliable feed source was destroyed by the silt that was deposited by the 1997 flood/ice event. In essence, the once productive uses that were attributed to the river bottoms and the adjacent land were lost following the 1997 flood/ice event and the vast amounts of sediment left in its wake. (Dick Anderson; Lyle Anderson; Pat Lawrence; Edwina Mowrer; Gregg Mowrer).

## II. CHANGES TO RIVER AND TO FLOODING CHARACTERISTICS.

### A. Changes In River Channel And Bed.

29. The Moreau River has a gradient of approximately 4 feet per mile. (2007 Report of Vernon Schaefer, p.1; Vernon Schaefer).

30. Either during or shortly after construction of the Oahe Reservoir, the Corps installed

rangeline monuments on the Moreau River to monitor changes in the cross sectional area of the river that would occur following the construction of the reservoir. (John Remus).

31. In relation to rangeline M-37.7, the lower regions of the river channel have been almost completely filled and a nearly planar surface had formed as a result of aggradation caused by the Oahe Dam. (2007 Report of Vernon Schaefer, p. 2 and Figure 3, p. 10; 1993 Lake Oahe Aggradation Study, pp. VI-1 to 5; John Remus; Vernon Schaefer).

32. In 2003, the deposition at rangeline M-37.7, was measured to be an additional 2.5 to 9.2 feet of sediment since the construction of the Oahe Reservoir. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 1; John Garrison; John Remus; Vernon Schaefer).

33. At that time, the thalwag of the channel at rangeline M-37.7, was about 13 feet higher than it was in 1962. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 1; John Garrison; John Remus; Vernon Schaefer).

34. At rangeline M-37.7, the channel has continued to narrow over the years and in 2003 it was less than one half the cross section that was in existence in 1962. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 1; John Garrison; John Remus; Vernon Schaefer).

35. In 2003, at rangeline M-41.4, the deposition was measured to be an additional 1 to 10 feet of sediment since the construction of the Oahe Reservoir. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, pp. 1-2; John Garrison; John Remus; Vernon Schaefer).

36. At that time, the thalwag of the channel at rangeline M-41.4 was about 5 feet higher in

elevation than what was recorded in 1962. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 2; John Garrison; John Remus; Vernon Schaefer).

37. The cross sectional area of the channel at this location has also been reduced by one half since 1962. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 2; John Garrison; John Remus; Vernon Schaefer).

38. In 2003, at rangeline M-44.1, the deposition was measured to be an additional 1 to 4.5 feet of sediment since the construction of the Oahe Reservoir. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 2; John Garrison; John Remus; Vernon Schaefer).

39. The thalwag of the channel at this location was about three feet higher in elevation than what was recorded in 1962. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 2; John Garrison; John Remus; Vernon Schaefer).

40. The cross sectional area of the channel in this location has decreased by seventeen percent. (2007 Report of Vernon Schaefer, p. 29; Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003; Vernon Schaefer; John Garrison).

41. In 2003, at rangeline M-47.8, deposition ranged from an additional 0.7 to 2 feet of sediment since construction of the Oahe Reservoir. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 2; John Garrison; John Remus; Vernon Schaefer).

42. The thalwag of the channel at this location was slightly less than two feet higher in elevation in 2003. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 3; John Garrison; John Remus; Vernon Schaefer).

43. The cross sectional area of the channel in this location has decreased by twenty-six percent between 1962 and 2003. (2007 Report of Vernon Schaefer, p. 29; Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003; John Garrison; Vernon Schaefer).

44. Rangelines M-52.7 and M-59.2, experienced up to one foot of deposition between 1962 and 2003. (2007 Report of Vernon Schaefer, p. 29; Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 3; John Garrison; John Remus; Vernon Schaefer).

45. Rangelines M-52.7 and M-59.2, likewise showed a decrease in channel cross sectional area in 2003, as compared to 1962, of twenty four and seventeen percent respectively. (2007 Report of Vernon Schaefer, p. 29; Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p. 3; John Garrison; John Remus; Vernon Schaefer).

46. With respect to parcel "A", which is located between rangelines M-52.7 and M-59.2, the stream bed used to be comprised of cobble. The cobble material allowed individuals to drive their vehicles into the river to wash them or to cross the river. This is no longer possible because the stream bed is now covered with silt. (October 29, 2002, Anderson and Lawrence Statements; Dick Anderson; Lyle Anderson; Tom Smith; Pat Lawrence).

47. The stream bed at or near parcels "B" and "C" is likewise now covered in silt as opposed to the cobble material that previously comprised the bed. (Photographs taken by Robert/Vivian Smith; Robert Smith; Vivian Smith; Gregg Mowrer; Edwina Mowrer).

48. The channel slope of the Moreau River has also decreased over time. (2007 Report of Vernon Schaefer, p. 33; Vernon Schaefer).

49. In addition, the post-dam confluence of the Moreau River and the Missouri River, at

maximum reservoir pool, has been relocated nearly 20 linear miles west of the previous confluence. (1948, 1997, 2004, 2005, and 2006 aerial photographs; January 15, 2007 Report of W. Carter Johnson; Carter Johnson).

**B. Changes in Sedimentation.**

50. The various individuals who live and ranch on or near parcels “A”, “B”, and “C” have indicated that the 1997 flooding/ice event resulted in sediment deposits up to several feet in depth on the respective properties. (Dick Anderson; Lyle Anderson; Pat Lawrence; Robert Smith; Gregg Mowrer).

51. The property near and as designated as parcels “A”, “B”, and “C” was surveyed in 2002, by Vernon Schaefer, Professional Engineer and James M. Hoover Chair of Geotechnical Engineering, Iowa State University, and in 2004, by Robert Nielsen, Certified Professional Soil Scientist. (Curriculum Vitaes of Vernon Schaefer and Robert Nielsen; 2007 Report of Vernon Schaefer, pp. 18-22, 24-25; Schaefer Field Notes and Site Investigation Photographs; August 9, 2004, Nielsen Site Investigation Report; August 12, 2004, Nielsen Site Investigation Report; August 30, 2004, Nielsen Site Investigation Report; Nielsen Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Nielsen Field Notes; Vernon Schaefer; Robert Nielsen).

52. During the 2002 survey, Vernon Schaefer obtained soil samples from various locations at or near the properties now described as parcels “A”, “B”, and “C.” (Boring Logs; Maps of Boring Locations; Site Investigation Photographs; 2007 Report of Vernon Schaefer; Schaefer Field Notes; Vernon Schaefer).

53. Therein, sediment along the lowest benches of or near parcel "A" measured a thickness of greater than 40 inches. The southwest bottomland was covered by sediment that ranged in thickness from a few inches to greater than 20 inches. The middle bench exhibited variable sediment thicknesses of one inch to four to ten inch thick mounds. (Boring Logs; Maps of Boring Locations; Site Investigation Photographs; 2007 Report of Vernon Schaefer, p. 18; Schaefer Field Notes; Vernon Schaefer).

54. In 2002, the bottom area near or of parcel "B", south of the river, was inundated by patches of sediment farther from the river, and a uniform layer of sediment near the river. The bottom area, north of the river, was severely affected by sediment waves. (Boring Logs; Maps of Boring Locations; Site Investigation Photographs; 2007 Report of Vernon Schaefer, p. 26; Schaefer Field Notes; Vernon Schaefer).

55. In 2002, on the lower bench of the property at or near parcel "C", the sediment thickness was generally several feet, with multiple borings indicating a thickness of greater than 40 inches. (Boring Logs; Maps of Boring Locations; Site Investigation Photographs; 2007 Report of Vernon Schaefer, pp. 11, 16; Schaefer Field Notes; Vernon Schaefer).

