Cook, Susan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CHEYENNE RIVER SIOUX TRIBE, et al.,

Plaintiffs,

-vs-

THE UNITED STATES,

Defendant.

Davenport, Evans, Hurwitz & Smith
Sioux Falls, South Dakota
February 14, 2007
12:30 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

D E P O S I T I O N   O F

TODD MORTENSON

* * * * * * * * * * * * * * * * * * * * * * * * * * *

APPEARANCES:

Mr. J. Crisman Palmer
Ms. Pamela Snyder-Varns
Gunderson, Palmer, Goodsell & Nelson
P.O. Box 8045
Rapid City, South Dakota 57709-8045

for the Plaintiffs;

Ms. Susan V. Cook
United States Department of Justice
Environment & Natural Resources Division
601 D. Street, N.W.
Washington, D.C. 20004

for the Defendant.

ALSO PRESENT: Dr. Paul Schwartz

2

INDEX TO WITNESS

| | Examination |
|---|---|
| by Ms. Cook: | P. 3 |

INDEX TO EXHIBITS

| | Marked for Identification | Offered into Evidence |
|---|---|---|
| Exhibit No. 1 (Notice of Taking Oral Deposition of Todd Mortenson) | P. 3 | |
| Exhibit No. 2 (12/4/06 Letter to Mr. Todd Mortenson from Ms. Pamela Snyder-Varns) | P. 10 | |
| Exhibit No. 3 (Todd Mortensons's Report) | P. 13 | |

(Original transcript given to Ms. Susan V. Cook.)

COPY

3

S T I P U L A T I O N

It is stipulated and agreed by and between the above-named parties, through their attorneys of record, whose appearances have been hereinabove noted, that the deposition of TODD MORTENSON may be taken at this time and place, that is, at the offices of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, on the 14th day of February, 2007, commencing at the hour of 12:20 p.m.; said deposition taken before Pat L. Beck, Registered Merit Reporter and Notary Public within and for the State of South Dakota; said deposition taken for the purpose of discovery or for use at trial or for each of said purposes, and said deposition is taken in accordance with the applicable Rules of Civil Procedure as if taken pursuant to written notice. Insofar as counsel are concerned, the reading and the signing of the transcript by the witness are waived, as is the notice of the filing of the original with counsel for the Defendant in the above-entitled action.

TODD MORTENSON,

called as a witness, being first duly sworn, deposed and said as follows:

(Mortenson Deposition Exhibit No. 1 was marked for identification.)

EXAMINATION BY MS. COOK:

Q Can you give us your full name, please, and

4

DEPT. OF JUSTICE - ENRD
ENVIRONMENT DIVISION
7 FEB 26 P4:24

spell your last?
A Todd Russell Mortenson, M-O-R-T-E-N-S-O-N.
Q And where do you reside?
A On a ranch on the Cheyenne River near Hayes, South Dakota.
Q And approximately how far -- where is that located in relation to the Moreau River?
A Oh, probably as the crow flies 35 miles.
Q And what is your occupation?
A I'm a rancher.
Q And how long have you been a rancher?
A All my life. I was born on the ranch.
Q And when were you born?
A 1961, March 16th.
Q Nineteen --
A -- sixty-one.
Q And what's your first memory of ranching as a child?
A First one?
Q I assume they gave you the first couple years off.
A They start you pretty young. The scariest one is being chased by a cow when I was, you know, too small to really get the heck out of the way.
Q When did you start actually -- at what age do



PL62
90-1-23-10920

you start actually doing work around the ranch?
A Oh, you know, probably when I was six, seven started riding horses a lot and started hoeing the garden, things like that. A lot of going with. I liked to go with.
Q I imagine. Do you have a resume or any list of your accomplishments that supports your expert testimony?
A Yes, I do.
Q Do you have it with you?
A I do not. I've got it on my computer at home. My wife made one for me several years ago.
MS. COOK: I will request a copy of that.
MR. PALMER: Of course.
A Okay.
Q So let's go over your resume orally. Could you please tell me one by one all the different life events you've had which qualify you to testify as an expert in this case.
A Could you explain the life events? What do you mean by "life events"?
Q Why do you feel you're qualified to testify as an expert in this case?
A Okay. Obviously I've been a rancher all my life. I came back from college in 1982 and took



over management of the ranch. I attended a number of seminars from the Holistic Management Research Center out of Albuquerque, New Mexico, that puts ranch management in context of the environment and the finances and the cattle, puts it all together.
I attended a number of those seminars. And I attended a seminar from -- oh, let me think of the name of the guy -- Roy Ferguson. He's from Oklahoma City, puts on financial seminars on farming and ranching. I've attended several of his seminars in that regard.
Q Anything else you can think of?
A Nothing that comes to mind right offhand. I guess I'd mention my family's won numerous environmental awards for the work that we've done on the ranch with grazing management in particular. Wildlife awards. Ducks Unlimited has given us an award. Friends of Wildlife, some other organizations. We were the Region Seven NCBA Stewardship award winner.
Q Can you provide me with a complete list of the awards?
A I sure can.
MS. COOK: And since he doesn't have a copy of his resume with him perhaps counsel can help



me. How is this witness more eminently qualified to testify concerning the effect of sedimentation and flooding on area ranches as opposed to the other various individual plaintiff landowners?
MR. PALMER: He'll be testifying regarding the effects of sedimentation on the property in question relative to its inability to use it relative to taking.
MS. COOK: Is that something that the individual landowners wouldn't also be testifying to?
MR. PALMER: They may be testifying to their individual issues, but he's intended to testify as someone with additional expertise based on running a ranch on a river and testifying about the effects of what he's seen, how it impacts that as an industry as opposed to individual ranches.
Q What is the name of your ranch?
A Mortenson Family Ranch. It's run under several different business entities, but the landowner is Mortenson Family Land Limited Partnership.
Q Mortenson Family --
A Mortenson Family Land Limited Partnership.



Q Why was it formed as a limited partnership?
A You would have to ask my father that. He did that back in 1975.
Q And the land is located along what river?
A The Cheyenne River.
Q Is any of the land located along the Moreau River?
A No.
Q What experience have you had with ranching along the Moreau River?
A None.
Q How many acres are there in your ranch?
A Sixteen thousand deeded.
Q I'm sorry. You've dropping a little bit and it's not making it across the room.
A Okay. Sixteen thousand deeded acres.
Q Okay. Plus other grazing allotments?
A Yes. Yes, grazing leases.
Q And the grazing leases are in addition to that 16,000 figure?
A Correct.
Q How many acres in grazing leases?
A It varies, but there's generally between sixteen and twenty-five thousand additional acres leased.

Q And how many head of cattle do you run?
A Eleven hundred head of cows and then four to five hundred head of yearling heifers. And I've got cattle in the feedlot.
Q Tell me what knowledge you have of the history of the Moreau River before the Oahe Dam was closed.
A Really no -- no knowledge of it.
Q What knowledge do you have of the history of the Moreau River since the creation of the Oahe Reservoir?
A Just by what I've read through the depositions that were provided to me about the case.
Q What depositions were provided to you?
A You want this box?
Q No. I need you to list them for the record.
MR. PALMER: Yup, that's fine.
A Do you need that?
Q Let me go ahead --
MS. COOK: Is it okay if I mark the original of this, counsel?
MR. PALMER: That's fine.
MS. COOK: This is a letter dated December 4, 2006, and let's mark it as Deposition Exhibit 2.



(Mortenson Deposition Exhibit No. 2 was marked for identification.)
MS. COOK: Thank you.
Q I'd like to show you what's been marked as Deposition Exhibit 2 which is a letter dated December 4, 2006, and ask you to verify that that's the letter you just handed me?
A Yup. Yes, it is.
Q And how did you happen to receive that letter?
A Ms. Varns sent it to me in the mail as part of -- I guess part of my indoctrination into the case, part of my learning about the Moreau River.
Q Now, when were you first contacted with regard to providing testimony in this case?
A It was in the fall of last year. October or November, I believe.
Q Of 2006?
A Yes.
Q And who contacted you?
A I believe Pam did, Pam Varns.
Q And what did she tell you about the case?
A She gave me I guess an outline of the case briefly, and then said that they would be sending a bunch of material and wanted me to look it all over and give me my opinion on the case.



Q And did she indicate to you at that time that she wanted you to testify as a witness?
A I believe it says in that letter that there's a possibility that I would testify.
Q Now, after you were first contacted in October or November of 2006 was there any further contact up until you received this letter?
A I don't recall. I don't recall if there were any e-mails sent or not. I don't believe there were. I think that was -- I think that was it.
Q And did Ms. Snyder-Varns indicate to you what topics she wished you to present testimony on?
A No, she didn't.
Q Did you have any kind of understanding of what topics you were going to be presenting testimony on?
A Well, I had assumed that since my background is in ranching it would be about the operation of the ranches.
Q What did you do when you received this letter of December 4 and the documents attached or included with it?
A I started reviewing them.
Q And have you looked at everything listed in this letter?
A Yes, I have.



Q Have you subsequently -- have you received other documents in addition to the ones listed in this letter?
A This one I don't know if it's listed. It might be listed. It's the one with Tom Van Norman's -- no, it's included, too. So no.
Q That would be which item?
A The Tom Van Norman deposition. And it's listed on here. I didn't know if it was or not, but it is. It came separate from everything else.
Q And have you been asked to form opinions to testify in this case?
A I haven't been directed as far as what they -- the opinion I should form. Yeah, I was told to read and study the stuff and give them my opinion of what was going on.
Q And what is your opinion on what is going on?
A It's in this report. I mean, I think that those -- that I covered it very well in there.
MS. COOK: Can I mark that copy?
MR. PALMER: Sure. It says, "JCP Work Copy" on it, but you can sure mark it.
MS. COOK: I think you were good enough not to write anything on it so you're safe.

