**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CHEYENNE RIVER SIOUX TRIBE, et al.,** | ) | |
| **Plaintiffs,** | ) | **No. 03-600 L** |
| **v.** | ) | **Chief Judge Edward J. Damich** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION IN LIMINE**
**TO EXCLUDE, IN PART, TESTIMONY OF**
**PLAINTIFFS' EXPERT VERNON SCHAEFER**
**AND SUPPORTING MEMORANDUM**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MOTION IN LIMINE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. THE PRELIMINARY NATURE OF THE REPORTS . . . . . . . . . . . . . . . . 3

B. LIMITATIONS OF THE HYDRAULIC REPORT . . . . . . . . . . . . . . . . . . 4

C. LIMITATIONS OF THE SEDIMENTATION REPORT . . . . . . . . . . . . . 6

III LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A. MOTIONS *IN LIMINE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. FEDERAL RULE OF EVIDENCE 702 AND THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE* MANDATE EXCLUSION OF EXPERT TESTIMONY THAT IS NOT RELIABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1. Federal Rule of Evidence 702 Requires that, to Be Admissible, Expert Witness Opinions Must be Both Reliable and Relevant . . 8

2. The Proponent of Expert Testimony Must Establish that the Expert's Opinions Are Reliable . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV. THE COURT MUST EXCLUDE THE OPINION AND TESTIMONY OF PLAINTIFFS' EXPERT VERNON SCHAEFER TO THE EXTENT IT IS BASED UPON FLAWED DATA AND REPORTS . . . . . . . . . . . . . . . . . . . . . . 10

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Indiana Bell Tel. Co.*,
2 F.Supp.2d 1077 (S.D. Ind. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Andrade Garcia v. Columbia Med. Ctr. of Sherman*,
996 F. Supp. 617 (E.D. Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Baskett v. United States*,
2 Cl. Ct. 356 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Bourjaily v. United States*,
483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-13

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kerrigan v. Maxon Indus.*,
223 F. Supp. 2d 626 (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-12

*Libas, Ltd. v. United States*,
193 F.3d 1361 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lithuanian Commerce Corp. v. Sara Lee Hosiery*,
179 F.R.D. 450 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Masters v. Hesston Corp.*,
291 F.3d 985 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*O'Conner v. Commonwealth Edison Co.*,
13 F.3d 1090 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Palmerin v. City of Riverside*,
794 F.2d 1409 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ralston v. Smith & Nephew Richards, Inc.*,
275 F.3d 965 (10th Cir. 2001) . . . . . . . . . . 9

*Terran v. Sec'y. of Health & Human Services*,
195 F.3d 1302 (Fed. Cir. 1999) . . . . . . . . . . 8

*White Mountain Apache Tribe v. United States*,
10 Cl. Ct. 115 (1986) . . . . . . . . . . 7

**FEDERAL RULES**

Fed. R. Evid. 702 . . . . . . . . . . 1, 8-13

Fed. R. Evid. 702(1) . . . . . . . . . . 11

Fed. R. Civ. P. 16. . . . . . . . . . . 7

**DEFENDANT'S MOTION IN LIMINE**
**TO EXCLUDE, IN PART, TESTIMONY OF**
**PLAINTIFFS' EXPERT VERNON SCHAEFER**

Pursuant to the Rules of the United States Court of Federal Claims, and the Court's September 11, 2007 Revised Trial Preparation Order, the United States respectfully seeks an order, in limine, to exclude the testimony of Plaintiffs' expert, Vernon Schaefer, to the extent that his testimony relates to or is based upon two reports prepared by staff members of the United States Army Corps of Engineers. The United States also seeks an order excluding the reports from evidence in this case. As set forth in detail below, the reports constitute preliminary reconnaissance-level studies. As such, they do not meet the standards of reliability required of materials relied upon by expert witnesses under Fed. R. Evid. 702 and Supreme Court precedent applying Rule 702. Moreover, the report authors have identified several limitations and errors in the studies that further diminish the reliability of the reports. These limitations and errors simply confirm that these preliminary studies are not adequate to form the basis of an expert opinion. Thus, the reports and the expert testimony based upon the reports should be excluded.