56. Along the eastern half of the bottom property on or near parcel "C," there existed an east-west fence line. This fence-line is now buried by sediment that varies in depth from one to several feet. (Boring Logs; Maps of Boring Locations; Site Investigation Photographs; 2007 Report of Vernon Schaefer, p. 13; Schaefer Field Notes; Vernon Schaefer; Gregg Mowrer).

57. A Ford Pickup is also located on property that is included in parcel "C." This pickup was

left in an oxbow in the north part of Section 23 after it suffered a blown engine. It was subsequently buried by sediment from the 1997 flood. (Boring Logs; Maps of Boring Locations; Site Investigation Photographs; 2007 Report of Vernon Schaefer, pp. 11, 16-7; Schaefer Field Notes; Vernon Schaefer; Gregg Mowrer).

58. During the 2004 surveys, Robert Nielsen performed observations and took samples at 35 soil study sites, chosen by the Defendant, between the confluence of the Moreau and Little Moreau Rivers and the Promise Bridge. (August 9, 2004, Nielsen Site Investigation Report; August 12, 2004, Nielsen Site Investigation Report; August 30, 2004, Nielsen Site Investigation Report; Nielsen Site Investigation Photographs; Field Notes of Robert Nielsen; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

59. The majority of the soil sampling sites selected by the Defendant are in the banks adjacent to the Moreau River or relatively close thereto. (Plots of Pits on 2004 Photo Base; NRCS Soil Mapping Units overlay 1948 photo base and depicting pit locations; Plots of Pits on 1948 Photo Base; Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

60. The sediments in the area of the sampling sites are classified as alluvial sediments. Alluvial sediments are sediments that are transported by moving water into a floodplain and subsequently deposited. These sediments are a mixture of different source materials that are being eroded from the surrounding uplands and transported during flooding. (January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

61. The repeated cut, filling, and deposition of these types of sediments on the floodplain

landscape render the soil poorly developed with few if any diagnostic or morphologic characteristics. (January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

62. Several sites were selected by the Defendant on or near parcel "C". These sites are described as follows. Sampling site 41.4 a, was in a depressional backwater area that was cutoff from sites 41.4b and c by a natural levee. Sites 41.4b and c were on the first terrace adjacent to the river and presented graded and stratified sediment indicating the source was flooding of the Moreau River. Sampling sites 44.1a, b, d, and e were also adjacent to the Moreau River channel on the first terrace above the active flood plain. These sediments presented as highly stratified sandy and silty sediments, as did those for sites 44.1 g and h. Site 44.1c was further from the river and dominated by silty sediments. Site 44.1i was taken in a depressional area. (August 9, 2004 Site Investigation Report; August 12, 2004 Site Investigation Report; August 30, 2004 Site Investigation Report; Nielsen Field Notes; Site Investigation Photographs; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Robert Nielsen).

63. Also related to parcel "C", site 44.1f was located in an abandoned oxbow very near the buried pickup. This site was typical of an abandoned oxbow. It presented strata of clay and silty clay textures. It exhibited a buried horizon of organic material at about 37 inches. This depth generally corresponded with the bottom of the pickup that was buried in the 1997 flood event. (August 9, 2004 Site Investigation Report; Nielsen Field Notes; Site Investigation Photographs; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Robert Nielsen).

64. Sampling sites 47.8 were very close together. Sites 47.8a and b were near the river and presented silty and sandy alluvium. Site 47.8c had large pieces of cottonwood bark imbedded in the sediment at about 36 inches from the surface, indicating a sediment deposit of the same depth in this location. (August 9, 2004 Site Investigation Report; Nielsen Field Notes; Site Investigation Photographs; Bark Samples; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Robert Nielsen).

65. Several sites were also selected by the Defendant on or near parcel "B". The two sites on the south side of the river were filled in before they could be viewed or described. Site 52.7a was on a high colluvial fan which was not in the Moreau River flood plain. Sites 52.7 b, c, and d were located in the flood plain and were representative of soils on alluvial terraces and as such presented highly stratified silty and sandy alluvium. (August 30, 2004 Site Investigation Report; Nielsen Field Notes; Site Investigation Photographs; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Robert Nielsen).

66. Sampling sites were also selected by the Defendant in the proximity of parcel "A". Sites 59.2a, b, and c were located on the low river terrace next to the river channel. Site 59.2d was located on the high or second terrace near the road. Sites 59.2 e, f, and g were also located on the first terrace next to the river channel. Sampling sites 33[1], 34, and 35 were located on the first and second benches of the river terrace system. The soils on the lower and second terrace were

[1] At this point in time, Mr. Nielsen adopted the sampling site naming convention that was utilized by the Defendant.

highly stratified sandy and silty alluvium. Site 35 had a buried soil horizon at 18 inches. Site 36 was located in a depressional area with clayey alluvial sediments typical of depressional areas and abandoned oxbows. Site 37 was on a high colluvial fan which was not located in the Moreau River floodplain. (August 9, 2004 Site Investigation Report; August 30, 2004 Site Investigation Report; Nielsen Field Notes; Site Investigation Photographs; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Robert Nielsen).

67. Lastly, sampling sites were selected by the Defendant between parcel "A' and the Whitehorse Bridge. Sites 29, 30, 31, and 32 were located in the active flood plain terrace near the Moreau River. This terrace was characterized by hummocky sandy alluvium. They were highly stratified and reworked due to flooding activity. (August 30, 2004 Site Investigation Report; Nielsen Field Notes; Site Investigation Photographs; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Robert Nielsen).

68. Turning to an analysis of the study areas, with respect to the upper reach of the study area, five of the sampling sites were taken near rangeline M-52.7, and parcel "A". These locations presented Trembles soil with a thin mantle of loamy material over stratified sand. The depth to the stratified sand, indicating the depth of sediment at this location, averaged between 10 to 21 inches. (August 30, 2004 Site Investigation Report; NCRS Soil Survey Map; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping

Unit overlying 1948 Photo Base; Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

69. Twenty of the remaining observed sampling sites selected by the Defendant consisted of loamy alluvial sediments on low terrace locations at or near the river channel. The sites presented Havrelon soils, which have a thicker loamy alluvial mantle than the Trembles soils denoted at the aforementioned sites. In addition, the depth to the stratified sand was on average 37 inches in these locations. (August 9, 12, and 30, 2004 Site Investigation Reports; NCRS Soil Survey Map; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Nielsen Field Notes; Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

70. Forty-five percent of these locations had a buried horizon of organic material at an average depth of 28 inches. An additional thirty percent of the soils demonstrated thin lamella of organic debris at an average depth of 24 inches. (August 9, 12, and 30, 2004 Site Investigation Reports; NCRS Soil Survey Map; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Nielsen Field Notes; Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

71. The remaining sampling sites were in depressional backwater areas and old oxbows. These sites presented Lohler soils consisting of clayey alluvial sediment overlying loamy or sandy alluvial sediments. The depth to the sandy sediment was on average 43 inches. (August 9, 12, and 30, 2004 Site Investigation Reports; Plots of Pits on 2004 Photo Base; Plots of Pits on

1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Nielsen Field Notes; Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

72. Several of these locations had buried horizons of organic material at an average depth of 22 inches. (August 9, 12, and 30, 2004 Site Investigation Reports; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Nielsen Field Notes; Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