MR. PALMER: I hope not. Hey, good.
MS. COOK: Why don't we make that Deposition Exhibit 3.
(Mortenson Deposition Exhibit No. 3 was marked for identification.)
Q Looking at Deposition Exhibit 3, the first statement -- the report begins, "Flooding and sedimentation along the Moreau River causes numerous problems to ranchers trying to make a living along its banks."
Specifically what problems does flooding and sedimentation along the Moreau River cause to ranchers trying to make a living along its banks?
A Loss of shelter, loss of habitat. Basically loss of grasses that are usable by cows. Bogging is a problem.
Q I'm sorry, what?
A Bogging.
Q Bogging?
A Yeah. Cows getting stuck in the mud, bogged in the mud.
Q Anything else you can think of?
A Well, like I say the loss of habitat, the loss of grazing grass for the cows, and the biggest loss in my opinion is the shelter, the reliable shelter



for calving.
Q Now, I believe you indicated that you yourself have never ranched along the Moreau River.
A Correct.
Q So what is the basis for your opinion that flooding and sedimentation on the Moreau River caused a problem of loss of shelter to ranchers on the river?
A One, my experience on living along a river, and, two, the depositions given by the ranchers that lived -- that do live along the Moreau.
Q And those are the depositions listed in the letter of December 4?
A Correct.
Q Now, there was litigation involving the Cheyenne River, wasn't there?
A Yes, there was.
Q And when was that?
A I couldn't tell you. It was four or five years ago, I'm guessing. I don't know for sure though.
Q Were you involved in that litigation?
A I was not.
Q What knowledge do you have of that litigation?
A I don't really have much. I know there was a case and that the landowners were paid. I guess



that's the extent of my knowledge.
Q Who were the landowners that were involved in that case?
A I couldn't tell you all of them. I know -- seems like the Lesmeisters were involved and the Briggses.
Q As you go could you spell those names so we get them clearly on the record?
A B-R-I-G-G-S. That's the easy one.
MR. PALMER: You went with the easy one first.
A Lesmeister, L-E-S-M-E-I-S-T-E-R.
Q Anyone else that you recall being involved?
A I don't know -- Fischers may have been. F-I-S-C-H-E-R. I don't know for sure if they were or not.
Q And what's the source of your information as to what landowners were involved; just general knowledge or what?
A Could you --
Q What is the source of your information as to what landowners were involved in the Cheyenne River litigation? How do you know?
A How do I know? They're my neighbors.
Q And they've told you --
A Yeah.



Q -- about it?
A Yeah.
Q And you remember any other landowners that were involved in the Cheyenne River litigation?
A No, I don't.
Q Were -- were any entities or individuals involved with your ranch involved in the Cheyenne River litigation?
A No.
Q Why not?
A Why weren't they involved in the Cheyenne River litigation? They were never asked, I guess. I don't know.
Q Has your ranch on the Cheyenne River experienced any problems with sedimentation or flooding?
A I live on the Lake Oahe -- technically the Lake Oahe portion of the Cheyenne River. So it's -- when the pool is full we're really on Lake Oahe.
Q And have you experienced any problems with flooding or sedimentation at your property?
A Yeah.
Q And what problems are those?
A Well, our ranch borders on the mud flat. There's 40-foot of sediment out there, 40-foot of

mud.
Q Have you ever lost cows in that mud?
A Yes.
Q Have you made a claim with the Corps of Engineers to recover money for those cows?
A The cattle that I ran on the reservation side, yes, because you can only get reimbursed for cattle if they are on the reservation side. On the side that I live on you don't get any reimbursement. You're just out.
Q And the reservation side would be the land you graze pursuant to grazing leases?
A Right. I also own land on the Cheyenne River Sioux Reservation.
Q So your reservation land would include both deeded land and grazing leased land?
A Right. The deeded land on the reservation is not adjacent to the Cheyenne River, however.
Q So your property must be adjacent to one of the takelines for Lake Oahe as they call it?
A The home place is, yeah. Yes.
Q About how many cows have you gotten money for from the Corps of Engineers?
A One.
Q And when was that?



A Oh, probably -- let's see. The lake went away in 2000. It was probably 2000 -- probably six years ago.
Q Now, since your property doesn't border the Cheyenne River what is the source of your information concerning problems ranchers have had with sedimentation of flooding on the Cheyenne River or do you -- I guess I should ask you first of all do you have any knowledge concerning problems ranchers have had with sedimentation and flooding on the Cheyenne River?
A No.
Q You were born in 1961. Correct?
A Correct.
Q So basically do you remember anything about either the Cheyenne River or the Moreau River before Oahe Reservoir was created?
A No, I do not.
Q Now, in the first paragraph of your report -- and let me number the sentences so we have a clear record. Sentence three, "Before the Oahe Dam was built and for a time afterward, those that made a living along its banks" -- and it says "it" but I assume "it" isn't needed there -- "could rely on the protection of a healthy river bottom ecosystem."



What is the basis for -- strike that. Is that one of the opinions you intend to testify to in this case?
A Yes.
Q And what is the basis for that opinion?
A My family has lived there on the ranch that we have now since 1942, and my grandpa before that ran the Diamond A on the -- the Diamond A Ranch on the Cheyenne River Reservation.
Q And how does that support the statement?
A Well, they used those river bottoms for wintertime protection and for calving.
Q So your opinion there is based on information they've told you?
A Yes.
Q Is there any other information that that statement is based on other than information that your father and grandfather have told you?
A Well, that and -- no.
Q Now, you state in sentence four, "That reliance has gradually waned as the frequency and length of flooding events increased." Is that an opinion you intend to testify to in this litigation?
A Yes.
Q And can you tell me what that opinion is based



on?
A On the testimony of the other plaintiffs, Lyle Anderson and Gregg Mowrer, Dick and Mary Jane Anderson.
Q So it's essentially based on what you've read in their depositions?
A Correct.
Q Sentence five reads, "The flood of 1997 forever changed the Moreau River." Is that an opinion you intend to testify to in this litigation?
A Yes.
Q And what is that opinion based on?
A The same, of reading the depositions of the people that have lived along it and the changes that they've indicated they've gone through.
Q Now, there's a number of statements in your report, and I can go through them one by one, but let me see if we can resolve it with an overall question. Essentially all the opinions in this report are based on the materials you were provided in the letter of December 4, 2006?
A Majority of it is, yes.
Q Okay. What opinions are based on something else and what is that something else?
A My experiences ranching.

Q My experiences ranching?
A Yes, in South Dakota.
Q In South Dakota.
A Uh-huh.
Q And specifically can you show me which statements in your report are based on your experience in ranching in South Dakota?
A Well, the second paragraph, that whole paragraph is really based upon my experience.
Q Now you don't have river bottoms at your ranch. Correct?
A No, we've got riparian areas.
Q Areas that are riparian to Lake Oahe?
A Yes, yes.
Q So you don't shelter your cattle in river bottoms, do you?
A No, we do not. Creek bottoms but not river bottoms.
Q What creeks do you have on your ranch?
A Foster Creek and Todd's Draw.
Q And have you had any problems in sheltering your cattle in creeks?
A No.
Q I'm going to take the liberty of numbering the pages of your report and ask you if you could turn



to the second page, the first full paragraph on that page. The first sentence of that first full paragraph on the page states, "Having already lost the protection of the Missouri River bottoms to flooding to create Lake Oahe, the protection afforded by the Moreau River river bottoms has become even more valuable."
What do you mean -- first of all, that's the first sentence. Correct?
A Uh-huh.
Q What do you mean by the statement, "Having already lost the protection of the Missouri River bottoms"?
A Well, the landscape around the area we're discussing, the Moreau River, the river bottoms are a particularly valuable commodity to have because they afford protection in the wintertime, January, February and March into the spring for livestock. Otherwise there's no place for them to get out of the wind. So when they lost the Missouri River bottom it made these -- you know, these tributaries of the Missouri even more valuable because there was less of it, I guess.
Q By using the word, "lost the Missouri River bottom," you're not meaning to suggest that they



weren't compensated for the land underneath the Oahe Reservoir, are you?
A In no way.
Q I'm sorry?
A In no way am I inferring that.
Q And compensation was paid for the land underneath the Oahe Reservoir. Correct?
A Yes. And there's still litigation over that issue.
Q But that's not being litigated here?
A Nope.
Q Now, later on in that paragraph you make the statement, "The fact that a sudden flood could occur at any time and drown livestock makes the river bottom extremely risky to rely upon for protection."
Do you see that statement?
A Yes, I do.
Q First of all, is there no way to tell ahead of time when the river is going to flood -- when the Moreau River is going to flood?
A I don't know that. I would assume at sometimes maybe there is and other times there's probably no way of knowing.
Q Why is that?
A A sudden thunderstorm for instance on the upper



reaches.
Q And what about in the winter? What times of year are the high flow periods?
A I would assume -- I'm not an expert in that area but I would assume it would be in the spring and in the summer.
Q And would spring floods be the result of a thunderstorm or something else?
A Could be either one.
Q A thunderstorm or what?
A Or a blizzard.
Q Or a blizzard. Were there thunderstorms prior to Lake Oahe?
A I would assume.
Q Were there blizzards prior to Lake Oahe?
A I would assume there were, yes.
Q Were there floods on the Moreau River prior to Lake Oahe?
A I am -- yeah, there were, I would assume.
Q Were there floods on the Cheyenne River prior to Lake Oahe?
A Yeah, I'm sure there were.
Q Now, in paragraph -- in the second full paragraph on page 2 you discuss the hesitancy of a bank to loan money. If I'm gathering the gist of

this paragraph correctly, because there's no longer any reliable shelter in the river bottoms. Is that basically what you're saying in this paragraph?
A Yes.
Q Can you give me the basis for that opinion?
A Well, having borrowed money myself I know that the bank isn't going to loan you money unless you can provide adequate protection for your livestock.
Q And even prior to Lake Oahe -- prior to Lake Oahe the banks were totally happy to loan money because they regarded the river bottom as adequate protection?
A I don't know that.
Q Is there a problem with noxious weeds on the Cheyenne River?
A Yes.
Q Is there a problem with noxious weeds on the Grand River?
A I don't know that.
Q Is there a problem with noxious weeds on the Moreau River?
A Yes.
Q Is there a problem with noxious weeds on the White River?
A I don't know that.