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION IN LIMINE**
**TO EXCLUDE, IN PART, TESTIMONY OF**
**PLAINTIFFS' EXPERT VERNON SCHAEFER**

## I. INTRODUCTION

In reaching the opinions he intends to offer in this case, Plaintiffs' expert, Vernon Schaefer, relies heavily upon two preliminary reconnaissance-level reports that contain certain limitations and flaws. Because of the preliminary nature of the reports, which have not been published and have not been subjected to peer review, the reports and Dr. Schaefer's opinions based on the reports do not meet the Supreme Court's reliability test for admissibility. The lack

reliability of the reports and the related testimony is further evidenced by limitations and deficiencies admitted by the authors of the reports. As a result, the reports, which are hearsay in any event, should not be admitted into evidence. Moreover, Dr. Schaefer's testimony regarding the reports and his related opinions should be excluded from the evidence in this case.

## II. FACTUAL BACKGROUND

Plaintiffs' expert, Vernon Schaefer, offers several opinions that effectively conclude that aggradation has occurred in the Moreau River as a result of the construction and operation of the Oahe Dam by the United States Army Corps of Engineers and that the aggradation has led to increased flooding in the bottom lands adjacent to the river. See Report on Aggradation and Flooding on the Moreau River, South Dakota by Vernon Schaefer ("Schaefer Report") attached hereto as Exhibit A. The report and opinions are based, in large part, upon two preliminary reports prepared by employees of the Corps of Engineers: (1) Moreau – Oahe Project – South Dakota, Sedimentation Analysis, August 2003 (the "Sedimentation Report") attached hereto as Exhibit B; and (2) Hydraulics Section, Aggradation Study – Moreau River, South Dakota – 16 October 2003 (the "Hydraulic Report") attached hereto as Exhibit C. In his report, Dr. Schaefer discusses both reports and quotes at length from them. Schaefer Report (Ex. A) at 29-33. Moreover, Dr. Schaefer confirms that he has relied upon the reports to "support [his] contention that the reservoir and its operation did lead to the deposition of sediment and the alteration of the flow regime of the Moreau River." Id. at 33.

A. THE PRELIMINARY NATURE OF THE REPORTS

In 2003, Jeff McClenathan, a hydraulic engineer for the Corps of Engineers, supervised a reconnaissance-level hydraulic analysis of the Moreau River, which was finalized on October 16, 2003. A reconnaissance-level study is not a detailed investigation intended to reach specific conclusions. Deposition of Jeff McClenathan (Aug. 24, 2006) ("McClenathan Dep.") at 122:8-123:8 (attached hereto as Exhibit D). Instead, it relies on already existing data and information to identify what additional data and analysis should be undertaken. Id. As explained by Mr. McClenathan, the purpose of a reconnaissance-level study is to determine if there are issues that should be studied further, not to determine the cause or extent of an existing problem. Id. As stated by Mr. McClenathan, this was a "quick study, but not real detailed [ ] just using read[il]y available information." Id. at 122:24-123:1. As a result, Mr. McClenathan "didn't want to provide a conclusion [in the Report] because the model is so coarse." Id. at 80:11-16.

Similarly, in 2003, John Garrison, a hydrologist for the Corps of Engineers, under the direction of his supervisor, John Remus, authored a separate reconnaissance-level Sedimentation Report which set forth conclusions regarding sediment deposition at defined points, called range lines, on the Moreau River. Again, the reconnaissance-level study relied upon cursory and preliminary data and analyses, and was not considered by its authors to be sufficient to support decision-making. Deposition of John Remus (Aug. 23, 2006) ("Remus Dep.") at 142:9-25 (attached hereto as Exhibit E). As explained by Mr. Garrison, the Sedimentation Report was simply a "first step" that suggested the need to "do more of an analysis." Garrison Dep. (Ex. F) 76:3-8; 78:12-20.