73. Ultimately, the compositions of the Defendant's soil sampling sites were compared to the NRCS soil survey publication. (August 9, 12, and 30, 2004 Site Investigation Reports; NCRS Soil Survey Map; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Nielsen Field Notes; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

74. Sites 41.4b and 41.4c, fall into the category of the Lohler soils found in the depressional backwater areas and old oxbows. With respect to these locations, in comparison, on the 1948 aerial photographs, these sites appear to be located on a sandbar or an area of sandy alluvium. In excess of 40 inches of clayey alluvial sediment has been deposited in these locations since the 1948 aerial photographs were taken. (August 12, 2004 Site Investigation Report; NCRS Soil Survey Map; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Nielsen Field Notes; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

75. The remaining upper reach sites that presented Lohler soils correlate well with the NRCS

soil maps, mapping units descriptions, and soil classification. (August 9, 12, and 30, 2004 Site Investigation Reports; NCRS Soil Survey Map; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Nielsen Field Notes; Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

76. However, the majority of the soil sampling sites (29 out of 35) fall in the "TREMBLES AND BANKS SOILS" map-unit. The observed soil composition at these locations does not correlate with the expected composition as described in the published soil survey report. Specifically, only three percent of the observed study sites presented Banks soils and only fifteen percent presented Trembles soils. Conversely, the majority of these locations now are comprised of Havrelon soils which contain less sand and more silt than either the Banks or Trembles soil classifications that were mapped in the 1970's. (NRCS Soil Survey Map; August 9, 12, and 30, 2004 Site Investigation Reports; Nielsen Field Notes, Site Investigation Photographs; January 15, 2007 Report of Robert Nielsen; Robert Nielsen).

**C. Changes In Vegetation.**

77. Aerial photographs taken in 1945, and fine scale maps created therefrom by the U.S. Corps of Engineers, demonstrate a heavily wooded vegetation area growing on the lower Moreau River floodplain near its confluence with the Missouri River. (Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; January 15, 2007 Report of W. Carter Johnson; Carter Johnson).

78. These same maps show pronounced changes upstream from the confluence. Specifically,

there is much less woodland cover and more non-woodland (i.e. rangeland) vegetation. For example, up from the confluence, aerial photographs of the Moreau River study area from 1948 show a grassland ecosystem dominated by grassy vegetation, with a few trees on the river's floodplain and adjacent to the river channel. (Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; 1948 Aerial Photographs; January 15, 2007 Report of W. Carter Johnson; January 15, 2007 Report of Robert Nielsen; Carter Johnson; Robert Nielsen).

79. Several pre-dam conditions contributed to the less favorable environment for woodland in the upstream reaches of the Moreau River. For example, courser and drier soils formed as finer materials were carried downstream. A deeper groundwater table was present in summer when riparian plants are most vulnerable to drought stresses. Less severe flooding associated with a steeper stream gradient and greater channel capacity likewise provided less moisture. The net effect of the drier upstream environment was to favor grassland rather than woodland on the portion of the Moreau River's floodplain above the influence of the un-impounded Missouri River. (Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; January 15, 2007, Report of W. Carter Johnson; Carter Johnson).

80. Since the 1997 flooding/ice event, the individuals who live on or near and work the effected properties have reported a significant change in vegetation. Specifically, they have indicated that many of the native grasses and vegetation were destroyed by the siltation that resulted from the 1997 flooding/ice event. Since this destruction, the once productive vegetation has now been replaced by weeds. (Photographs taken by Robert Smith; Robert Smith; Lyle

Anderson, Dick Anderson; Pat Lawrence; Gregg Mowrer; Bob Ducheneaux; Dave Nelson; Dennis Rousseau).

81. W. Carter Johnson, Ph.D., Professor of Ecology in the Horticulture, Forestry, Landscape & Parks Department of South Dakota State University, performed a field reconnaissance exercise on the lower reaches of the Moreau River on November 18, 2004. This exercise began near Dupree, South Dakota, and ended downstream at the Promise Bridge. (Curriculum Vitae of W. Carter Johnson; January 15, 2007 Report of W. Carter Johnson; Johnson Field Notes; Carter Johnson).

82. The location furthest upstream that was observed was above the confluence between the Little Moreau River and the Moreau River. At this location, it was noted that the stream bed comprised of cobble size material. The riparian woodland that was observed was restricted to the floodplain near the river channel. The higher benches of the floodplain were dominated by upland grasses and forbs. This location was found to be a self-sustaining and relatively natural floodplain ecosystem. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; January 15, 2007 Report of W. Carter Johnson; Johnson Field Notes; Carter Johnson).

83. This location presented sparse riparian woody vegetation similar to that which was depicted on the Corps 1945 maps. (Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; Johnson Field Notes; January 15, 2007, Report of W. Carter Johnson; Carter Johnson).

84. The area near the confluence between the Little Moreau River and the Moreau River

differs in appearance from that observed upstream. The channel was degraded and incised. The floodplain was wider and more complex vegetationally. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; December, 2004 Report of W. Carter Johnson; Johnson Field Notes; Carter Johnson).

85. From the confluence to rangeline 59.2, the composition of the streambed changed from cobble to silt. In addition, a relatively continuous and vigorous fringe of sandbar willow was noted along the channel roughly coincident with the appearance of silt in the channel. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; January 15, 2007 Report of W. Carter Johnson; Johnson Field Notes; Carter Johnson).

86. These changes increase in intensity the further downstream the observations are made. Near rangeline 44.1, the floodplain was well-wooded and exhibited a more extensive growth pattern of woody plants and willows. This channel exhibited narrowing and was also silt-laden with no observable cobble. The young woodland noted in this area replaced the grassland that dominated the floodplain in the pre-dam period which is depicted on the Corps' maps. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; January 15, 2007 Report of W. Carter Johnson; Johnson Field Notes; Carter Johnson).

87. At the location of the buried pickup truck, near mile 42, it was noted that the channel banks were heavily covered with sandbar willow and extensive deposits of silt. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; Johnson Field Notes; Carter Johnson).

88. At the Promise Bridge, the willow thickets increased in density to a nearly impenetrable condition. Sandbar willows were observed on the banks and tree willows and other vegetation were noted on the floodplain. In addition, the entire floodplain was noted to be silt-laden. (Map of the Moreau River From U.S. Army Corps of Engineers dated August 17, 2004; December, 2004 Report of W. Carter Johnson; Johnson Field Notes; Carter Johnson).

89. A comparison of 1948 aerial photographs with aerial photographs taken of the same location in 1997, 2004, 2005, and 2006 illustrate the significant change in vegetative cover that has occurred up to the confluence of the Moreau and the Little Moreau Rivers. Specifically, a predominance of trees and shrubs and woody vegetation has replaced the original grassland. (1948, 1997, 2004, 2005, and 2006 Aerial Photos; Nielsen Field Notes; Site Investigation Photographs; January 15, 2007 Report of Robert Nielsen; Robert Nielsen; Carter Johnson).

**D. Changes In Flooding Conditions.**

90. Ranchers operating along the Moreau River acknowledge that they periodically experienced flooding, floating ice, and ice jams along the Moreau River. (2007 Report of Vernon Schaefer, p. 2; Lyle Anderson; Dick Anderson; Vernon Schaefer; Pat Lawrence; Bob Ducheneaux; Gregg Mowrer).

91. In at least four years prior to 1997, peak gage heights at Whitehorse were roughly equivalent to that experienced in 1997. Specifically, in 1972: 26.2 feet; in 1978: 25.31 feet; in 1982: 26.0 feet; and in 1987: 26.93 feet. (2007 Report of Vernon Schaefer, pp. 4-5, 32; Table 3, depicting data for USGS 06360500; Vernon Schaefer).