Q What expertise do you have concerning the invasion of noxious weeds such as Canadian thistle, salt cedar, cord grass and cocklebur s that you discuss in the third full paragraph on page 2?
A As far as expertise I can identify them.
Q And when did you first see your first, for example, Canadian thistle?
A Probably six years ago.
Q Do you know why they call it Canadian thistle? Does it come from Canada?
A I would assume, but I don't know for sure.
Q Now, in the last paragraph on the page you discussed the loss of native plants such as plum, currant and chokecherry. What is your basis for those statements?
A It was in the depositions -- and I can't remember whether it was Mary Jane Anderson or whether it was Edwina Mowrer -- but one of them, that was the thing that they noticed the most was the loss of basically the fruit-bearing bushes.
Q Now, have you yourself experienced any loss of plum, currant or chokecherry?
A On our ranch?
Q On your ranch.
A No. As a matter of fact it's just the



opposite.
Q What do you mean by that?
A We were getting more of them.
Q And do you regard that as good or bad?
A It's good.
Q I mean, I guess it depends if you like plums, currants and chokecherries.
A And I do.
Q Then it's good.
A Uh-huh.
Q When did you start getting more plum, currants and chokecherries?
A Oh, probably shortly after dad, you know, arrived at the ranch, or my grandpa actually did, because the area was so overgrazed in the '30s that a lot of that stuff was not there.
Q So the cows like plums, currants and chokecherries, too, huh?
A No, they don't. They don't eat them.
Q So why weren't they there before?
A Well, there was a lot of -- probably a lot of different things that played into the fact they weren't there. One, there used to be frequent fires, uncontrolled fires.
Q Who conducted the fires?



A Mother Nature. And two --
Q These would be on the reservation or anywhere in the area?
A Anywhere in the area.
Q And were they like from lightning?
A Yes.
Q Natural causes?
A Yes.
Q And they weren't fought; they were just allowed to burn out?
A Well, they were fought but it wasn't with today's technology so it was harder.
Q It wasn't in big airplanes --
A It was much harder to control.
Q And about when was this?
A It would have been throughout history, I guess. I mean, fires burned every time I suppose a thunderstorm would go through, and if it was dry it would start a fire.
Q Have you yourself experienced naturally-caused fires?
A Yes, I have.
Q On how many occasions?
A Oh, man, I'm on the volunteer fire department. This last year there was probably a dozen that I

went to.
Q And how are they fought nowadays?
A With fire trucks and hand sprayers. And if it gets bad enough they'll send in the tankers.
Q And who is it that sends in the tankers?
A The fire chief is the one that's responsible for making that call.
Q And are they actually tankers from the firefighting units maintained by the forest -- U.S. Forest Service?
A I believe that's where they are, yeah. I think there's one or two of them stationed in Rapid.
Q Tell me about your grandfather. Was he the first one in your family to settle the ranch?
A Yes.
Q And when was that?
A He started putting the place together in the '30s. He would buy the tax liens.
Q I'm sorry?
A He would pay the tax liens on them on a quarter at a time.
Q So he came through during the depression when people were losing the land?
A Yeah.
Q And paid the taxes?



A Yes. He'd lost a leg in World War I -- this is just kind of an anecdote -- and so he had a monthly check coming through. And when he collected and got enough money saved up he'd go make the payment on another quarter. That's how he put the ranch together.
MS. SNYDER-VARNS: It cost him a leg.
A Yeah. And he still wanted to ranch. That's the amazing thing.
Q It's beautiful country. When did he start grazing cattle?
A You know, I couldn't give you the exact year. I know dad talks about the first time he saw the ranch was in 1942, so I would assume it was right around there.
Q Now is your grandfather still alive?
A No. No, he's deceased.
Q Now, the father says the first time he saw the ranch was 1942?
A Uh-huh.
Q And what was the context? Had he been living somewhere else or --
A Yeah. He'd been living up in Eagle Butte.
Q And how did he happen to be living in Eagle Butte?



A That's where my grandma was. Obviously that's where my grandma lives so he was 11 years old in '42 -- no, 13. Excuse me. He was 13 in '42, but he was working there for my grandpa at the time when he first saw it.
Q Now you reference the overgrazing in the 1930s. Tell me about that.
A Well, there was -- on our place alone there was over 36 different quarters of land with different ownership. Not all 36 of those people lived out there at one time, but a lot of them did. And when you put that much pressure on the land, especially during the drought, you're going to do some damage to the ecosystem.
Q So there were 36 different quarter sections is what we're talking about?
A Uh-huh.
Q Thirty-six different quarter sections, each with a different owner with their own herd of cattle?
A Not all of them lived there at the same time. You know, to prove up you were supposed to live there for I guess five years or something like that to prove up on your claim. Like I say, not all of them did that, not all of them stayed there.



Q So this is land that was initially homesteaded?
A Yes.
Q So what happened during the '30s in terms of grazing? There were no grazing allotments yet, grazing leases, so there was no control by the BIA on carrying capacity. Correct?
A And on the home place there wasn't any way because we're not on the reservation.
Q The other thing that would be useful for me is if when you put together your resume you could put together a map, the home place, the leases.
A Okay.
Q That would be useful. How was the ecosystem damaged by the overgrazing in the '30s?
A Well, you know, you realize there was a drought, the Dirty '30s. So in our country the rule of thumb is 30 to 35 acres per animal unit. It doesn't take very many animal units to cover a quarter. If you have a milk cow and a few draft horses pretty soon you've covered all your grazing units. So if you had ten head of cattle -- ten head of animal units you could overgraze a quarter pretty easily. And combine that with the drought it was kind of a recipe for disaster.
Q Now, you said 30 to 35 acres; that's assuming

no drought?
A Right. That's considering a normal year.
Q Do you have any knowledge concerning whether similar overgrazing was occurring on the Moreau River during the '30s?
A No, I don't.
Q Do you have any idea where you would go to get an answer to that information -- to that question?
A Might be able to find some answers in the archives, state archives, or maybe the tribe has some records from that period. The difference would be at home we had water, spring water. I don't know that they had that. So I don't know that the cattle necessarily stayed on that land up on the reservation. I don't know that they were able to keep the cattle because of the water situation, not having any.
Q Because they didn't have enough water on the Moreau?
A I don't know that. I don't know that they didn't, but that would be my -- I guess my look at it was I doubt it was as intense as it was on our ranch.
Q But there were ranchers down there running cattle on the Moreau as well. Right?



A In what years?
Q In the '30s.
A You know, it was -- a lot of the reservation was leased to big cattle interests like the Diamond A or the Turkey Track, and they would lease up hundreds of thousands of acres at one time. So I don't know during the '30s to what extent they were in there. I couldn't answer that.
Q Were there any other causes? I mean, so far you've talked about three reasons why vegetation in the area was impaired in the '30s. We have natural fires that weren't fought with the effectiveness of today. We have the drought that you mentioned and we have the possibility of overgrazing. Are there any other factors you're aware of based on your history of the area that would have impaired vegetation in the '30s?
A The need for trees -- for wood I should say.
Q And what was -- what was wood being used for? Were people cutting down trees?
A Oh, yeah. They needed it for shelter, to build corrals, build fence, burn in their fireplace.
Q And what's the source of that information?
A Books and my father.
Q Was the initial ranch house made of wood?



A Yes.
Q And were there corrals --
A Yes.
Q -- made of wood?
A Uh-huh.
Q Back in the '30s was the Moreau River settled to the same extent as the Cheyenne River or do you know?
A I don't know.
MS. COOK: If you could give me just a moment.
(A recess was taken.)
Q (By Ms. Cook) Just a few more questions. Shortly before we broke I asked you if there were any other reasons that vegetation would have been impaired during the '30s and you talked about cutting wood for various purposes. Is there any other reason you can think of why vegetation in the '30s -- we've talked about fire, drought, overgrazing and now cutting wood -- why vegetation in the '30s would have been impaired?
A No, I can't think of anything else.
MS. COOK: Thank you very much. I have no further questions.
MR. PALMER: Todd, you have the right to read and sign your deposition or you can rely on the



accuracy of Pat, which I would recommend you do, but you have to tell her you waive it.
THE WITNESS: I waive it.
(Witness excused.)

STATE OF SOUTH DAKOTA )
:SS CERTIFICATE
COUNTY OF MINNEHAHA )

I, Pat L. Beck, Registered Merit Reporter and Notary Public within and for the State of South Dakota:

DO HEREBY CERTIFY that the witness was first duly sworn by me to testify to the truth, the whole truth, and nothing but the truth relative to the matter under consideration, and that the foregoing pages 1-36, inclusive, are a true and correct transcript of my stenotype notes made during the time of the taking of the deposition of this witness.

I FURTHER CERTIFY that I am not an attorney for, nor related to the parties to this action, and that I am in no way interested in the outcome of this action.

In testimony whereof, I have hereto set my hand and official seal this 14th day of February, 2007.