B. LIMITATIONS OF THE HYDRAULIC REPORT

The 2003 Hydraulic Report prepared by Jeff McClenathan and his staff in the Corps' Hydraulics Section, stated that

> …there is a high likelihood that flood levels are impacted under high pool conditions in Lake Oahe up to river station 78150 (M-52.7). Landowners below this section would appear to be increasingly affected by floods, particularly at high reservoir pool levels. The decreased bed slope and reduced flow capacity of the lower sections of the Moreau River appear to be at least partially responsible for increasing flood stages in that area.

Hydraulic Report (Ex. C) at 3. This statement is heavily relied upon by Dr. Schaefer. Schaefer Report (Ex. A) at 31.

By the admission of the supervisor of the section that prepared the Hydraulic Report, however, that conclusion was, at least in part, inaccurate, and suffered in its entirety from several limitations. The statement was inaccurate because the analysis did not show that high pool conditions in Lake Oahe had an impact on flooding up to cross section M-52.7. In reality, the pool level effect only existed at range line M-37.7 and downstream, areas which are well within the Corps' property boundaries. McClenathan Dep. (Ex. D) at 74:16-23.

According to Mr. McClenathan, the Hydraulic Report also suffers from the following limitations:

- Because of data limitations, there were insufficient cross-sections to conduct a reliable analysis. Insufficient cross-sections greatly increase the uncertainty of the results of the analysis. In addition, a number of the cross-sections that were available did not cover the region under investigation because they only measured the river channel, not the overbank areas. McClenathan Dep. (Ex. D) at 78:3-9; 123:14-124:22 ("Q: What is the impact of the distance between range lines on your model. A: . . . having them so far apart, it kind of affects the detail of the model and it greatly increases the uncertainty.")

- The model was run assuming an ice cover rather than assuming ice jams. Ice jams occur regularly on the Moreau River; ice cover does not. Id. at 50:6-16; 59:10-17; 61:13-21; 63:21-24 ("A: I guess what we did is we did this kind of cursory ice model because we had heard that ice jams were a problem in '97. And based on the information we had, that's all we could really do at the time."); 134:18-135:1.

- The Old Promise Bridge, a bridge which existed prior to the Oahe Dam, was not included in the model. Instead, the New Promise Bridge, which was constructed at the same time as the Oahe Dam, was inadvertently left in the pre-dam model analysis. In addition, the Whitehorse Bridge and a railroad bridge at Promise were excluded from the model all together because the authors could not obtain information regarding the bridges. Id. at 41:4-5; 78:11-16; 79:3-8; 129:24-130:9.

- The geographic area analyzed by the model was not extended sufficiently far upstream or downstream, because of limited cross-section data, to assure accurate results. Id. at 78:16-23.

- The model relied upon topographic maps for the post-dam condition that actually pre-dated the construction of the dam. Above range line M-59.2, the maps used in both the pre-dam and post-dam conditions were exactly the same. Id. 127:7-128:16; 126:6-127:6.

- The model did not vary the pre-dam river miles and post-dam river miles of the range lines, despite the fact that river mileage of the range lines had changed as a result of natural meandering of the river. Id. 131:18-132:8

- The model was never calibrated to determine the likelihood of whether its projections were accurate. Id. 59:1-9 (an uncalibrated model results in a "large amount of uncertainty with the results"); 132:13-133:17.

Finally, the Hydraulic Report contained an anomaly that caused the analysis to be unreliable. As Mr. McClenathan explained, convergence of pre-dam and post-dam elevations are to be expected as the study moves up the river. McClenathan Dep. (Ex. D) at 74:24-75:6;

75:16-76:24. The 2003 Hydraulic Report, however, shows an initial convergence followed by divergence. Id. Mr. McClenathan explained that this anomalous situation, which is almost certainly incorrect, was, in fact, not that surprising given that this was:

> kind of a reconnaissance study and the cross-sections are really quite widely spaced. . . . So for a model of this [limited] level of detail, that probably isn't that unusual. It would be unusual in a more detailed model.