92. The peak stream flows in these four years were likewise equivalent to that which was

experienced in 1997. (2007 Report of Vernon Schaefer, pp. 4-5, 32; Table 3, depicting data for USGS 06360500; Vernon Schaefer).

93. There are also five additional years, between construction of the Oahe Dam and the 1990's, in which the peak gage height statistics indicate that the river waters may have overflowed the banks. Those years are 1962, 1966, 1967, 1975, 1986. (2007 Report of Vernon Schaefer, pp. 4-5; Table 3, depicting data for USGS 06360500; 1975 Structure Inventory & Appraisal Sheet, Bates Nos. US003169; Vernon Schaefer).

94. Beginning in 1993, the respective properties experienced flooding, floating ice and ice jams similar in magnitude and duration to those events previously experienced. These events also occurred in 1994, 1995, and 1996. (2007 Report of Vernon Schaefer, pp. 4-5; Table 3, depicting data for USGS 06360500; October 29, 2002, Lawrence Statement; Vern Schaefer; Pat Lawrence).

95. In each of the flooding events prior to 1997, these events generally lasted a comparatively short amount of time and resulted in little if any sediment deposition. (October 28, 2002, Ducheneaux Statement; 2007 Report of Vernon Schaefer, pp. 2; Vernon Schaefer; Lyle Anderson; Pat Lawrence; Gregg Mowrer; Bob Ducheneaux).

96. Each of the respective prior ice events likewise resulted in little if any damage to the subject properties. (Lyle Anderson, Dick Anderson, Pat Lawrence, Gregg Mowrer, Bob Ducheneaux).

97. In March of 1997, the subject area experienced a flooding and ice event that greatly

varied in severity and magnitude from those which were previously experienced. In this event, the water and ice remained for approximately two weeks, three weeks closer to parcel “C”, and resulted in up to several feet of sediment being deposited in its wake. (March 22-26, 1997, Photographs taken by Dave Nelson; March 1997, Photographs taken by Mary Jane Anderson; March 1997 CRST Game, Fish & Parks Video; March 23, 1997 Ducheneaux Video; 2007 Report of Vernon Schaefer, pp. 4-5; Table 3, depicting data for USGS 06360500; October 28, 2002, Mowrer and Ducheneaux Statements; Vernon Schaefer; Lyle Anderson; Dick Anderson; Pat Lawrence; Gregg Mowrer; Bob Ducheneaux; Dave Nelson; Dennis Rousseau).

98. The critical distinction between the prior events and the 1997 event is that the higher although not uncommon flowage, experienced in 1997 occurred when the pool level of the Oahe Reservoir was at the maximum flood control stage level of 1618 feet. (March 1997 CRST Game, Fish & Parks Video; March 23, 1997 Ducheneaux Video; 2007 Report of Vernon Schaefer, pp. 6, 32; USACE End of Month Reservoir Elevation data for Oahe Reservoir; March 21, 1997, photographs taken of the Promise Bridge by Mary Jane Anderson; Vernon Schaefer; Mary Jane Anderson; Bob Ducheneaux; Dennis Rousseau).

99. In addition, prior to the 1997 event, the Moreau River had reached a nearly planar surface at its lower reaches. It had, at a minimum, experienced decreased cross sectional areas from the confluence with the Missouri River up to rangeline 59.2. The Moreau River also experienced a decrease in channel slope. Furthermore, the thalwags of the lower reaches were at or near the normal operating pool levels of the Oahe reservoir. (*See* Proposed Findings Nos. 31, 33, 34, 36, 37, 39, 40, 42, 43, 45, 48, 106).

100. Subsequent to the existence of these factors, and the extensive damage caused by the 1997 flood, flooding was again experienced in 1998 and 1999. (Vernon Schaefer; Lyle Anderson; Mary Jane Anderson; Pat Lawrence; Greg Mower; Bob Ducheneaux; Dave Nelson; Dennis Rousseau).

101. Notably, this flooding occurred despite the fact that the bank gage heights were not exceeded at the Whitehorse Bridge gaging station. (2007 Report of Vernon Schaefer, pp. 4-5; Table 3, depicting data for USGS 06360500; Vern Schaefer).

102. Subsequent thereto, flooding again occurred in 2001. (2007 Report of Vernon Schaefer, pp. 4-5; Table 3, depicting data for USGS 06360500; October 28, 2002, Lawrence Statement; Vernon Schaefer; Pat Lawrence; Gregg Mowrer).

103. Since that time, this particular part of the country has suffered from drought conditions. (Eric Stasch; Lyle Anderson; Dick Anderson; Pat Lawrence; Gregg Mowrer; Dennis Rousseau; Dave Nelson).

## III. CHANGES WERE THE DIRECT, NATURAL, OR PROBABLE RESULT OF THE OAHE DAM.

104. Impoundment of water in Lake Oahe began in July 1958, and reached a multiple-use zone fill in 1968 (to elevation 1,607.5 feet MSL). (Sedimentation in the Cheyenne River Arm – Lake Oahe, 1958-1991, January 1993, p. II-8, Bates No. US001460; John Remus).

105. The normal operating pool level of Lake Oahe is elevation 1,610 feet MSL. (Sedimentation in the Cheyenne River Arm – Lake Oahe, 1958-1991, January 1993, p. II-7, Bates No. US001459; Vernon Schaefer; John Remus; Eric Stasch).

106. When Lake Oahe is functioning at its normal operating pool level, the thalwags at rangelines M-35.1 and M-37.7 are at or just below the same level. (2007 Report of Vernon Schaefer, p. 2 and Figure 3, p. 10; 1993 Lake Oahe Aggradation Study, pp. VI-1 to 5; Vernon Schaefer).

107. As a result, the operating pool backs up to the Promise Bridge. (2007 Report of Vernon Schaefer, p. 2 and Figure 3, p. 10; 1993 Lake Oahe Aggradation Study, pp. VI-1 to 5; Vernon Schaefer).

108. The maximum normal operating pool level of Lake Oahe is elevation 1,617 feet MSL. (Sedimentation in the Cheyenne River Arm – Lake Oahe, 1958-1991, January 1993, p. II-7, Bates No. US001459; John Remus; Vernon Schaefer).

109. When Lake Oahe is operating at it maximum normal operating level, the back water effects of the operating pool are experienced to between rangelines M-41.4 and M-44.1. (2007 Report of Vernon Schaefer, p. 2 and Figure 3, p. 10; Vernon Schaefer).

110. Exclusive flood control storage designation is from 1617.0 to 1620.0 feet MSL. (Sedimentation in the Cheyenne River Arm – Lake Oahe, 1958-1991, January 1993, p. II-7, Bates No. US001459; John Remus; Vernon Schaefer).

111. Exclusive flood control storage space (above elevation 1,617 feet MSL) has only been utilized three times in the years between 1958 and 1995 (1,617.1 feet MSL in 1975; 1,618.3 feet MSL in 1984; and 1617.4 feet MSL in 1986). (Sedimentation in the Cheyenne River Arm – Lake Oahe, 1958-1991, January 1993, p. II-8 and III-1, Bates No. US001460-61; USACE End of Month Reservoir Elevation data for Oahe Reservoir; Vernon Schaefer).