______________________________

Pat L. Beck, Notary Public
Expiration Date: June 11, 2011
Iowa CSR Number: 1185

-

-- [62]
-vs- [1] 1/5

A

able [2] 33/9 33/15
above-entitled [1] 3/18
above-named [1] 3/3
accomplishments [1] 5/7
accordance [1] 3/13
accuracy [1] 36/1
acres [7] 8/12 8/16 8/22 8/24 32/17 32/25 34/6
across [1] 8/15
action [3] 3/18 37/14 37/15
actually [4] 4/25 5/1 27/14 29/8
actually -- [1] 4/25
addition [2] 8/19 12/2
additional [2] 7/15 8/24
adequate [2] 25/8 25/11
adjacent [2] 17/18 17/19
afford [1] 22/17
afforded [1] 22/6
afterward [1] 18/22
age [1] 4/25
ago [4] 5/12 14/20 18/3 26/8
agreed [1] 3/2
ahead [2] 9/18 23/18
ahead -- [1] 9/18
airplanes [1] 28/13
airplanes -- [1] 28/13
al [1] 1/3
Albuquerque [1] 6/3
alive [1] 30/16
allotments [2] 8/17 32/4
allowed [1] 28/9
alone [1] 31/8
along [12] 8/4 8/6 8/10 13/8 13/9 13/12 13/13 14/3 14/9 14/11 18/23 20/14
also [3] 1/24 7/11 17/13
am -- [1] 24/19
amazing [1] 30/9
and -- [1] 19/19
Anderson [3] 20/3 20/4 26/17
anecdote [1] 30/2
animal [3] 32/17 32/18 32/22
another [1] 30/5
answer [2] 33/8 34/8
answers [1] 33/9
Anyone [1] 15/12
anything [5] 6/12 12/24 13/22 18/15 35/21
anywhere [2] 28/2 28/4
appearances [2] 1/14 3/4
applicable [1] 3/13
approximately [1] 4/6
archives [2] 33/10 33/10
area [8] 7/3 22/14 24/5 27/15 28/3 28/4 34/11 34/16
areas [2] 21/12 21/13
around [3] 5/1 22/14 30/15
arrived [1] 27/14
ask [4] 8/2 10/6 18/8 21/25
asked [3] 12/11 16/12 35/13
assume [10] 4/20 18/24 23/21 24/4 24/5 24/14 24/16 24/19 26/11 30/14
assume -- [1] 24/4
assumed [1] 11/16
assuming [1] 32/25
attached [1] 11/20
attended [4] 6/1 6/6 6/7 6/10
attorney [1] 37/13
attorneys [1] 3/3
award [2] 6/18 6/20
awards [3] 6/15 6/17 6/22
aware [1] 34/15
away [1] 18/1

B

B-R-I-G-G-S [1] 15/9
back [3] 5/25 8/3 35/6
background [1] 11/16
bad [2] 27/4 29/4
bank [2] 24/25 25/7
banks [4] 13/10 13/13 18/23 25/10
based [11] 7/15 19/13 19/17 19/25 20/5 20/12 20/20 20/23 21/6 21/9 34/15
basically [4] 13/14 18/15 25/3 26/20
basis [5] 14/5 19/1 19/5 25/5 26/14
beautiful [1] 30/10
Beck [3] 3/9 37/4 37/19
become [1] 22/7
begins [1] 13/7
believe [6] 10/16 10/20 11/3 11/9 14/2 29/11
between [2] 3/2 8/23
BIA [1] 32/5
big [2] 28/13 34/4
biggest [1] 13/24
bit [1] 8/14
blizzard [2] 24/11 24/12
blizzards [1] 24/15
bogged [1] 13/20
Bogging [3] 13/15 13/18 13/19
Books [1] 34/24
border [1] 18/4
borders [1] 16/24
born [3] 4/12 4/13 18/13
borrowed [1] 25/6
bottom [5] 18/25 22/21 22/25 23/15 25/11
bottoms [10] 19/11 21/10 21/16 21/17 21/18 22/4 22/6 22/13 22/15 25/2
box [2] 1/17 9/14
briefly [1] 10/23
Briggses [1] 15/6
broke [1] 35/13
build [2] 34/21 34/22
built [1] 18/22
bunch [1] 10/24
burn [2] 28/10 34/22
burned [1] 28/17
bushes [1] 26/20
business [1] 7/22
Butte [2] 30/23 30/25
buy [1] 29/18

C

call [3] 17/20 26/9 29/7
called [1] 3/20
calving [2] 14/1 19/12
came [3] 5/25 12/10 29/22
Canada [1] 26/10
Canadian [3] 26/2 26/7 26/9
capacity [1] 32/6
carrying [1] 32/6
case [12] 5/19 5/23 9/12 10/12 10/14 10/21 10/22 10/25 12/12 14/25 15/3 19/3
cattle [14] 6/5 9/1 9/4 17/6 17/7 21/15 21/22 30/11 31/20 32/21 33/13 33/16 33/25 34/4
cattle -- [1] 32/21
cause [1] 13/12
caused [1] 14/7
causes [3] 13/8 28/7 34/9
cedar [1] 26/3
Center [1] 6/3
CERTIFICATE [1] 37/2
CERTIFY [2] 37/6 37/13
changed [1] 20/9
changes [1] 20/14
chased [1] 4/23
check [1] 30/3
CHEYENNE [20] 1/3 4/4 8/5 14/16 15/21 16/4 16/7 16/11 16/14 16/18 17/13 17/18 18/5 18/7 18/11 18/16 19/9 24/20 25/15 35/7
chief [1] 29/6
child [1] 4/18
chokecherries [3] 27/7 27/12 27/18
chokecherry [2] 26/14 26/22
City [2] 1/17 6/9
Civil [1] 3/14
claim [2] 17/4 31/24
CLAIMS [1] 1/1
clear [1] 18/20
clearly [1] 15/8
closed [1] 9/6
cocklebурs [1] 26/3
collected [1] 30/3
college [1] 5/25
combine [1] 32/23
comes [1] 6/13
coming [1] 30/3
commencing [1] 3/8
commodity [1] 22/16
compensated [1] 23/1
compensation [1] 23/6
complete [1] 6/21
computer [1] 5/11
concerned [1] 3/15
concerning [5] 7/2 18/6 18/9 26/1 33/3
conducted [1] 27/25
consideration [1] 37/9
considering [1] 33/2
contact [1] 11/6
contacted [3] 10/13 10/19 11/5
context [2] 6/4 30/21
control [2] 28/14 32/5
Cook [4] 1/19 2/3 2/20 35/12
copy [4] 5/13 6/24 12/20 12/21
cord [1] 26/3
Corps [2] 17/4 17/23
corrals [2] 34/22 35/2
corrals -- [1] 35/2
correct [11] 8/21 14/4 14/14 18/13 18/14 20/7 21/11 22/9 23/7 32/6 37/10
correctly [1] 25/1
cost [1] 30/7
counsel [4] 3/15 3/17 6/25 9/20
country [2] 30/10 32/16
COUNTY [1] 37/3
couple [1] 4/20
course [1] 5/14
COURT [1] 1/1
cover [1] 32/18
covered [2] 12/19 32/20
cow [2] 4/23 32/19
cows [8] 9/2 13/15 13/20 13/24 17/2 17/5 17/22 27/17
create [1] 22/5
created [1] 18/17
creation [1] 9/9

C

Creek [2] 21/17 21/20
creeks [2] 21/19 21/22
Crisman [1] 1/15
crow [1] 4/8
CSR [1] 37/21
currant [2] 26/14 26/22
currants [3] 27/7 27/11 27/17
cutting [3] 34/20 35/16 35/19

D

D.C [1] 1/21
dad [2] 27/13 30/13
Dakota [10] 1/9 1/17 3/7 3/11 4/5 21/2 21/3 21/7 37/1 37/5
Dam [2] 9/6 18/21
damage [1] 31/13
damaged [1] 32/14
Date [1] 37/20
dated [2] 9/22 10/5
Davenport [2] 1/9 3/6
day [2] 3/7 37/17
deceased [1] 30/17
December [5] 9/22 10/6 11/20 14/13 20/21
deeded [4] 8/13 8/16 17/16 17/17
Defendant [3] 1/7 1/22 3/18
department [2] 1/20 28/24
depends [1] 27/6
deposed [1] 3/20
deposition [15] 2/8 3/5 3/9 3/11 3/13 3/22 9/23 10/1 10/5 12/8 13/2 13/4 13/6 35/25 37/11
depositions [7] 9/11 9/13 14/10 14/12 20/6 20/13 26/16
depositions -- [1] 26/16
depression [1] 29/22
Diamond [3] 19/8 19/8 34/5
Diamond A [1] 34/5
Dick [1] 20/3
difference [1] 33/11
different [8] 5/17 7/22 27/22 31/9 31/9 31/15 31/18 31/19
directed [1] 12/13
Dirty [1] 32/16
disaster [1] 32/24
discovery [1] 3/11
discuss [2] 24/24 26/4
discussed [1] 26/13
discussing [1] 22/15
Division [1] 1/20
documents [2] 11/20 12/2
does [3] 13/11 19/10 26/10
doesn't [3] 6/24 18/4 32/18
doing [1] 5/1
doubt [1] 33/22
down [2] 33/24 34/20
dozen [1] 28/25
Dr [1] 1/24
draft [1] 32/19
Draw [1] 21/20
dropping [1] 8/14
drought [6] 31/13 32/16 32/23 33/1 34/13 35/18
drown [1] 23/14
dry [1] 28/18
Ducks [1] 6/17
duly [2] 3/20 37/6

E

e-mails [1] 11/9
Eagle [2] 30/23 30/24
easily [1] 32/23
easy [2] 15/9 15/10
eat [1] 27/19
ecosystem [3] 18/25 31/14 32/13
Edwina [1] 26/18
effect [1] 7/2
effectiveness [1] 34/12
effects [2] 7/7 7/17
either [2] 18/16 24/9
Eleven [1] 9/2
eminently [1] 7/1
Engineers [2] 17/5 17/23
enough [4] 12/23 29/4 30/4 33/18
entities [2] 7/22 16/6
environment [2] 1/20 6/4
environmental [1] 6/15
especially [1] 31/12
essentially [2] 20/5 20/19
et [1] 1/3
Evans [2] 1/9 3/6
events [4] 5/18 5/20 5/21 19/22
Evidence [1] 2/6
exact [1] 30/12
Examination [1] 2/2
example [1] 26/7
Excuse [1] 31/3
excused [1] 36/4
Exhibit [10] 2/7 2/9 2/11 3/22 9/24 10/1 10/5 13/3 13/4 13/6
EXHIBITS [1] 2/5
experience [4] 8/9 14/9 21/7 21/9
experienced [4] 16/15 16/20 26/21 28/20
experiences [2] 20/25 21/1
expert [4] 5/7 5/19 5/23 24/4
expertise [3] 7/15 26/1 26/5
Expiration [1] 37/20
explain [1] 5/20
extent [3] 15/1 34/7 35/7
extremely [1] 23/15