Id. at 76:8-24. According to Mr. McClenathan, because of this and other anomalies, and because of other limitations in the study, the conclusions based upon the analysis are not reliable.[1/]

C. LIMITATIONS OF THE SEDIMENTATION REPORT

According to John Garrison, the lead author of the Sedimentation Report, the report includes a cross-section analysIs with no additional data or analyses. Such limited studies have several inherent limitations. First, cross-section measurements are only a snapshot in time and can change depending upon the time of year and the conditions at the time the measurements are taken. Garrison Dep. (Ex. F) at 89:3-8; Remus Dep. (Ex. E) at 86:13-20. Second, the cross-section measurements do not address what is happening either upstream or downstream from the cross-section. Garrison Dep. (Ex. F) at 71:18-24. Third, cross-section measurements do not address the reasons, either natural or man-made, that may contribute to changes in cross-section

---

[1/]Mr. McClenathan testified as follows at deposition:

> Q. [By Defendant's counsel Mr. Gette] Were there – did you experience data limitations that impacted your confidence in the results of the model?
>
> A. [By Mr. McClenathan] Yes. Because we only had those channel surveys at the range lines, the spacing was – for a more detailed model, [the spacing] would be kind of excessive. And it would have been nice to have had overbank surveys instead of using the quad maps.

measurements such as beaver dams, bluff slides, drought conditions, debris piles, vegetation encroachment, meanders, etc. Id. at 71:2-72:14; 78:7-23; 87:18-88:11. Fourth, data that is important to river capacity, a critical issue with respect to river flooding, was not available to the study authors. For example, the authors had no data regarding the slope or the roughness of the river. Remus Dep. (Ex. E) at 139:19-140:1; 144:23-145:3; 142:13-25.

## III. LEGAL STANDARD

### A. MOTIONS *IN LIMINE*

This Court has acknowledged that "[a] motion *in limine* is a recognized method under [RCFC] 16 and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial." White Mountain Apache Tribe v. United States, 10 Cl. Ct. 115, 116 (1986), and "is a useful tool to prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters." Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); see Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986) (motion *in limine* is useful to “resolve issues which would otherwise 'clutter up' the trial"). Indeed, as this Court has previously acknowledged, the Court has a duty to exercise its power to exclude testimony or evidence in appropriate cases:

> There is no question under [RCFC] 16, that this court, as a trial court, has the power to issue pretrial orders simplifying issues for trial. Not only does this court have such power, it has a duty to exercise it in appropriate cases. This power allows the court, *inter alia*, to define the issues, facts, and theories actually in contention and to weed out extraneous issues. Too, this court also has the authority to issue pretrial rulings concerning the admissibility at trial of proposed testimony and documentary evidence.

Baskett, 2 Cl. Ct. at 359 (emphasis added). Motions *in limine* are appropriate where a party submits purported expert testimony that is unreliable.

B. FEDERAL RULE OF EVIDENCE 702 AND THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE* MANDATE EXCLUSION OF EXPERT TESTIMONY THAT IS NOT RELIABLE

1. Federal Rule of Evidence 702 Requires that, to Be Admissible, Expert Witness Opinions Must be Both Reliable and Relevant

The testimony of expert witnesses is admissible only if it satisfies the requirements of Federal Rule of Evidence 702, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert, by knowledge, skill, experience, training or education, may testify thereto in the from of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Rule 702 expressly incorporates the requirements for admission of expert testimony established by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). There are two aspects to the test that the Supreme Court set forth in Daubert for the admissibility of scientific expert opinions.[2/] First, the court must determine whether the expert's opinions are "reliable." Daubert, 509 U.S. at 590; Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). Second, assuming the methodology used by the expert in

[2/]The Supreme Court subsequently extended its holding in Daubert and held that the analysis governing the admission of scientific expert opinions is also applicable to non-scientific expert testimony based on "technical" and "other specialized" knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); see also Terran v. Sec'y. of Health & Human Services, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Thus, whenever expert testimony is offered, the Daubert inquiry must be conducted, including an inquiry into whether the opinion is reliable and "tied to the facts" of a particular "case." Kumho, at 150.

reaching his opinion is proven to be reliable, it is not admissible unless it is relevant. Daubert, 509 U.S. at 597; Kuhmo Tire, 526 U.S. at 141. In short, Daubert requires that, in performing its gate-keeping role, the trial court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. In this case, Dr. Schaefer's opinions, which are based upon unreliable reports, must be precluded because they fail to meet the threshold requirements for admissibility established by the Supreme Court in Daubert.