112. Prior to 1997, none of the high pool level years coincided with high flow years as recorded at the Whitehorse gauge. (2007 Report of Vernon Schaefer, p. 2, 10, 32; USACE End of Month Reservoir Elevation data for Oahe Reservoir; Vernon Schaefer).

113. Jeff McClenathan, hydraulic engineer for the U.S. Army Corps of Engineers, supervised an aggradation study on the Moreau River in October of 2003. (Hydraulics Section Aggradation Study – Moreau River, South Dakota, October 16, 2003; Jeff McClenathan; Vernon Schaefer).

114. Therein, the Corps concluded, "…there is a high likelihood that flood levels are impacted under high pool conditions in Lake Oahe up to river station 78150 (M-52.7). Landowners below this section would appear to be increasingly affected by floods, particularly at high reservoir pool levels. The decreased bed slope and reduced flow capacity of the lower sections of the Moreau River appear to be at least partially responsible for increasing flood stages in that area." (Hydraulics Section Aggradation Study – Moreau River, South Dakota, October 16, 2003, p. 3; Jeff McClenathan; Vernon Schaefer).

115. The above reference to impacted flood levels means that the water surface elevations were higher for the post-dam condition than the pre-dam condition. (Deposition of Jeff McClenathan, p. 81; Jeff McClenathan)

116. This 2003 report acknowledges impacts from the Oahe Reservoir up to rangeline 59.2. (Hydraulics Section Aggradation Study – Moreau River, South Dakota, October 16, 2003, p. 3; Jeff McClenathan; Vernon Schaefer).

117. In addition, in 2003, John Garrison, hydrologist for the U.S. Army Corps of Engineers,

issued a report which set forth conclusions regarding the Corps investigation of sedimentation trends in the vicinity of the Oahe Project boundary on the Moreau River. (Moreau River – Oahe project – South Dakota Sedimentation Analysis, 2003, p. 1; John Garrison; John Remus; Vernon Schaefer).

118. Therein, the U.S. Army Corps of Engineers concluded, "Sediment deposition, that can be related to the operation of the main stem system of dams, is definitely impacting the channel and the lower floodplain up to sediment rangeline M-44.1." (Moreau River – Oahe project – South Dakota Sedimentation Analysis, 2003, p. 4; John Garrison; John Remus; Vernon Schaefer).

119. The Corps also concluded, "Sediment rangeline M-47.8 shows some channel narrowing and some floodplain deposition that can probably be explained by the operations of the main stem system and some of the overbank deposition that was probably caused by the 1997 flood." (Moreau River – Oahe project – South Dakota Sedimentation Analysis, 2003, p.4; John Garrison; John Remus; Vernon Schaefer).

120. Finally, the Corps concluded that minor amounts of channel narrowing and floodplain deposition were occurring up to rangeline 59.2. (Moreau River – Oahe project – South Dakota Sedimentation Analysis, 2003, p. 4; John Garrison; John Remus; Vernon Schaefer).

121. Ultimately, the Corps found that some of the area that was the subject of this litigation had definitely been impacted by the operation of the Oahe Dam. (Moreau River – Oahe project – South Dakota Sedimentation Analysis, 2003, p. 4; John Garrison; John Remus; Vernon Schaefer).

122. The Corps again surveyed the aforementioned rangelines in 2005 and 2006. John Remus, U.S. Army Corps of Engineers Chief of the Sedimentation and Channel Stabilization Section, has reviewed this data and indicated that he does not believe that it would change any of the above conclusions. (John Remus Deposition, p. 86-7; John Remus).

123. Vernon Schaefer has likewise concluded that aggradation is occurring in the Moreau River as a result of the Oahe Reservoir. (2007 Report of Vernon Schaefer, pp. 9, 32; 1993 Lake Oahe Aggradation Study; Vernon Schaefer).

124. This aggradation in the Moreau River has resulted in the filling of the original river channel and the deposition of sediment on the overbank areas. (Site Investigation Photographs; 2007 Report of Vernon Schaefer, p. 9; 1993 Lake Oahe Aggradation Study; Vernon Schaefer).

125. The resultant loss of channel slope and capacity has reduced the hydraulic capacity of the Moreau River. (2007 Report of Vernon Schaefer, p. 33; Vernon Schaefer; Jeff McClenathan)

126. The increased stage gage that was recorded at the Whitehorse bridge in 1997 is attributable to the high water levels in the Oahe Reservoir and the decreased channel capacities downstream from the gage. (2007 Report of Vernon Schaefer, p. 30; Vernon Schaefer).

127. The high reservoir level and decreased channel capacity that existed in 1997 caused the prolonged natured of the flooding and ice event and the resultant deposit of sediment in the river bed and on the abutting properties. (2007 Report of Vernon Schaefer, p.31; Hydraulics Section Aggradation Study – Moreau River, South Dakota, October 16, 2003; Vernon Schaefer).

128. The changes in the soil compositions, from those denoted in the 1970’s, are the result of

episodic flooding, most predominantly the 1997 flooding event, reworking the alluvial sediments. Specifically, longer duration flooding events will deposit finer soils than what would be deposited in a shorter term and faster velocity flood event. As a result, a shift in soil composition from Trembles or Banks to Halveron soils is found in the subject areas. (August 9, 12, and 30, 2004 Site Investigation Reports; NCRS Soil Survey Map; Plots of Pits on 2004 Photo Base; Plots of Pits on 1948 Photo Base; Plots of Pits on NRCS Soil Mapping Unit overlying 1948 Photo Base; Nielsen Field Notes; Site Investigation Photographs; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

129. Geospacial Kriging analysis of the study area suggests that the 1997 flood deposited an average of two feet of alluvial sediments. This modeling is supported by the observed buried soil layers, buried organic lamella, and reference sites such as the abandoned pickup and fence lines. (Kriged Depth to Buried Soil Horizon graphic; August 9, 12, and 30, 2004 Site Investigation Reports; Site Investigation Photos; NCRS Soil Survey Map; Nielsen Field Notes; January 15, 2007, Report of Robert Nielsen; Robert Nielsen; Gregg Mowrer).

130. The flattening of the Moreau River's gradient and the narrowing of its channel have resulted in a delta being formed upstream of the new confluence of the Moreau and the Missouri Rivers. Consequently, riparian woodland conditions, not unlike those present on the 1945 Corps maps of the lower Moreau River just above its pre-dam confluence with the Missouri River, are now forming within and upstream of the post-dam confluence. (Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; 1997, 2004, 2005, 2006

aerial photographs; Johnson Field Notes; January 15, 2007 Report of W. Carter Johnson; Carter Johnson).

131. While the effects of the Oahe Reservoir on the Moreau River are most noticeable nearest the post-dam confluence, those riparian woodland effects continue upstream to just below the Little Moreau River's confluence with the Moreau River. (Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; 1997, 2004, 2005, 2006 aerial photographs; Johnson Field Notes; January 15, 2007 Report of W. Carter Johnson; January 15, 2007 Report of Robert Nielsen; Carter Johnson; Robert Nielsen).

132. Specifically, the areas that were grassland have now been replaced by a predominance of trees, shrubs, and woody vegetation. (Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; 1948, 1997, 2004, 2005, 2006 aerial photographs; Johnson Field Notes; January 15, 2007 Report of W. Carter Johnson; January 15, 2007 Report of Robert Nielsen; Carter Johnson; Robert Nielsen).