F

F-I-S-C-H-E-R [1] 15/14
fact [3] 23/13 26/25 27/22
factors [1] 34/15
fall [1] 10/15
Falls [2] 1/9 3/7
family [6] 7/21 7/23 7/24 7/25 19/6 29/14
family's [1] 6/14
far -- [1] 4/6
farming [1] 6/9
father [4] 8/2 19/18 30/18 34/24
February [4] 1/10 3/8 22/18 37/17
FEDERAL [1] 1/1
feedlot [1] 9/4
feel [1] 5/22
fence [1] 34/22
Ferguson [1] 6/8
figure [1] 8/20
filing [1] 3/17
finances [1] 6/5
financial [1] 6/9
fine [2] 9/16 9/21
fire [5] 28/19 28/24 29/3 29/6 35/18
firefighting [1] 29/9
fireplace [1] 34/22
fires [6] 27/24 27/24 27/25 28/17 28/21 34/12
first [23] 3/20 4/17 4/19 4/20 10/13 11/5 13/6 15/10 18/8 18/19 22/1 22/2 22/2 22/8 22/9 23/18 26/6 26/6 29/14 30/13 30/18 31/5 37/6
Fischers [1] 15/13
five [4] 9/3 14/19 20/8 31/23
flat [1] 16/24
flies [1] 4/8
flood [4] 20/8 23/13 23/19 23/20
flood -- [1] 23/19
flooding [10] 7/3 13/7 13/11 14/6 16/16 16/21 18/7 18/10 19/22 22/5
floods [3] 24/7 24/17 24/20
flow [1] 24/3
follows [1] 3/21
for -- [1] 19/1
foregoing [1] 37/9
forest [2] 29/9 29/10
forest -- [1] 29/9
forever [1] 20/8
form [2] 12/11 12/14
formed [1] 8/1
Foster [1] 21/20
fought [4] 28/9 28/11 29/2 34/12
four [3] 9/2 14/19 19/20
frequency [1] 19/21
frequent [1] 27/23
Friends [1] 6/18
from -- [1] 6/7
fruit-bearing [1] 26/20
full [6] 3/25 16/19 22/1 22/2 24/23 26/4
further [3] 11/6 35/23 37/13

G

garden [1] 5/4
gathering [1] 24/25
general [1] 15/17
generally [1] 8/23
gets [1] 29/4
getting [3] 13/20 27/3 27/11
gist [1] 24/25
given [3] 2/20 6/17 14/10
gone [1] 20/15
good [5] 12/23 13/1 27/4 27/5 27/9
Goodsell [1] 1/16
gotten [1] 17/22
gradually [1] 19/21
Grand [1] 25/18
grandfather [3] 19/18 29/13 30/16
grandma [2] 31/1 31/2
grandpa [3] 19/7 27/14 31/4
grass [2] 13/24 26/3
grasses [1] 13/15
graze [1] 17/12
grazing [13] 6/16 8/17 8/18 8/19 8/22 13/24 17/12 17/16 30/11 32/4 32/4 32/5 32/20
Gregg [1] 20/3
guess [11] 6/14 10/11 10/22 14/25 16/12 18/8 22/23 27/6 28/16 31/23 33/21
guessing [1] 14/20
Gunderson [1] 1/16
guy [1] 6/8
guy -- [1] 6/8

H

habitat [2] 13/14 13/23
hand [2] 29/3 37/16
handed [1] 10/7
happen [2] 10/9 30/24
happened [1] 32/3
happy [1] 25/10
harder [2] 28/12 28/14

H

haven't [1] 12/13
Hayes [1] 4/4
he'd [3] 30/1 30/4 30/23
He'll [1] 7/6
he's [4] 6/8 7/14 7/17 30/17
head [5] 9/1 9/2 9/3 32/21 32/21
healthy [1] 18/25
heck [1] 4/24
heifers [1] 9/3
help [1] 6/25
herd [1] 31/19
HEREBY [1] 37/6
hereinabove [1] 3/4
hereto [1] 37/16
hesitancy [1] 24/24
Hey [1] 13/1
high [1] 24/3
his [2] 6/10 6/25
history [4] 9/5 9/8 28/16 34/16
hoeing [1] 5/3
Holistic [1] 6/2
home [5] 5/11 17/21 32/7 32/11 33/12
homesteaded [1] 32/1
hope [1] 13/1
horses [2] 5/3 32/20
hour [1] 3/8
house [1] 34/25
however [1] 17/18
huh [1] 27/18
hundred [2] 9/2 9/3
hundreds [1] 34/6
Hurwitz [2] 1/9 3/6

I

I -- [1] 30/1
I'd [2] 6/14 10/4
idea [1] 33/7
identification [4] 2/6 3/23 10/2 13/5
identify [1] 26/5
imagine [1] 5/6
impacts [1] 7/17
impaired [4] 34/11 34/16 35/15 35/20
inability [1] 7/8
include [1] 17/15
included [2] 11/20 12/6
inclusive [1] 37/9
increased [1] 19/22
INDEX [2] 2/1 2/5
indicate [2] 11/1 11/11
indicated [2] 14/2 20/15
individual [4] 7/4 7/11 7/14 7/18
individuals [1] 16/6
indoctrination [1] 10/11
industry [1] 7/18
inferring [1] 23/5
information [8] 15/16 15/20 18/6 19/13 19/16 19/17 33/8 34/23
information -- [1] 33/8
initial [1] 34/25
initially [1] 32/1
Insofar [1] 3/15
instance [1] 23/25
intend [3] 19/2 19/23 20/10
intended [1] 7/14
intense [1] 33/22
interested [1] 37/15
interests [1] 34/4
invasion [1] 26/2
involved [10] 14/21 15/2 15/5 15/12 15/17 15/21 16/4 16/7 16/7 16/11
involving [1] 14/15
Iowa [1] 37/21
isn't [2] 18/24 25/7
issue [1] 23/9
issues [1] 7/14
it's -- [1] 16/18
item [1] 12/7
its [4] 7/8 13/10 13/13 18/23

J

Jane [2] 20/3 26/17
January [1] 22/17
JCP [1] 12/21
June [1] 37/20
Justice [1] 1/20

K

keep [1] 33/16
know -- [2] 15/4 15/13
knowing [1] 23/23
knowledge [8] 9/5 9/7 9/8 14/23 15/1 15/18 18/9 33/3

L

L-E-S-M-E-I-S-T-E-R [1] 15/11
lake [13] 16/17 16/17 16/19 17/20 18/1 21/13 22/5 24/13 24/15 24/18 24/21 25/9 25/9
land [17] 7/23 7/25 8/4 8/6 17/11 17/13 17/15 17/16 17/16 17/17 23/1 23/6 29/23 31/9 31/12 32/1 33/14
landowner [1] 7/22
landowners [7] 7/5 7/11 14/25 15/2 15/17 15/21 16/3
landscape [1] 22/14
last [4] 4/1 10/15 26/12 28/25
later [1] 23/12
learning [1] 10/12
lease [1] 34/5
leased [3] 8/25 17/16 34/4
leases [6] 8/18 8/19 8/22 17/12 32/5 32/11
leg [2] 30/1 30/7
length [1] 19/21
Lesmeister [1] 15/11
Lesmeisters [1] 15/5
less [1] 22/23
let's [3] 5/16 9/23 18/1
letter [12] 2/9 9/22 10/5 10/7 10/9 11/3 11/7 11/19 11/24 12/3 14/13 20/21
liberty [1] 21/24
liens [2] 29/18 29/20
life [5] 4/12 5/17 5/20 5/21 5/25
lightning [1] 28/5
like [10] 5/4 10/4 13/23 15/5 27/6 27/17 28/5 31/23 31/24 34/4
liked [1] 5/5
limited [3] 7/23 7/25 8/1
list [3] 5/6 6/21 9/15
listed [6] 11/23 12/2 12/4 12/5 12/8 14/12
litigated [1] 23/10
litigation [10] 14/15 14/21 14/23 15/22 16/4 16/8 16/12 19/23 20/10 23/8
little [1] 8/14
live [4] 14/11 16/17 17/9 31/22
lived [5] 14/11 19/6 20/14 31/10 31/21
lived -- [1] 14/11
lives [1] 31/2
livestock [3] 22/18 23/14 25/8
living [7] 13/9 13/13 14/9 18/23 30/21 30/23 30/24
loan [3] 24/25 25/7 25/10
located [3] 4/7 8/4 8/6
long [1] 4/11
longer [1] 25/1
looked [1] 11/23
Looking [1] 13/6
losing [1] 29/23
loss [10] 13/14 13/14 13/15 13/23 13/23 13/24 14/7 26/13 26/20 26/21
lost [6] 17/2 22/3 22/12 22/20 22/24 30/1
lot [7] 5/3 5/4 27/16 27/21 27/21 31/11 34/3
Lyle [1] 20/2

M

M-O-R-T-E-N-S-O-N [1] 4/2
mail [1] 10/10
maintained [1] 29/9
Majority [1] 20/22
makes [1] 23/14
making [2] 8/15 29/7
man [1] 28/24
management [4] 6/1 6/2 6/4 6/16
many [6] 8/12 8/22 9/1 17/22 28/23 32/18
map [1] 32/11
March [2] 4/14 22/18
mark [4] 9/19 9/23 12/20 12/22
marked [5] 2/6 3/22 10/1 10/4 13/4
Mary [2] 20/3 26/17
material [1] 10/24
materials [1] 20/20
matter [2] 26/25 37/8
mean [8] 5/21 12/18 22/8 22/11 27/2 27/6 28/17 34/9
mean -- [1] 22/8
meaning [1] 22/25
memory [1] 4/17
mention [1] 6/14
mentioned [1] 34/13
Merit [2] 3/9 37/4
Mexico [1] 6/3
might [2] 12/4 33/9
miles [1] 4/8
milk [1] 32/19
mind [1] 6/13
MINNEHAHA [1] 37/3
Missouri [5] 22/4 22/12 22/20 22/22 22/24
moment [1] 35/10
money [7] 17/5 17/22 24/25 25/6 25/7 25/10 30/4
monthly [1] 30/2
Moreau [22] 4/7 8/6 8/10 9/6 9/9 10/12 13/8 13/12 14/3 14/6 14/11 18/16 20/9 22/6 22/15 23/20 24/17 25/21 33/4 33/19 33/25 35/6
MORTENSON [13] 1/13 2/8 2/10 3/5 3/19 3/22 4/2 7/21 7/23 7/24 7/25 10/1 13/4
Mortensons's [1] 2/11
most [1] 26/19
Mother [1] 28/1
Mowrer [2] 20/3 26/18
Mowrer -- [1] 26/18
Mr [2] 1/15 2/9
Ms [7] 1/16 1/19 2/3 2/10 2/20 11/11 35/12
Ms. [1] 10/10
Ms. Varns [1] 10/10
mud [5] 13/20 13/21 16/24 17/1 17/2