2. The Proponent of Expert Testimony Must Establish that the Expert's Opinions Are Reliable

The party proposing to introduce expert opinion "has the burden of establishing that the pertinent admissibility requirements [including reliability] are met by a preponderance of the evidence." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing Bourjaily v. United States, 483 U.S. 171 (1987)); see Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001) (citing cases); Kerrigan v. Maxon Indus. 223 F. Supp. 2d 626, 629-630 (E.D. Pa. 2002), citing In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999); Lithuanian Commerce Corp. v. Sara Lee Hosiery, 179 F.R.D. 450, 457 (D.N.J. 1998). That burden has not been met here.

## IV. THE COURT MUST EXCLUDE THE OPINION AND TESTIMONY OF PLAINTIFFS' EXPERT VERNON SCHAEFER TO THE EXTENT IT IS BASED UPON FLAWED DATA AND REPORTS

"The Supreme Court has held that reliability is the touchstone for expert testimony [based] on 'scientific, technical, or other specialized knowledge.'" Libas, Ltd. v. United States, 193 F.3d 1361, 1365-66 (Fed. Cir. 1999) (emphasis added) citing Daubert, 509 U.S. at 589. "To gauge reliability, the [trial] judge must" not only determine whether the expert is qualified in the relevant field, but must also determine "whether the methodology underlying the expert's conclusions is reliable." Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002). Federal Rule of Evidence 702 expressly incorporates the requirements for admission of expert testimony established by the United States Supreme Court in Daubert, 509 U.S. 579 (1993), and Kumho Tire, 526 U.S. 137 (1999). Pursuant to those decisions, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590.

By his own admission, Vernon Schaefer's opinions rest in large part upon the Sedimentation Report prepared by John Garrison and the Hydraulic Report prepared by Jeff McClenathan. Schaefer Report (Ex. A) at 29-33. What Dr. Schaefer does not admit, or even mention, however, is that the reports were preliminary studies never intended to form the basis for the detailed opinions he is offering in this case. See supra p. 3. As Mr. Remus stated, preliminary studies of this nature are not sufficiently reliable to reach conclusions that would support final decisions. Indeed, the studies were intended only to identify what additional analysis was needed and not to provide conclusive answers. In describing the reconnaissance-level studies, Mr. Remus explained:

A. [By Mr. Remus] A recon-level study uses existing information supplemented by a very small amount of additional information, maybe filling in some gaps in the data, or if you can gather data quickly, you do that. We use very cursory or preliminary type analyses, some of them are quantitative, some are qualitative, to come to some – they're used to make a decision on which way to go next. They're not used for final decision-making support.

Q. [By Defendant's counsel Mr. Gette] Would you consider a recon-level study to be a robust analysis?

A. No.

Remus Dep. (Ex. E) at 142:13-25 (emphasis added). This same sentiment was echoed by Mr. McClenathan who testified that he did not even want to draw a conclusion in his report because of the severe limitations. As he stated "[I] didn't want to provide a conclusion [in the Report] because the model is so coarse." Id. at 80:11-16.

Rule 702 requires that any expert opinion, to be admissible, must be "based upon sufficient facts or data. . . ." Fed. R. Evid. 702(1). In this case, the Reports form the core of Dr. Schaefer's opinions. Yet, Dr. Schaefer fails to mention, let alone address, the fact that the authors of the Reports have concluded that these preliminary reconnaissance-level Reports are not adequate to form the bases for conclusions regarding whether aggradation has occurred on the Moreau River as the result of the Oahe Project. As a result, Dr. Schaefer's opinions, as they do not rest upon a reliable foundation, are inadmissible to the extent they rely upon the preliminary Reports.