133. This shift in vegetation is caused by the inundation of water and the change in composition of soils in the affected locations that resulted from the 1997 flood. To illustrate, the upper reach sites that present Lohler soils have a preponderance of trees and shrubs that are divergent from the vegetation that is predominant in Lohler soils. With respect to the Halveron and Trembles soils that present in a majority of the Defendant's study sites, there is a preponderance of brush, western wheatgrass, wildrye and weeds. This vegetation is inconsistent with the expected grass varieties and fruit bearing bush varieties that should be present. (August 9, 2004, Site Investigation Report; August 12, 2004, Site Investigation Report; August 30, 2004,

Site Investigation Report; Site Investigation Photographs; Field Notes of Robert Nielsen; January 15, 2007, Report of Robert Nielsen; Robert Nielsen).

134. These visual differences in vegetation are indicative of a flattening of the stream gradient, the development of an increasingly shallow groundwater table, and increased overbank flooding. (Maps compiled by the U.S. Army Corps of Engineers created from 1945 aerial photographs; Johnson Field Notes; January 15, 2007 Report of W. Carter Johnson; Nielsen Field Notes; January 15, 2007 Report of Robert Nielsen; Carter Johnson; Robert Nielsen).

135. The construction of the Oahe Reservoir caused aggradation of the Moreau River channel which resulted in a decrease in the both the channel slope and the hydraulic capacity of the river. This decrease in slope and channel capacity, in conjunction with the high operating pool level of the Oahe Reservoir in 1996 and 1997, caused the prolonged nature of the flooding and ice event experienced in March of 1997, as well as the extensive amount of sediment that was left in the wake of the event. As a consequence of the prolonged event, the properties identified as parcels "A", "B", and "C" have been taken in their entirety. (USGS Topographic Maps; Vernon Schaefer's calculation overlays; FEMA Studies; Vernon Schaefer).

**A. The resultant sedimentation and flooding was foreseeable.**

**1. The aggradation conditions that were utilized to determine the appropriate U.S. Army Corps of Engineers' takeline have been exceeded.**

136. The U.S. Army Corps of Engineers, in anticipation of sedimentation and flooding that would result from the construction of the Oahe Dam, purchased land and/or flowage easements on the floodplain of the Moreau River. (PL 83-776 (1954); October 25, 1956

Correspondence, Bates No. US003622; 2007 Report of Vernon Schaefer, p. 2; Vernon Schaefer; John Remus).

137. In ascertaining the appropriate take line, the following was considered: "The maximum combined allowance for backwater and aggradation is about 10 feet. The backwater is predicated on a pool elevation of 1,617 with a 5-year frequency inflow of 65,000 c.f.s. The maximum allowance for aggradation is 10 feet, and the maximum backwater is 2.5 feet, both heights noncoincidental." (Correspondence to Chief of Engineers, Department of Army, August 13, 1954, p. 2, Bates No. US003627; Eric Stasch; John Remus).

138. This criteria was deemed to be satisfactory and the final proposal for the take line was recommended for approval on November 7, 1960. (First Ind. Dated August 13, 1954, Bates No. US003625; Correspondence dated November 2, 1960, Bates No. US003671; Eric Stasch; John Remus).

139. The maximum allowance for aggradation that the U.S. Army Corps of Engineers took into account in determining the appropriate take line has since been exceeded. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p.1; John Garrison; John Remus; Vernon Schaefer).

140. As early as 1975, 8 feet of sediment had aggraded at the Promise Bridge. (1975 Structure Inventory & Appraisal Sheet, Bates Nos. US003169; John Remus).

141. By 1976, the aggradation of sediment had reached a depth of 36 feet at rangeline M-29.7. (1993 Lake Oahe Aggradation Study, pp. VI-2; Bates Nos. US002380; 2007 Report of Vernon Schaefer, Figure 3, p. 10; Vernon Schaefer; John Remus).

142. By 1976, the thalweg elevations upstream from rangeline M-35.1, had increased on the order of 24 feet from the pre-project conditions. (1993 Lake Oahe Aggradation Study, pp. VI-1; Bates Nos. US0023792007; Report of Vernon Schaefer, Figure 3, p. 10; Vernon Schaefer; John Remus).

143. By 1989, the thalwag at rangeline M-37.7, which is 2.3 river miles downstream of the Corps' property boundary, presented about 10 feet of aggradation. In 2003, this same location presented 13 feet of aggradation. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p.1; 2007 Report of Vernon Schaefer, Figure 3, p. 10; Vernon Schaefer; Vernon Schaefer; John Garrison; John Remus).

144. In addition, up to 10 feet of aggradation were recorded in 2003, at rangeline M-41.4, which is outside of the Corps' property boundary. (Moreau River – Oahe Project – South Dakota Sedimentation Analysis, 2003, p.1; John Garrison; 2007 Report of Vernon Schaefer, Figure 3, p. 10; Vernon Schaefer; John Garrison; John Remus).

**2. After setting the take line parameters, the U.S. Army Corps Of Engineers altered the original design for the Promise bridge in a manner that restricted the flow capacity of the Moreau River.**

145. In 1960, the U.S. Army Corps of Engineers designed what is now the Promise Bridge. (Real Estate Memorandum, MO-133, entitled Moreau River Railroad & Highway Crossing, Bates Nos. US003500 – 3534; John Remus).

146. This design was prepared to handle an average flow velocity of less than 6.5 f.p.s. under the then existing river conditions. The Corps noted, "However, when aggradation effects due to backwater from Oahe Reservoir were considered, it was found necessary to provide

overflow sections 100 feet wide at natural ground elevation. The width of the overflow sections is sufficient to limit the velocity to 8.5 f.p.s. even if the channel were to be completely filled with sediment." (Real Estate Memorandum, MO-133, entitled Moreau River Railroad & Highway Crossing, Bates Nos. US003500 – 3534, p. US003514; John Remus).

147. In a March 3, 1960, indorsement thereto, the Corps altered the design of the bridge. Specifically, it stated, "The need for overflow sections wide enough to limit the velocity to 8.5 f.p.s. with the river channel completely filled with sediment is questioned. It is suggested the length of the bridges be substantially reduced in the interest of economy unless further justification of the proposed bridge length can be furnished. If each bridge is shortened one 70 ft. span on each end, the velocity above the assumed filled channel would be increased to less than 12 ft. per second. However, aggraded material probably would be scoured near the bridges so that this velocity would not be reached. Considering the severity of the aggradation assumed, it appears that the resulting increase in head above the bridges would not be critical because of the undeveloped area upstream. The estimated saving in cost would be over $100,000." (Real Estate Memorandum, MO-133, entitled Moreau River Railroad & Highway Crossing, and Indorsements thereto, Bates Nos. US003492 – 3534, p. US003497; John Remus).

148. As a result, 140 feet of flow area were eliminated from the original design of the Promise Bridge by the U.S. Army Corps of Engineers. (Real Estate Memorandum, MO-133, entitled Moreau River Railroad & Highway Crossing, and Indorsements thereto, Bates Nos. US003492 – 3534, p. US003497; John Remus).

149. Despite this introduced restriction in flow capacity, the 1956 take line parameters were

recommended for approval, without related adjustments, in the same year that the bridge design was altered. (Real Estate Memorandum, MO-133, entitled Moreau River Railroad & Highway Crossing, and Indorsements thereto, Bates Nos. US003492 – 3534, p. US003497; John Remus).

**3. The U.S. Army Corps of Engineers knew as early as 1973 that the flow capacity of the Promise bridge had been further reduced due to aggradation caused by the Oahe Reservoir.**

150. On July 25, 1973, the Corp of Engineers performed a supplementary bridge inspection on the Promise bridge, which crosses the Moreau River one half mile north of Promise, South Dakota. (Supplementary Bridge Inspection Report and Structure Inventory & Appraisal Sheet, Bates Nos. US003106; 108-109; 111-112; John Remus).