M

must [1] 17/19
my -- [1] 33/21

N

N.W [1] 1/21
name [3] 3/25 6/8 7/20
names [1] 15/7
native [1] 26/13
natural [3] 1/20 28/7 34/11
naturally-caused [1] 28/20
Nature [1] 28/1
NCBA [1] 6/19
near [1] 4/4
necessarily [1] 33/14
need [3] 9/15 9/17 34/18
needed [2] 18/24 34/21
neighbors [1] 15/23
Nelson [1] 1/16
never [2] 14/3 16/12
New [1] 6/3
Nineteen [1] 4/15
no -- [1] 9/7
None [1] 8/11
Nope [1] 23/11
normal [1] 33/2
Norman [1] 12/8
Norman's [1] 12/5
Norman's -- [1] 12/5
Notary [3] 3/10 37/5 37/19
noted [1] 3/4
notes [1] 37/10
nothing [2] 6/13 37/8
notice [3] 2/7 3/14 3/17
noticed [1] 26/19
November [2] 10/16 11/6
nowadays [1] 29/2
noxious [5] 25/14 25/17 25/20 25/23 26/2
number [5] 6/1 6/6 18/20 20/16 37/21
numbering [1] 21/24
numerous [2] 6/14 13/8

O

Oahe [18] 9/6 9/9 16/17 16/18 16/19 17/20 18/17 18/21 21/13 22/5 23/1 23/7 24/13 24/15 24/18 24/21 25/9 25/10
Oahe -- [2] 16/17 25/9
Obviously [2] 5/24 31/1
occasions [1] 28/23
occupation [1] 4/9
occur [1] 23/13
occurring [1] 33/4
October [2] 10/15 11/5
of -- [2] 10/11 27/21
Offered [1] 2/6
offhand [1] 6/13
offices [1] 3/6
official [1] 37/17
oh [7] 4/8 5/2 6/7 18/1 27/13 28/24 34/21
Oklahoma [1] 6/8
old [1] 31/2
ones [1] 12/2
operation [1] 11/17
opinion [13] 10/25 12/14 12/15 12/17 13/25 14/5 19/5 19/13 19/22 19/25 20/9 20/12 25/5
opinions [4] 12/11 19/2 20/19 20/23
opposed [2] 7/4 7/18
opposite [1] 27/1
or -- [1] 30/22
Oral [1] 2/7
orally [1] 5/16
organizations [1] 6/19
original [3] 2/20 3/17 9/19
other [14] 6/18 7/4 8/17 12/2 16/3 19/16 19/17 20/2 23/22 32/9 34/9 34/15 35/14 35/17
Otherwise [1] 22/19
our [5] 16/24 26/23 31/8 32/16 33/22
outcome [1] 37/15
outline [1] 10/22
over [5] 5/16 6/1 10/24 23/8 31/9
overall [1] 20/18
overgraze [1] 32/22
overgrazed [1] 27/15
overgrazing [5] 31/6 32/14 33/4 34/14 35/19
owner [1] 31/19
ownership [1] 31/10

P

p.m [2] 1/10 3/8
P.O [1] 1/17
page [6] 22/1 22/2 22/3 24/24 26/4 26/12
pages [2] 21/25 37/9
paid [3] 14/25 23/6 29/25
Palmer [2] 1/15 1/16
Pam [2] 10/20 10/20
Pamela [2] 1/16 2/10
paragraph [12] 18/19 21/8 21/9 22/1 22/3 23/12 24/23 24/24 25/1 25/3 26/4 26/12
paragraph -- [1] 24/23
part [3] 10/10 10/11 10/12
particular [1] 6/16
particularly [1] 22/16
parties [2] 3/3 37/14
partnership [3] 7/23 7/25 8/1
Pat [4] 3/9 36/1 37/4 37/19
Paul [1] 1/24
pay [1] 29/20
payment [1] 30/4
people [4] 20/14 29/23 31/10 34/20
per [1] 32/17
perhaps [1] 6/25
period [1] 33/11
periods [1] 24/3
place [7] 3/6 17/21 22/19 29/17 31/8 32/7 32/11
plaintiff [1] 7/5
plaintiffs [3] 1/4 1/18 20/2
plants [1] 26/13
played [1] 27/22
please [2] 3/25 5/17
plum [3] 26/13 26/22 27/11
plums [2] 27/6 27/17
Plus [1] 8/17
pool [1] 16/19
portion [1] 16/18
possibility [2] 11/4 34/14
present [2] 1/24 11/12
presenting [1] 11/15
pressure [1] 31/12
pretty [3] 4/22 32/20 32/22
prior [6] 24/12 24/15 24/17 24/20 25/9 25/9
probably [10] 4/8 5/2 18/1 18/2 18/2 23/22 26/8 27/13 27/21 28/25
probably -- [1] 18/1
problem [6] 13/16 14/7 25/14 25/17 25/20 25/23
problems [8] 13/9 13/11 16/15 16/20 16/23 18/6 18/9 21/21
Procedure [1] 3/14
property [4] 7/7 16/21 17/19 18/4
protection [9] 18/25 19/12 22/4 22/5 22/12 22/17 23/15 25/8 25/12
prove [2] 31/22 31/24
provide [2] 6/21 25/8
provided [3] 9/12 9/13 20/20
providing [1] 10/14
Public [3] 3/10 37/5 37/19
purpose [1] 3/11
purposes [2] 3/12 35/16
pursuant [2] 3/14 17/12
put [4] 30/5 31/12 32/10 32/10
puts [3] 6/3 6/5 6/9
putting [1] 29/17

Q

qualified [2] 5/22 7/2
qualify [1] 5/18
quarter [6] 29/20 30/5 31/15 31/18 32/19 32/22
quarters [1] 31/9
question [3] 7/8 20/19 33/8
questions [2] 35/12 35/23

R

ran [2] 17/6 19/7
ranch [27] 4/4 4/12 5/1 6/1 6/4 6/16 7/16 7/20 7/21 8/12 16/7 16/14 16/24 19/6 19/8 21/10 21/19 26/23 26/24 27/14 29/14 30/5 30/8 30/14 30/19 33/23 34/25
ranched [1] 14/3
rancher [3] 4/10 4/11 5/24
ranchers [7] 13/9 13/13 14/7 14/10 18/6 18/10 33/24
ranches [3] 7/3 7/19 11/18
ranching [7] 4/17 6/10 8/9 11/17 20/25 21/1 21/7
Rapid [2] 1/17 29/12
reaches [1] 24/1
read [4] 9/11 12/14 20/5 35/24
reading [2] 3/15 20/13
reads [1] 20/8
realize [1] 32/15
really [5] 4/24 9/7 14/24 16/19 21/9
reason [1] 35/17
reasons [2] 34/10 35/14
recall [3] 11/8 11/8 15/12
receive [1] 10/9
received [3] 11/7 11/19 12/1
recess [1] 35/11
recipe [1] 32/24
recommend [1] 36/1
record [4] 3/3 9/15 15/8 18/21
records [1] 33/11
recover [1] 17/5
reference [1] 31/6
regard [3] 6/11 10/13 27/4
regarded [1] 25/11
regarding [1] 7/6
Region [1] 6/19
Registered [2] 3/9 37/4
reimbursed [1] 17/7
reimbursement [1] 17/9
related [1] 37/14
relation [1] 4/7
relative [3] 7/8 7/9 37/8

R

reliable [2] 13/25 25/2
reliance [1] 19/20
rely [3] 18/24 23/15 35/25
remember [3] 16/3 18/15 26/17
report [8] 2/11 12/18 13/7 18/19 20/17 20/20 21/6 21/25
report -- [1] 18/19
Reporter [2] 3/10 37/4
request [1] 5/13
Research [1] 6/2
reservation [11] 17/6 17/8 17/11 17/14 17/15 17/17 19/9 28/2 32/8 33/15 34/3
Reservoir [4] 9/10 18/17 23/2 23/7
reside [1] 4/3
resolve [1] 20/18
Resources [1] 1/20
responsible [1] 29/6
result [1] 24/7
resume [4] 5/6 5/16 6/25 32/10
reviewing [1] 11/22
riding [1] 5/3
right [7] 6/13 17/13 17/17 30/14 33/2 33/25 35/24
riparian [2] 21/12 21/13
risky [1] 23/15
river [60]
room [1] 8/15
Roy [1] 6/8
rule [1] 32/16
Rules [1] 3/13
run [2] 7/21 9/1
running [2] 7/16 33/24
Russell [1] 4/2