Adopting a "flexible" approach[3/] to assessing whether a scientific expert opinion is

---

[3/] The Supreme Court in Kumho Tire emphasized that "the test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in

reliable, the Daubert Court has instructed trial courts to consider the following non-exhaustive list of factors:

> (1) whether the expert's technique or theory can be or has been tested;
>
> (2) whether the technique or theory has been subject to peer review and publication;
>
> (3) the known or potential error rate of the theory or technique, and the existence and maintenance of standards and controls for application of the theory or technique; and
>
> (4) whether the theory or technique has been generally accepted in the relevant scientific community.

Daubert, 509 U.S. at 593-94; Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 149-50.

Dr. Schaefer's opinions and the Reports on which they are based do not meet the specific tests for reliability set forth by the Supreme Court in Daubert and Kumho Tire. First, Dr. Schaefer has not tested, in any way, the Sedimentation and Hydraulic Reports that he relies upon. Second, the Reports have never been published and, as such, have never been subjected to the rigors of peer review. Third, no one, including Dr. Schaefer, has ever attempted to calculate a potential error rate for the Reports' findings. Indeed, the only limited analysis of the accuracy of the Reports' findings has been conducted by the authors of the Reports, who have, in large part, found them to suffer from numerous limitations and inaccuracies. Finally, Plaintiffs' expert, Dr. Schaefer, has provided no evidence that these Reports have been generally accepted

---

every case." Id. See also Tyus v. Urban Search Management, 102 F.3d 256 (7th Cir. 1996) (holding that the Daubert factors did not easily apply to testimony from a social scientist), cited in Fed. R. Evid. 702 advisory committee's note.

in the relevant scientific communities. One would assume that Reports with findings questioned by the Report authors would scarcely find general acceptance in the relevant community.

As the Supreme Court explained in Daubert, 509 U.S. at 590, expert "'knowledge' connotes more than subjective belief or unsupported speculation." Accord O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994). Rather, as the Daubert Court concluded, expert testimony must "rest[] on a reliable foundation." 509 U.S. at 597. As trial courts have repeatedly held, to be reliable, expert opinions must be based upon reliable facts and data. Adams v. Indiana Bell Tel. Co., 2 F.Supp.2d 1077, 1093 (S.D. Ind. 1998) ("[A]n opinion is only as good as the sources behind it." As a result, "Judges must look behind an expert's ultimate conclusion and analyze the adequacy of the foundation."); Andrade Garcia v. Columbia Med. Ctr. of Sherman, 996 F. Supp. 617, 620 (E.D. Tex. 1998) (the Daubert analysis requires that the trial court assess "whether the reasoning or methodology underlying the testimony is scientifically valid."); See also General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

In the instant case, Dr. Schaefer's opinions, as presented, simply do not satisfy the requirements for reliability set forth by the United States Supreme Court because they are not based upon an adequate foundation. For example, Dr. Schaefer fails to address the fact that the Reports' authors found them to be rife with data limitations and several errors that cause them to be unreliable. See supra pp. 3-7. It is beyond doubt that inaccurate reports do not represent "sufficient . . . data" as required by Rule 702.

Plaintiffs have simply failed to carry their burden of demonstrating the reliability of the

materials relied upon by their expert. Indeed, all evidence is to the contrary. The overwhelming evidence is that the Reports relied upon by Plaintiffs' expert were prepared for limited purposes, relied upon limited and incomplete data, and contained several inconsistencies and errors. As such, those materials, as well as the conclusions and opinions derived from them, should be excluded from the evidence in this case.

## V. CONCLUSION

To the extent that Plaintiffs' expert, Vernon Schaefer, bases his opinions upon unreliable data and analyses as contained in the Sedimentation and Hydraulic Reports, those opinions must be excluded from the evidence in this case along with the flawed Reports. All as set forth more fully above, Defendant respectfully requests that its motion *in limine* to exclude the testimony of Vernon Schaefer be granted and that Dr. Schaefer's opinions based upon the Sedimentation and Hydraulic Reports be excluded from the evidence in this case along with the Reports.

January 23, 2008.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environmental & Natural Resources Division

s/ Susan V. Cook by s/ James D. Gette
SUSAN V. COOK, Senior Attorney
JAMES D. GETTE, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044
Tele (202) 305-0470
Fax (202) 305-0506
susan.cook@usdoj.gov
Attorneys for Defendant

433295.1