151. During this supplementary inspection, the Corp of Engineers noted that siltation at the bridge had limited the waterway capacity. (Structure Inventory & Appraisal Sheet, Bates No. US003106; John Remus).

152. Another supplementary inspection was performed in August of 1975. At this time, the Corp of Engineers likewise denoted that siltation had limited the waterway capacity. (Supplementary Bridge Inspection Report and Structure Inventory & Appraisal Sheet, Bates Nos. US003169-176; John Remus).

153. In 1975, the Corp of Engineers concluded that channel siltation along the stretch of the Moreau River near the Promise bridge was estimated to be about 8 feet. At that time, it concluded, “No concern is yet warranted, however, during this years occurrence of high water the river banks were overtopped because of limited channel capacity. Also, it will occur again

during the next high water period." (1975 Structure Inventory & Appraisal Sheet, Bates Nos. US003169; John Remus).

154. Notably, the gage data for the same year confirms banks were overtopped upstream to the Whitehorse Bridge. (2007 Report of Vernon Schaefer, pp. 4-5; Table 3, depicting data for USGS 06360500; Vernon Schaefer).

155. In 1977, the Corp of Engineers again noted that the waterway at the Promise bridge was limited by channel siltation. (1977 Structure Inventory & Appraisal Sheet, Bates Nos. US003263; John Remus).

**B. The resultant sedimentation and flooding was predictable.**

156. The flooding, icing, and resultant sedimentation of parcels "A", "B", and "C" was predictable. Specifically, the U.S. Army Corps of Engineers knew it was constructing a system of dams on one of the greatest sediment producing water systems in this country. It also knew that the Moreau River was one of the largest sediment producing tributaries for the Oahe Reservoir. (*See* Proposed Findings Nos. 1 and 3).

157. It likewise knew that construction of the Oahe Reservoir would result in sediment deposition in and around the operating pool and the adjoining tributaries. (John Remus).

158. As a result, the U.S. Army Corps of Engineers installed rangeline monuments to track changes in the cross sectional area of the Moreau River. (John Remus).

159. The data collected by the defendant confirmed that the areas surrounding parcels "A", "B", and "C", had historically experienced various flooding and icing events. (*See* Proposed Findings Nos. 91, 92, 93, 94).

160. The Defendant knew when it constructed the Promise Bridge that it had altered the design of the bridge in a manner that eliminated 140 feet of flow space. Despite this knowledge, it made no modification to the parameters utilized to ascertain the area taken subject to construction of the Oahe Reservoir. (*See* Proposed Findings No. 145-149).

161. It also anticipated, as far back as 1960, severe aggradation would occur in the area near the bridge. Despite this knowledge, the Defendant concluded, "Considering the severity of the aggradation assumed, it appears that the resulting increase in head above the bridges would not be critical because of the undeveloped area upstream." (*See* Proposed Findings No. 147).

162. This expectation was confirmed as early as 1973. By 1975, the Defendant acknowledged that a reduction in the river channel capacity due to aggradation near the Promise Bridge has resulted in water overflowing the river banks. The Defendant also acknowledged at this time that bank overflows would happen again. (*See* Proposed Findings Nos. 150-155).

163. Moreover, the rangeline data and supplemental bridge inspection reports indicated that aggradation had and was continuing to occur. (*See* Proposed Findings Nos. 150-155; Report of Vernon Schaefer, pp. 2, 10; John Remus; John Garrison; Vernon Schaefer).

164. Ultimately, the Defendant knew before the 1997 flooding and icing event that the sedimentation parameters that it utilized to ascertain the appropriate take area when it constructed the Oahe dam had since been exceeded. (*See* Proposed Findings Nos. 150-155; Report of Vernon Schaefer, pp. 2, 10; John Remus; John Garrison; Vernon Schaefer).

## IV. INTERFERENCE FROM THE OAHE DAM IS SUBSTANTIAL AND FREQUENT ENOUGH TO RISE TO THE LEVEL OF A FIFTH AMENDMENT TAKING.

**A. Degree Of Intrusiveness.**

165. The natural calving shelter on the Moreau River bottoms was lost as a result of the 1997 flood/ice event. (October 29, 2002, Anderson, Lawrence, and Mowrer Statements; Dick Anderson; Lyle Anderson; Pat Lawrence; Gregg Mowrer).

166. The bottom land winter grazing upon which the property owners depended was lost in the 1997 flood/ice event. As a result, hay and other feed supplements must now be purchased. In addition, at least one operation has had to lease additional land for feeding purposes. (October 29, 2002, Anderson, Ducheneaux, and Lawrence Statements; Photographs taken by Robert Smith; Dick Anderson; Lyle Anderson; Pat Lawrence; Bob Ducheneaux; Gregg Mowrer).

167. Much of the natural vegetation that was utilized annually for feed was destroyed by the silt that was deposited in the 1997 flood/ice event. Noxious weeds and other vegetation that the cattle will not eat have replaced this relied upon feed source. (Photographs taken by Robert Smith; Lyle Anderson; Dick Anderson; Pat Lawrence; Robert Smith; Gregg Mowrer; Edwina Mowrer; Dave Nelson; Dennis Rousseau).

168. Berry producing vegetation was also lost as a result of the silt that was deposited in the 1997 flood/ice event. (Lyle Anderson; Mary Jane Anderson; Dick Anderson; Pat Lawrence; Gregg Mowrer; Dennis Rousseau).

169. The 1997 flooding event resulted in losses of hundreds of calves, yearlings, and cows. (October 29, 2002, Anderson, Mowrer and Ducheneaux Statements; Dick Anderson; Lyle Anderson; Gregg Mowrer; Bob Ducheneaux).

170. Wells on or near parcels “A” and “C” were also lost as a result of sedimentation from

the 1997 flood/ice event. (October 29, 2002, Anderson Statement; Dick Anderson; Lyle Anderson; Edwina Mowrer; Gregg Mowrer).

171. Fencing along the river is routinely destroyed by the various flooding events that occur in the subject area. (October 29, 2002, Anderson, Ducheneaux, and Mowrer Statements; Dick Anderson; Gregg Mowrer; Bob Ducheneaux).

172. Ice was pushed out of the river during the 1997 event and caused damage to many of the abutting trees. (Photographs taken by Robert Smith; Pat Lawrence; Robert Smith).

173. With respect to parcel "A", someone has to be hired to come in each year and construct a river crossing as the nature cobble crossings were eliminated by the siltation from the 1997 flood/ice event. (October 29, 2002, Lawrence Statement; Pat Lawrence; Lyle Anderson).

174. The river bed is likewise silted in near parcels "B" and "C", thereby preventing the relatively easy crossing that occurred prior to the 1997 event. (October 29, 2002, Smith and Mowrer Statements; Photographs taken by Robert Smith; Robert Smith; Tom Smith; Gregg Mowrer).

175. Many of the ranches are also split in two because they are unable to cross the silty river bottoms that now are present, as opposed to the cobble bottoms that were routinely crossed prior to the increased duration of flooding. (Report of Todd R. Mortenson; Lyle Anderson; Gregg Mowrer; Todd Mortenson).

176. As there is no longer enough native vegetation to sustain the cattle, the ranching operations experience double or triple the feeding costs incurred. (Report of Todd R. Mortenson; Todd Mortenson; Gregg Mowrer).