S

safe [1] 12/24
salt [1] 26/3
saved [1] 30/4
saw [3] 30/13 30/18 31/5
say [3] 13/23 31/24 34/18
saying [1] 25/3
says [4] 11/3 12/21 18/23 30/18
scariest [1] 4/22
Schwartz [1] 1/24
seal [1] 37/17
second [3] 21/8 22/1 24/23
sections [2] 31/15 31/18
sediment [1] 16/25
sedimentation [9] 7/3 7/7 13/8 13/12 14/6 16/15 16/21 18/7 18/10
seems [1] 15/5
seen [1] 7/17
seminar [1] 6/7
seminars [4] 6/2 6/6 6/9 6/10
send [1] 29/4
sending [1] 10/23
sends [1] 29/5
sentence [5] 18/21 19/20 20/8 22/2 22/9
sentences [1] 18/20
separate [1] 12/10
Service [1] 29/10
settle [1] 29/14
settled [1] 35/6
seven [2] 5/2 6/19
several [3] 5/12 6/10 7/21
shelter [7] 13/14 13/25 13/25 14/7 21/15 25/2 34/21
sheltering [1] 21/21
shortly [2] 27/13 35/13
show [2] 10/4 21/5
side [4] 17/6 17/8 17/8 17/11
sign [1] 35/25
signing [1] 3/16
similar [1] 33/4
since [5] 6/24 9/9 11/16 18/4 19/7
SIOUX [4] 1/3 1/9 3/7 17/14
situation [1] 33/16
six [3] 5/2 18/2 26/8
sixteen [3] 8/13 8/16 8/24
sixty-one [1] 4/16
small [1] 4/24
Smith [2] 1/9 3/7
Snyder-Varns [3] 1/16 2/10 11/11
someone [1] 7/15
something [5] 7/10 20/23 20/24 24/8 31/23
sometimes [1] 23/21
somewhere [1] 30/22
soon [1] 32/20
sorry [4] 8/14 13/17 23/4 29/19
source [4] 15/16 15/20 18/5 34/23
South [10] 1/9 1/17 3/7 3/10 4/5 21/2 21/3 21/7 37/1 37/5
specifically [2] 13/11 21/5
spell [2] 4/1 15/7
sprayers [1] 29/3
spring [4] 22/18 24/5 24/7 33/12
SS [1] 37/2
start [6] 4/22 4/25 5/1 27/11 28/19 30/10
started [4] 5/3 5/3 11/22 29/17
state [5] 3/10 19/20 33/10 37/1 37/5
statement [6] 13/7 19/10 19/17 22/11 23/13 23/16
statement -- [1] 13/7
statements [3] 20/16 21/6 26/15
states [4] 1/1 1/6 1/20 22/3
stationed [1] 29/12
stayed [2] 31/25 33/14
stenotype [1] 37/10
Stewardship [1] 6/20
still [3] 23/8 30/8 30/16
stipulated [1] 3/2
Street [1] 1/21
strike [1] 19/1
stuck [1] 13/20
study [1] 12/15
stuff [2] 12/15 27/16
subsequently [1] 12/1
subsequently -- [1] 12/1
such [2] 26/2 26/13
sudden [2] 23/13 23/25
suggest [1] 22/25
summer [1] 24/6
support [1] 19/10
supports [1] 5/7
suppose [1] 28/17
supposed [1] 31/22
Susan [2] 1/19 2/20
sworn [2] 3/20 37/7

T

takelines [1] 17/20
taken [6] 3/5 3/9 3/11 3/13 3/14 35/11
talked [3] 34/10 35/15 35/18
talking [1] 31/16
talks [1] 30/13
tankers [3] 29/4 29/5 29/8
tax [2] 29/18 29/20
taxes [1] 29/25
technically [1] 16/17
technology [1] 28/12
tell [10] 5/17 9/5 10/21 14/19 15/4 19/25 23/18 29/13 31/7 36/2
ten [2] 32/21 32/21
terms [1] 32/3
testify [11] 5/18 5/22 7/2 7/14 11/2 11/4 12/12 19/2 19/23 20/10 37/7
testifying [4] 7/6 7/12 7/13 7/16
testimony [6] 5/8 10/14 11/12 11/15 20/2 37/16
Thank [2] 10/3 35/22
there -- [1] 18/24
these [3] 22/21 22/21 28/2
these -- [1] 22/21
they -- [1] 12/13
they'll [1] 29/4
they've [4] 15/24 19/14 20/15 20/15
third [1] 26/4
Thirty-six [1] 31/18
thistle [3] 26/2 26/7 26/9
those [10] 6/6 12/19 14/12 15/7 16/23 17/5 18/22 19/11 26/15 31/10
those -- [1] 12/19
though [1] 14/20
thousand [3] 8/13 8/16 8/24
thousands [1] 34/6
three [2] 18/21 34/10
through [7] 3/3 9/11 20/15 20/17 28/18 29/22 30/3
throughout [1] 28/16
thumb [1] 32/17
thunderstorm [4] 23/25 24/8 24/10 28/18
thunderstorms [1] 24/12
time [14] 3/5 11/1 18/22 23/14 23/19 28/17 29/21 30/13 30/18 31/4 31/11 31/21 34/6 37/11
times [2] 23/22 24/2
today [1] 34/13
today's [1] 28/12
TODD [8] 1/13 2/8 2/9 2/11 3/5 3/19 4/2 35/24
Todd's [1] 21/20
together [5] 6/5 29/17 30/6 32/10 32/11
told [4] 12/14 15/24 19/14 19/18
Tom [2] 12/5 12/8
took [1] 5/25
topics [2] 11/12 11/15
totally [1] 25/10
Track [1] 34/5
transcript [3] 2/20 3/16 37/10
trees [2] 34/18 34/20
trees -- [1] 34/18
trial [1] 3/12
tribe [2] 1/3 33/10
tributaries [1] 22/21
trucks [1] 29/3
true [1] 37/10
truth [3] 37/7 37/7 37/8
trying [2] 13/9 13/13
Turkey [1] 34/5
turn [1] 21/25
twenty-five [1] 8/24

U

U.S [1] 29/9
Uh-huh [6] 21/4 22/10 27/10 30/20 31/17 35/5
uncontrolled [1] 27/24
underneath [2] 23/1 23/7
understanding [1] 11/14
unit [1] 32/17

U

UNITED [3] 1/1 1/6 1/20
units [4] 29/9 32/18 32/21 32/22
unless [1] 25/7
Unlimited [1] 6/17
upon [2] 21/9 23/15
upper [1] 23/25
usable [1] 13/15
used [3] 19/11 27/23 34/19
useful [2] 32/9 32/13
using [1] 22/24

V

valuable [3] 22/7 22/16 22/22
Van [2] 12/5 12/8
varies [1] 8/23
various [2] 7/4 35/16
Varns [2] 10/10 10/20
vegetation [5] 34/10 34/17 35/14 35/17 35/19
verify [1] 10/6
very [3] 12/19 32/18 35/22
volunteer [1] 28/24

W

waive [2] 36/2 36/3
waived [1] 3/16
waned [1] 19/21
wanted [3] 10/24 11/2 30/8
War [1] 30/1
was -- [4] 11/10 31/8 34/3 34/19
Washington [1] 1/21
water [4] 33/12 33/12 33/16 33/18
we've [3] 6/15 21/12 35/18
weeds [5] 25/14 25/17 25/20 25/23 26/2
well [14] 11/16 12/19 13/23 16/24 19/11 19/19 21/8 22/14 25/6 27/21 28/11 31/8 32/15 33/25
Were -- [1] 16/6
weren't [6] 16/11 23/1 27/20 27/23 28/9 34/12
what's [4] 4/17 10/4 15/16 34/23
whether [3] 26/17 26/18 33/3
White [1] 25/24
whole [2] 21/8 37/7
whose [1] 3/4
wife [1] 5/12
Wildlife [2] 6/17 6/18
wind [1] 22/20
winner [1] 6/20
winter [1] 24/2
wintertime [2] 19/12 22/17
wished [1] 11/12
witness [8] 2/1 3/16 3/20 7/1 11/2 36/4 37/6 37/12
won [1] 6/14
wood [6] 34/18 34/19 34/25 35/4 35/16 35/19
wood -- [1] 35/19
word [1] 22/24
work [3] 5/1 6/15 12/21
working [1] 31/4
World [1] 30/1
wouldn't [1] 7/11
write [1] 12/24
written [1] 3/14

Y

yeah [13] 12/14 13/20 15/25 16/2 16/22 17/21 24/19 24/22 29/11 29/24 30/8 30/23 34/21
year [5] 10/15 24/3 28/25 30/12 33/2
yearling [1] 9/3
years [8] 4/20 5/12 14/19 18/2 26/8 31/2 31/23 34/1
yet [1] 32/4
you -- [3] 15/19 15/24 18/8
you're [7] 5/22 12/24 17/10 22/25 25/3 31/13 34/15
you've [5] 5/18 8/14 20/5 32/20 34/10
young [1] 4/22
yourself [3] 14/2 26/21 28/20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEYENNE RIVER SIOUX TRIBE, et al, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 03-600 |
| | ) | Hon. Chief Judge Edward J. Damich |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF TAKING ORAL DEPOSITION**
**OF TODD MORTENSON**

Pursuant to RCFC 26(b) and 30, Defendant will depose Todd Mortenson before a notary public or other officer authorized to administer oaths at the offices of Davenport, Evans, Hurwitz & Smith, L.L.P. located at 206 West 14th Street, Sioux Falls, SD 57101-1030, on **Wednesday, February 14th, 2007, beginning at 1:30 pm.**

Pursuant to RCFC 30(b)(5) and 34, the deponent is requested to bring the following documents, if in their possession, custody or control:

EXHIBIT
# 1
Mortenson
2-14-07 GdB
PENGAD 800-631-6989

1. All correspondence or documents exchanged (including electronic) between the deponent and any individual currently serving or previously serving under an expert contract for purposes if this case (i.e, an "expert witness"). This document request is meant to include any correspondence or other documents exchanged between the deponent and any individual associated with such expert witness.

2. All notes taken by the deponent regarding any meetings, discussions, or interviews with any such expert witness, or any individual associated with such expert witness, that were made in relation to this case.