177. The degradation and resultant loss of the river bottom lands has caused the ranchers to have to spend money on feedlots, barns, windbreaks, supplemental feed and water development. These endeavors negatively impact the cash flow of a ranching operation. (October 29, 2002, Anderson and Mowrer Statements; Dick Anderson; Lyle Anderson; Gregg Mowrer; Report of Todd R. Mortenson; Todd Mortenson).

**B. Permanent Injury.**

178. It is imperative that a rancher have a reliable shelter for cattle. Flooding of a shelter area renders it of little use because the risk to the cattle being sheltered is too great for a ranching operation to bear in this part of the country. As a result, the flooding of the Moreau River bottom effectively results in a loss of shelter to area ranchers. (Curriculum Vitae of Todd Mortenson; Report of Todd R. Mortenson; Todd Mortenson; Gregg Mowrer; Lyle Anderson).

179. Ten years after the 1997 flood/ice event, the area ranchers are still unable to utilize the bottom lands as they had prior to the 1997 and subsequent events. (Dick Anderson; Lyle Anderson; Pat Lawrence; Gregg Mowrer).

180. A severe impact is imposed upon a rancher who loses shelter provided by a river bottom. Specifically, river bottom shelter is vital in a cow-calf operation to protect the animals from the harsh elements that are present during both winter and calving cycles. Better protection results in less stress upon a calf, less feed required to maintain the calf, less sickness, and more weight to sell in the fall. (Report of Todd R. Mortenson; Todd Mortenson; Lyle Anderson).

181. The loss of the Moreau River bottom habitat has caused the ranchers to calve

later, run fewer cows, and suffer more weather-related livestock losses. All of these factors continue to contribute to less weight to sell in the fall and lower profits. (October 29, 2002, Anderson Statement; Report of Todd R. Mortenson; Dick Anderson; Lyle Anderson; Todd Mortenson).

182. The loss of grasses, legumes, and forbs also has a negative impact upon a ranching operation. Specifically, the aforementioned productive vegetation is now buried in silt. These once productive areas are now covered in lesser quality plants such as noxious weed Canadian thistle, salt cedar, willows, cord grass, and cockleburs. Not only are these plants toxic in certain stages of development, the cattle can not and will not utilize them as a feed source. (October 29, 2002, Anderson Statement; Photographs taken by Robert/Vivian Smith; Report of Todd R. Mortenson; Vivian Smith; Robert Smith; Dick Anderson; Gregg Mowrer; Lyle Anderson; Dennis Rousseau; Todd Mortenson).

183. Upland benches that naturally support productive rangeland vegetation are especially vulnerable to damage if flooding and sedimentation are introduced. (January 15, 2007 Report of W. Carter Johnson; Carter Johnson).

184. The length of time for the affected property to recover to its most productive condition is considerable. (January 15, 2007 Report of W. Carter Johnson; Carter Johnson).

185. Ten years after the 1997 event, the once productive vegetation has not returned to the condition or concentration in which it was found prior to the 1997 event. (Dick Anderson; Gregg Mowrer; Lyle Anderson; Dennis Rousseau).

186. Absent the present drought conditions, events such as the 1997 flooding event

should become more frequent in the future and accelerate the post-dam shift in vegetation from range grasses to early-successional weeds, shrubs, and trees. (January 15, 2007 Report of W. Carter Johnson; Carter Johnson).

187. Prior to the drought conditions which are currently affecting the land contained in parcels "A", "B", and "C", the frequency of flooding of the same had increased as a result of the effects of the Oahe Reservoir. (*See* Proposed Findings Nos. 91, 92, 93, 94, 97, 100, 102).

188. The delayed calving period has resulted in at least one ranching operation permanently switching the breed of cattle it raises. (Lyle Anderson).

189. The loss of the wells resulted in a permanent need to obtain water through the Tri-County Water Association, at an increased cost to the rancher. (October 28, 2002, Mowrer Statement; Gregg Mowrer).

**C. Frequency of invasion.**

190. The frequency of flooding/icing events with respect to parcels "A", "B", and "C" has increased since construction of the Oahe Dam. (*See* Proposed Findings Nos. 91, 92, 93, 94, 97, 100, 102).

191. Three of the four years following the 1997 flood/ice event have resulted in some level of flooding on the respective properties. (*See* Proposed Findings Nos. 100, 102).

192. Since that time, the respective area has suffered a drought and as a result has not been subjected to flooding. (*See* Proposed Findings No. 103).

193. The sediment that was deposited in the 1997 flood/ice event has in effect permanently

invaded the subject properties. (*See* Proposed Findings Nos. 50-89, 173, 174, 175, 183, 184, 185, 187).

**V. THIS COURT MAINTAINS JURISDICTION OVER THE PLAINTIFFS' CLAIMS BECAUSE THE SUBJECT LAWSUIT WAS TIMELY FILED.**

194. While the U.S. Army Corps of Engineers purchased land and/or flowage easements on the floodplain of the Moreau River in anticipation of sedimentation and flooding caused by the Oahe Dam, it has not made efforts to obtain flowage easements or condemn the property which is designated as parcels "A", "B", or "C". (2007 Report of Vernon Schaefer, p. 2; Vernon Schaefer; Lyle Anderson; Dick Anderson; Pat Lawrence; Robert Smith; Gregg Mowrer).

195. The 1997 flooding event began to impact the properties adjacent to the Moreau River on March 22, 1997. (Lyle Anderson; Dick Anderson; Pat Lawrence; Robert Smith; Edwina Mowrer; Gregg Mowrer).

196. This event inundated parcels "A", "B", and "C" with water and ice for a period that lasted ten days to three weeks. (Lyle Anderson; Dick Anderson; Pat Lawrence; Robert Smith; Edwina Mowrer; Gregg Mowrer).

197. Once the waters/ice receded, the individuals who lived on and ranched the properties became aware that this inundation of water resulted in the deposit of up to several feet of sediment on parcels "A", "B", and "C". (Lyle Anderson; Dick Anderson; Pat Lawrence; Gregg Mowrer; Edwina Mowrer; Robert Nielsen; Vernon Schaefer).

198. This inundation of sediment permanently altered the manner in which parcels "A", "B", and "C" are utilized. (Lyle Anderson; Dick Anderson; Pat Lawrence; Gregg Mowrer).

199. It is at this point in time that the individuals who live and ranch on parcels "A", "B", and "C" became aware that the gradual process the Defendant set into motion with the construction of the Oahe Dam had permanently damaged the respective properties. (Lyle Anderson; Dick Anderson; Pat Lawrence; Robert Smith; Edwina Mowrer; Gregg Mowrer).

200. The Complaint for this litigation was timely filed, within six years of the date in which the permanency of the flooding and sedimentation has been ascertained, on March 17, 2003. (Complaint; Lyle Anderson; Dick Anderson; Pat Lawrence; Edwina Mowrer; Gregg Mowrer).

Dated this 16th day of July, 2007.

GUNDERSON, PALMER, GOODSELL
& NELSON, LLP

By: *s/J. Crisman Palmer*

J. Crisman Palmer
440 Mt. Rushmore Road
P.O. Box 8045
Rapid City, SD 57709
(605) 342-1078
(605) 342-9503 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of July, 2007, I sent, via e-mail, a true and correct copy of **Plaintiffs' Proposed Findings of Fact** to:

Ms. Susan V. Cook
Senior Attorney
Mr. James D. Gette
Trial Attorney
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington D.C. 20044-0663

By: *s/J. Crisman Palmer*
J. Crisman Palmer