3. All documents that the deponent reviewed in preparation for the above-noticed deposition.

UNITED STATES OF AMERICA

Matthew McKeown
Assistant Attorney General
Environment and Natural Resources Division

SUSAN V. COOK
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P. O. Box 663
Washington, DC 20044-0663
Phone: (202) 305-0470
Fax: (202) 305-0274

Dated: February 5, 2007

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the foregoing Notice of Deposition to be served upon counsel for Plaintiffs by facsimile and first class mail, postage prepaid, this 5th day of February of 2007, to:

Pamela Snyder-Varns
*Gunderson, Palmer, Goodsell & Nelson, LLP*
Assurant Building
440 Mt. Rushmore Road
Rapid City, SD 57709-8045

Felecia Lesesne
Felecia Lesesne

**GUNDERSON, PALMER, GOODSELL & NELSON, LLP**

ATTORNEYS AT LAW

J. CRISMAN PALMER
G. VERNE GOODSELL
JAMES S. NELSON
DANIEL E. ASHMORE
TERENCE R. QUINN
DONALD P. KNUDSEN
PATRICK G. GOETZINGER
TALBOT J. WIECZOREK
MARK J. CONNOT
JENNIFER K. TRUCANO
DAVID E. LUST

ASSURANT BUILDING
440 MT. RUSHMORE ROAD
POST OFFICE BOX 8045
RAPID CITY, SOUTH DAKOTA 57709-8045

TELEPHONE (605) 342-1078 • FAX (605) 342-0480
www.gundersonpalmer.com
ATTORNEYS LICENSED TO PRACTICE IN
SOUTH DAKOTA, NORTH DAKOTA, IOWA, NEBRASKA
COLORADO, MONTANA, WYOMING & MINNESOTA

THOMAS E. SIMMONS
TERRI LEE WILLIAMS
PAMELA SNYDER-VARNS
SARA FRANKENSTEIN
AMY K. KOENIG
JASON M. SMILEY
SHANE C. PENFIELD
JONATHAN M. OOSTRA
MATTHEW E. NAASZ

WYNN A. GUNDERSON
*Of Counsel*

*Writer's Email Address:*
*psnyder-varns@gpgnlaw.com*

December 4, 2006

Mr. Todd Mortenson
2510 Foster Bay Rd.
Hayes, SD 57537

EXHIBIT
#2
Mortenson
2-14-07 BJB
PENGAD 800-631-6989

RE: Cheyenne River Sioux Tribe, et al. v. United States of America
Civil No. 03-600-L
GPGN File No. 6389.050390

Dear Todd:

By way of follow-up to our telephone conversation today, I am enclosing information pertinent to the above referenced action, which I am asking you to review, including:

1. Plaintiff's statements, October 2002;

2. Representative parcel ownership documentation;

3. Grazing permits;

4. Discovery responses with attached indices of defendant's production;

5. Depositions of the following individuals:

   a. Lyle Anderson (Representative parcel A);
   b. Mary Jane Anderson (Representative parcel A);
   c. Dick Anderson (Representative parcel A);
   d. Lawrence, Charlotte (Representative parcel A0;
   e. Lawrence, Pat (Representative parcel A);
   f. Bob Smith (Representative parcel B);
   g. Vivian Smith (Representative parcel B);
   h. Tom Smith (Representative parcel B);
   i. Edwina Mowrer (Representative parcel C);
   j. Gregg Mowrer (Representative parcel C);
   k. Tom Traversie (CRST);

GUNDERSON, PALMER, GOODSELL & NELSON, LLP



l. Rousseau, Dennis (Tribal witness);
m. Tom Van Norman (CRST);
n. Dave Nelson (CRST);
o. Wayne Ducheneaux (CRST Housing Authority);
p. Eric Stasch (Corp of Engineer fact witness – Oahe Project);
q. John Remus (Corp of Engineer fact witness);
r. John Garrison (Corp of Engineer fact witness); and
s. Jeff McClenathan (Corp of Engineer fact witness).

6. Expert reports (plaintiffs' and defendant's).

In all matters connected with your evaluation and any communications between us, you are to consider yourself as a direct consultant to me, Cris Palmer, Tracey Fischer and/or Frank Brost. All of your evaluation results, documents, communications, and procedures should be considered privileged through the attorney work-product privilege until advised by me to the contrary. You are also not to offer yourself or permit yourself to serve as a consultant or expert witness for any other party in any litigation involving these parties. In conducting your evaluation, you are to make inquiries of persons as you may select.

Upon completion of your evaluation, please contact me regarding your opinions. I will then make a determination on whether I want you to prepare a report. I wish to make it clear in this request that I do not seek, in any fashion, to predetermine your opinion, just as I do not wish to limit the scope of your evaluation.

If you need additional documentation, please do not hesitate to contact me. After you have reviewed the enclosed materials, please give me a call to discuss.

Thank you for your assistance in this matter, Todd.

Sincerely yours,

Pamela Snyder-Varns

Pamela Snyder-Varns

PSV:bmp
Enclosures
cc: Ms. Tracy Fisher
Mr. Frank Brost

JCP Work Co

# The Changing Moreau River: Sedimentation and Flooding Impacts on Area Ranches

EXHIBIT #3 Mortenson 2-14-07 PENGAD 800-631-6989

## By Todd R. Mortenson

Flooding and sedimentation along the Moreau River causes numerous problems to ranchers trying to make a living along its banks. The loss of reliable winter and spring storm protection, loss of valuable forage production that has been gradually buried in silt and was finished off by the 1997 flood, and the loss of the animals themselves in floods and bogs has turned the Moreau River from an asset to a liability. Before the Oahe Dam was built and for a time afterward, those that made a living along its banks it could rely on the protection of a healthy river bottom ecosystem. That reliance has gradually waned as the frequency and length of flooding events increased . The flood of 1997 forever changed the Moreau River. More importantly, it changed the way people along its banks lived and operated their ranches.

The greatest impact to these ranching operations is the loss of the shelter provided by river bottoms. In a cow-calf operation, in particular, it is necessary to have shelter that cattle can rely on to protect themselves from the elements. Today, as an example, the temperature is four degrees above zero, with a 20-25 mile per hour northwest wind, making the wind chill factor –15 degrees Fahrenheit, a 19-degree difference. The cow that can get into the shelter of a healthy river bottom ecosystem and be protected by the trees and bushes has a lot better chance at survival than the cow that has no protection and must stand out in the open.

This habitat becomes even more critical when the cows are calving. Newborn calves are particularly vulnerable to the elements. Being born on a river bottom protected by trees and grass as opposed to open prairie with no protection can be the difference between a live calf (profit) and a frozen carcass (loss). Better protection means less stress on the cow, less feed required to maintain her, less stress on her calf, less sickness and more weight to sell in the fall. A calf born on a mat of grass protected from the wind by a stand of cottonwood trees on a river bottom has a good shot at survival in a blizzard. That same calf born in the muddy silt on the Moreau River bottom will certainly chill down and most would not survive without human intervention.

Loss of reliable river bottom habitat has caused these ranchers to calve cows later, run fewer cows, and suffer more weather-related livestock losses. All of these factors contribute to less weight to sell in the fall and lower profits. Ranchers have had to spend money on barns, windbreaks, and water development, all as a result of the degradation of the bottomlands. It has split the ranches in two. Where once you could easily cross the river, now you have to drive miles around to get to the other side. Some operations have

had to hire expensive equipment to come in and clean silt out of the crossings. All of these things are costs that negatively impact a cash flow.

Having already lost the protection of the Missouri River bottoms to flooding to create Lake Oahe, the protection afforded by the Moreau River bottoms has become even more valuable. In a landscape largely devoid of trees, these river bottoms are relied upon by animals both domestic and wild as a source of protection from the elements. No amount of manmade barns or windbreaks can replace these bottoms as protection in a blizzard. The fact that a sudden flood could occur at any time and drown livestock makes the river bottom extremely risky to rely upon for protection. As many ranchers found out in 1997, it is not a risk worth taking.

Now I understand that the river bottom is still there, but as a reliable shelter in a spring blizzard, it is of little use. Say you have 100 cows, worth $1,000 a head. Are you going to allow those cows to use the river bottom as protection, knowing it might flood and you could lose $100,000, putting you out of business? Now imagine you are Lyle Anderson, asking the bank for a loan to buy some more cows. The bank will be more than a little hesitant to loan him the money, knowing the risks involved in ranching without adequate, reliable protection for the animals.

The loss of native forage on the Moreau River bottoms is another economic loss to the ranchers along its banks. Not only did flooding and siltation make the bottoms too rough and strewn with rubble to hay, but also the grasses, legumes and forbs themselves were drowned out and buried in silt. These areas are now covered in lesser quality plants that cattle cannot utilize, such as the noxious weed Canadian thistle, salt cedar, willows, cord grass, and cockleburs, which are toxic in certain stages of development. This change in the plant community has also made it harder to herd cattle that are on the bottoms as it much more difficult to get around. The thick tangle of weeds and willows combined with the debris left by the 1997 flood has made even getting around horseback to move cattle difficult. If the cattle are "sheltered up" during a storm, moving them would be next to impossible.

When these bottoms are used, mainly in December and January, cattle have to be fed expensive hay and supplements, as there is not enough desirable forage to sustain them. Hay that was once produced on the bottoms must now be shipped in, doubling or tripling the cost to the ranchers. Purchased hay is often of lesser quality than the native hay that was produced on the bottoms prior to the flooding in 1997. Unless the purchased hay is of the same type of grass that the cow is used to eating, she will waste a lot, again increasing the cost.

The flooding and siltation that has occurred have negatively impacted each rancher living along the Moreau River. For some, it has been a loss of native plants, such as plum, currant and chokecherry that they notice the most. For others, it has altered the way they do businesses. It has made livestock production a much riskier, and more labor intensive venture. It is much riskier for several reasons. Since the 1997 flood, overhead costs have gone up as a result of the degradation of the Moreau River bottoms. Feed, labor, fuel, and

water expenses, just to name a few, have all increased squeezing already tight profit margins further. Two, the increased frequency of flooding on the Moreau River since the Oahe Dam was built, and the 1997 flood in particular, has forced the ranchers along the bottoms to totally abandon them when they need the protection the most, which is during calving in the late winter and early spring months.
The risk of disease outbreaks, especially scours in young calves, is much greater when you confine the cows and calves in a barn or around a windbreak lot as opposed to letting them scatter out and calve in the natural protection of a river bottom. This also gets to the reasons why it is more labor intensive. Cows calving out on the bottoms seldom needed to be handled. They calved on their own and were fine. Moving up off the bottoms to avoid the flooding causes the cows to be handled numerous times. In a storm, they would need to brought in to shelter. They need to be fed. They need to be watched constantly for calving activity. If calving, they would be separated from the rest of the herd and put in a pen in a barn so the cow and calf would bond and you could be sure the calf got adequate colostrum. Once that has happened the cow – calf pair would be kicked out and the pen would need to be cleaned and readied for the next pair. As you can see, very labor intensive. Dangerous as well in that often cows get agitated before calving and the more they are handled the more agitated they become. Once they calve anything that is a threat to their calf they will attempt to run off. If they catch you they will bludgeon you with their head and attempt to stomp you to death.

The changes on the Moreau River since the Oahe Dam was built until 1997 were subtle. The changes since the flood of 1997 until now have been dramatic . The changes to the landscape are the most obvious. What is not so obvious is the changes that have occurred on the ranches and to the ranchers that have relied on the Moreau River for their livelihood. They have all had to change their operations. None are better off now than before 1997.