IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CHEYENNE RIVER SIOUX TRIBE, ET AL., PLAINTIFFS, | ) | CIVIL NO. 03-600-L |
| VS. | ) | DEPOSITION OF JOHN REMUS |
| THE UNITED STATES OF AMERICA, DEFENDANT. | ) | TAKEN ON BEHALF OF PLAINTIFFS |

DEPOSITION OF JOHN REMUS taken before Susan M. McKenzie, General Notary Public within and for the State of Nebraska, beginning at 9:00 a.m. on August 23, 2006, at the offices of the United States Corps of Engineers, 106 15th Street, Omaha, Nebraska.

COPY

APPEARANCES

ON BEHALF OF PLAINTIFF:
MS. PAMELA SNYDER-VARNS
Gunderson, Palmer, Goodsell & Nelson, LLP
American Memorial Life Building
440 Mt. Rushmore Road
Rapid City, SD 57709
(605) 342-1078 Fax (605) 342-9503
and
MS. TRACEY FISCHER
Cheyenne River Sioux Tribal Attorney
Box 1, Fort Pierre, SD 57532
(605) 223-9099 Fax (605) 223-9199

ON BEHALF OF DEFENDANT:
MR. JAMES D. GETTE
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street NW
Washington D.C. 20004
(202) 305-1461 Fax (202) 514-8865
and
MR. THOMAS J. INGRAM, IV, Assistant District Counsel
US Army Corps of Engineers
106 South 15th Street
Omaha, NE 68102
(402) 221-7599 Fax (402) 221-4061

ALSO PRESENT: LINDA BURKE



INDEX


CASE CAPTION .............. Page 1
APPEARANCES .............. Page 2
INDEX .................. Page 3
CERTIFIED QUESTIONS .......... Page 4
TESTIMONY ............... Page 5
REPORTER CERTIFICATE .......... Page 147
COST CERTIFICATE ............ Page 148
READ & SIGN LETTER ........... Page 149
ERRATA SHEET .............. Page 150
DIRECT EXAMINATION
By Ms. Snyder-Varns ........ Page 4
CROSS EXAMINATION
By Mr. Gette ........... Page 138
REDIRECT EXAMINATION
By Ms. Snyder-Varns ........ Page 144


| EXHIBITS | MARKED |
| --- | --- |
| 2 - CORPS OF ENGINEERS OMAHA DISTRICT WEB PAGE - AVAILABLE SERVICES | 36 |
| 3 - CORPS OF ENGINEERS OMAHA DISTRICT WEB PAGE - CURRENT PROJECTS | 48 |
| 4 - AGGRADATION AND DEGRADATION ASPECTS OF THE MISSOURI RIVER MAIN STEM DAMS | 56 |
| 5 - HAND DRAWING | 68 |
| 6 - MOREAU RIVER, OAHE PROJECT, SEDIMENTATION ANALYSIS - AUGUST 2002 | 74 |
| 7 - HYDRAULICS SECTION AGGRADATION STUDY MOREAU RIVER - OCTOBER 16, 2003 | 116 |



NOTARY PUBLIC
CERTIFICATION OF QUESTIONS

I, SUSAN McKENZIE, Certified Shorthand Reporter, General Notary Public within the State of Nebraska, do hereby certify that I took the deposition of JOHN REMUS on the 23rd day of August, 2006, in the above-captioned matter, with the following questions being asked, and the witness refusing to answer same, and certification being requested:

PAGE: 69 LINE: 12

IN WITNESS WHEREOF, I hereunto affix my signature and seal the _____ day of __________, 2006.

______________________________
SUSAN McKENZIE
GENERAL NOTARY PUBLIC

MY COMMISSION EXPIRES:



(Whereupon, the following proceedings were had, to-wit:)

JOHN REMUS
having been first duly sworn
was examined and testified as follows:
DIRECT EXAMINATION

BY MS. SNYDER-VARNS:
Q Would you please state your name for the record?
A John Remus.
Q What is your business address?
A 106 South 15th Street, Omaha, Nebraska.
Q Mr. Remus, my name is Pam Snyder-Varns. I am a lawyer for the Plaintiffs in this matter. And I would just like to go through a few deposition rules by way of reminder.
Have you ever had your deposition taken before?
A Yes.
Q Well, if I ask a question that you don't understand, just let me know and I will rephrase it. If you would try to remember -- and I will try to do the same -- to state your answers out loud and wait until I'm finished, and I'll try to wait until you're finished so the court reporter can get our words

down.

If you need a break, just let me know, and if there's not a question pending, we'll take a break. I tend to forget about that, so it's fair to let me know.

What is your profession?
A I'm a Hydraulic Engineer.
Q And where did you go to school for that?
A University of Nebraska at Lincoln.
Q When was that?
A From 1978 through 1985.
Q And you have a graduate degree as well?
A Yes.
Q And what is that in?
A Civil Engineering.
Q And where did you get that?
A At Lincoln.
Q Okay. Any other training after your graduate degree, which is what?
A Master of Civil Engineering is my graduate degree. I've had one additional graduate level course in Sediment Transportation, and I've taken numerous training courses offered by the Corps, offered by other vendors relative to sediment transport, Fluvial geomorphology, and just some



management type courses here at the Corps.
Q And you're a certified engineer in the State of Nebraska?
A Registered Professional Engineer in the State of Nebraska, yes.
Q And what memberships and what professional organizations do you have?
A I'm a member of the Society of American Military Engineers and a member of the American Society of Civil Engineers.
Q And your employed with the Corps of Engineers?
A Yes.
Q How long have you been with the Corps?
A Twenty-one years.
Q And what position did you start out with when you came to the Corps?
A I started out as a Journeyman Hydraulic Engineer doing the same work that I do today -- or that I supervise today.
Q Did you start in the Omaha District?
A Yes.
Q So you have been here in the Hydrologic Engineering Division for 21 years?
A Yes.



Q What is your current position there?
A I am Chief of the Sedimentation and Channel Stabilization Section.
Q How many sections within the division?
A The Hydrologic Engineering Branch, there's five sections. And then in the Engineering Division there's five more branches.
Q Who is the Cchief of the Hydrologic Engineering Branch?
A Larry Buss.
Q And who is the Chief of the Engineering Division?
A John Bertino.
Q How many people are in the Hydrologic Engineering Division?
A The Hydrologic Engineering Branch right now has about four five employees.
Q How many people are under you in the Sedimentation and Channel Stabilization Section?
A There's eight full-time permanent employees, and then the students vary from two to six depending on the workload and time of year.
Q How long have you been the Chief of this --
A About 15 years.
Q What are your duties and responsibilities



as the Chief of the Channel Stabilization and Sedimentation Section?
A My duties include supervision of the employees in the section, putting together budgets for O&M programs, for specific -- project-specific work, technical review of products, technical production of some products, of some of the more difficult more complex projects. I also do administrative work as far as contract management for AE contracts. I also serve on the Corp of Engineers Channel Stabilization Committee, which is a nationwide committee.
Q What do you do in that capacity?
A Which capacity?
Q The Channel Stabilization Committee.
A I'm just a member of that committee. We -- it's a nationwide committee of experts in river engineering. We assist districts in solving very special problems.
Q Such as?
A If they have a flood control project that is unique and they need expertise that they don't have, or a navigation problem, anything to do with water resources.
Q That's a nationwide committee you said?

Page 10

A Uh-huh.
Q What types of individuals or I guess Corps positions are a part of that committee? And how big is it?
A Right now we have eight members on there. They are comprised of seven Hydraulic Engineers and a Geotechnical Engineer, and then we have one Administrative Assistant.
Q When did that committee could into being?
A I don't know.
Q Would you say that it's somewhat prestigious to be on this committee?
A Yes.
Q And it comes from your experience and expertise?
A Yes.
Q How long have you been on it?
A Since 1999.
Q Seven years?
A Yeah.
Q Were you appointed to the committee?
A Yes.
Q By whom?
A By -- I was nominated by someone who was leaving the committee, and the committee approved the

Page 11

nomination.
Q The committee itself?
A Yeah, the remaining members of the committee.
Q Who is the chair of the committee?
A Ed Sing.
Q And who is he?
A He's a Hydraulic Engineer in the South Pacific Division in the Corp of Engineers.
Q Is he comparable to you in rank within the Corps?
A No. I would say he'd be above me in rank in the Corps.
Q He's Chief of the Hydrologic Engineering --
A I don't think he's chief of anything. He's just in the Division office, which is above the District office in the hierarchy of the Corps.
Q Getting back to your duties and responsibilities here in the Omaha District, I see from your bio from the web page that one of them is navigation design construction, oversight and monitoring of navigation.
A Yes.
Q How much of your time do you spend on navigation issues?

Page 12

A Navigation issues, maybe ten to 15 percent of my time.
Q What does it consist of?
A Reviewing designs for the maintenance of the navigation project from Sioux City down to Rulo, Nebraska, assistance to the users of the navigation project, conducting surveys of the channel, directing surveys of the channel, and going to meetings with navigators.
Q One of your responsibilities is channel restoration?
A Yes.
Q What does that consist of?
A We have a large restoration project that has been underway since the early 1990 to restore aquatic and terresterial habitat along the Missouri River, and then we're moving forward with that.
Q Where?
A It has been concentrating from Sioux City down to the mouth at St. Louis, but in recent years we've expanded it to include the Missouri River all the way to Fort Peck, Montana.
Q And that's driven by environmental purposes of the I guess Omaha District management of the Missouri river main stem system?

Page 13

A It's mandated by the Endangered Species Act and through a couple separate appropriations from Congress.
Q When we were talking about channel restoration, that assumes that channels deteriorate?
MR. GETTE: Objection.
BY MS. SNYDER-VARNS:
Q Can you just tell me what causes channels to deteriorate?
MR. GETTE: Objection.
THE WITNESS: That really is -- I don't really understand the question about "deteriorate." Define that.
BY MS. SNYDER-VARNS:
Q Just basic information that you probably assume in your day-to-day work. But I'm asking you, what is channel restoration? Why do you have to have it?
A Channel restoration is -- and we have it here -- is restoration of the aquatic -- or the echo system. That's the restoration as we do it here.
Q Restoration to what state?
A To whatever we can do within the resources we have.
Q Has there been a change in the Missouri

Page 14

River channel from its natural state?
A Yes.
Q What has caused it?
A A number of things. The placement of the dams in the Dakotas and Montana, the channelization from Sioux City on downstream, tributary development.
Q Development of the channel from Sioux City downstream, what do you mean by that?
A I said channelization of the channel.
Q Excuse me. And what did you mean by that?
A We channelized it. We took it from multiple channels down to one channel.
Q So the Corps changes river channels for -- the Corps changes river channels; right?
A We have changed river channels, yes.
Q Why do you do that?
A Because Congress tells us to do it.
Q Why does Congress tell you to do it?
A I don't know why Congress tells us to do it.
Q Is it for navigation?
A Sometimes.
Q What other purposes?
A Do you mean just in general with the Corps?

Page 15

Q Yes.
A For any water resource development purpose.
Q What do those include?
A Flood control, navigation, water supply are the primary ones. We also have water quality, fish and wildlife, including the Endangered Species Act, water supply, irrigation. Just about anything that you could use water for.
Q You mentioned tributary development.
A Uh-huh.
Q What do you mean by that?
A Projects that have been placed on tributaries, dams, levies, straightening of those channels.
Q Do you mean tributaries to the Missouri River?
A Primarily, but any tributaries.
Q Another of your responsibilities according to your bio is stream bank and bed stabilization?
A Yes.
Q What does that consist of?
A The primary focus of the work that we do in our section is stream bank stabilization, preventing erosion from laterally moving the stream banks back. The bed stabilization we have not done much of that.

Page 16

That's on a very small scale, very site-specific, and usually on very small streams.
Q What causes stream bank erosion?
A Stream bank erosion is a natural process.
Q What erodes them?
A Water erodes the stream banks.
Q Water in the river channels?
A Yes.
Q What other types or events of water erodes stream banks?
A I have no idea what you're asking.
Q Well, you've been working this long at the Corps --
A I don't understand the question.
MR. GETTE: Objection. He said he didn't understand the question. Please rephrase it.
BY MS. SNYDER-VARNS:
Q Some of the questions I'm going to ask, Mr. Remus, are basic information. And I'm developing a record here. And I'm entitled to do that. So I'll just ask you questions that seem so obvious that it's going to be almost embarrasing for you to talk about them, but I'm asking you to do that. And so when I ask you what causes a stream bank to erode, if you wouldn't mind, I would appreciate a response.

Page 17

MR. GETTE: And he did respond. He said water.
MS. SNYDER-VARNS: And he said water in what form. And there -- I want to know how water erodes stream banks.
MR. GETTE: Okay. Another question.
THE WITNESS: Water erodes stream banks by the attracted force of the water moving against the bed. It creates a friction force that pulls material out of the bed or the bank.
BY MS. SNYDER-VARNS:
Q And into the river?
A Yes.
Q Or water course?
A Yes.
Q And that material in the water course is what?
MR. GETTE: Objection.
THE WITNESS: I still don't understand the question.
BY MS. SNYDER-VARNS:
Q What is the term that you use to call the dirt in the water?
A The sediment.
Q Thank you.

Can you give me some examples of stream bank -- excuse me.

You mentioned that you haven't done much bed stabilization work?

A Right.

Q And is that through the course of your employment with the Omaha District, the whole time you've been there, or just since you've been the Chief of the --

A Through the whole thing.

Q Okay. So when we're talking about this particular task, this is not a major component of your duties and responsibilities?

A The bed stabilization, is that what you're asking?

Q Yes.

A We do not do a lot of that, no.

Q What about stream bank stabilization?

A We do a fair amount of that, yes.

Q Can you give me examples of projects that you have done that are stream bank stabilization projects?

A You want site-specific projects or just a description of them?

Q I would like some site-specific projects.



And then I would also be interested in a description of what you do.

A Bank stabilization for us here in the Omaha District usually means riprappng the bank of a river, placing stone or some other type of riprap on the bank of the river to harden it. That's a general description of bank stabilization. There are other types of that, but that is the primary way we have done it in the Omaha District.

In the last 21 years we have built projects on a various number of tributary streams to the Missouri River. There's one, on Marne Creek in Yankton, South Dakota, a bank stabilization project that protected the sewage treatment system is an example. We had built a project in Elk Mountain, Wyoming, that protected the public library there, riprap on the banks.

Q You designed those projects?

A I designed those two projects, yes.

Q Do you carry out projects designed by other people -- other stream bank stabilization projects?

A I'm not sure I understand the question.

Q Who decides what projects to do as far as stream bank stabilization?

A It depends on the various program that --



I guess the project would fit under. They all have their different criteria to whether or not a project gets built and how it gets built.

Q Under what programs do stream bank stabilization projects falls?

A We have an emergency stream bank protection program called the Section 14 program. We have the River Authority which is -- the Missouri National Recreational River which is the river from Gavins Point down to Ponca State Park where we have an authority to build bank stabilization. We have Section 33 which is a general bank stabilization authority for the Missouri River from Ponca to Fort Peck. We've built projects under that authority as well. And then sometimes Congress gives us specific projects to build, but they have not done any in my tenure here.

Q Another of your responsibilities is reservoir sedimentation management?

A Uh-huh.

Q Can you define that for me?

A The beginning part of reservoir sedimentation management is a monitoring of the sedimentation in the reserviors. And then when problems arise or when issues arise, we look at ways



to manage the issue, not necessarily of sediment, but possibly manage that issue of whatever the problem or issue is at the time.

Q So is this particular task limited to the reserviors themselves?

A Reservoir sediment management is limited primary to reserviors, yes.

Q And when you say "primarily," it implies that possibly there's some other areas.

A In the management of the sediment in the reserviors, we may look at downstream if we think we want to do something with the sediment in a downstream area.

Q And by "downstream," what do you mean?

A Downstream of the dam.

Q And so are you talking about main stem dams or all the dams in the Omaha District?

A All the dams in the Omaha District.

Q So that would include dams on tributaries as well?

A Right.

Q Jumping back for just a moment to stream bank stabilization programs, I asked who decides what projects to do. And you told me that there are several programs under which these projects fall.

Page 22

When you do a stream bank stabilization program, where do you get the authority or the direction to do them under these various programs, from an individual or several individuals? Does it come from Corps headquarters? Help me understand the organization here.
A Each one of those authorizations has their implementation criteria. Some of them are economic; some of them are environmental criteria. A project is proposed, and sometimes a local sponsor will come into the project saying, we'd like to have a bank stabilization project here. We'll evaluate it, and if it fits the criteria, we set it up for approval. Some of those are approved at our Division office; some are approved at the Washington headquarters office.
Q Thank you.
Now, with reservoir sedimentation management, why do you have a program for sedimentation?
A The reservoirs, when they - all reservoirs that are constructed, we know that sediment will enter those reservoirs. And we know that we're going to have to deal with certain issues out there, whether it's recreational access issues or water

Page 23

quality issues or water supply issues or, you know, whatever comes up that may be related to sediment. So we have a sedimentation program where we monitor that. We've done some studies on some of the main stems -- we haven't done very many studies on the tributaries -- to keep track of that so that we have the information available to address issues as they come up.
Q I noticed from your web page that you have a list of sedimentation reports and memorandums.
A Uh-huh.
Q So those would be the studies that you're referring to?
A Those are -- it's a partial list of the studies that we've done.
Q Monitoring of the sediment is just one component of managing the sediment. Can you describe the monitoring program that you have for the main stem reservoir system?
A Our monitoring program consists of periodically resurveying what we call range lines, which are permanently established cross-sections across the reservoirs at -- well, I'm not really sure why they were placed where they were in the beginning. But they were established either at the

Page 24

time the reservoir was built or shortly thereafter. And we basically use these surveys to calculate volume changes within the pool area of the reservoir.
Q You say there are permanently established cross-sections. What do you mean by that?
A We have a monument on either side of the reservoir so that we survey the exact same cross-section each time.
Q What's the monument usually?
A It's a pipe with a brass cap on top of it.
Q When the cross-section is installed, what physically is that?
A It's just a line on a map that we survey across.
Q So it's the markers that are the physical installation?
A Right.
Q And then they are reference points on maps so that you survey the same place every time?
A Right.
Q And you have these range lines throughout the main stem system?
A Right.
Q And they were installed historically?
A They were installed at each of the projects

Page 25

either at the time the project was being built or shortly thereafter.
Q Do you have any knowledge as to what the structure or the organization is for where they are and how many there are?
A There's over 2600 Monuments out there. Why they were placed where they were placed I do not know. My predecessor's predecessor's predecessor set those up.
Q And the purpose of them was so that you would measure water volume at the same place --
A No. We would measure at the same place, and then we'd use this information to calculate volume changes within the pool.
Q Measure what at the same place every time?
A The cross-section, just a line across, a survey line across.
Q So when you're talking about a cross-section, it's like a slice of either the reservoir or the water course?
A Right. It's a slice perpendicular to the reservoir.
Q And the slice is of the channel or the configuration of the ground as opposed to the water?
A Right.

Q Okay. Why does the Corps do that?
A So that we can monitor the filling of the reserviors.
Q So the filling of the reserviors is an event that does occur and that the Corps has a program to deal with, which is the establishment of the range lines and monitoring the deposition of sediment throughout the system by surveying these range lines periodically?
A Periodically, yes.
Q Can you tell me what the system is for surveying the range lines or the cross-sections?
A Could you be more specific?
Q I want to know what the overall program is for monitoring sedimentation in the main system system. And you've told me that these 2600 monuments for cross-sections or range lines exist. And I don't know -- is it more appropriate to call them range lines or cross-sections?
A We call them range lines.
Q Okay. Is there a system -- and I would guess there is -- for surveying these range lines?
A Do you mean what we physically do or what is our schedule or --
Q What is the schedule?



A We try to schedule our main stem -- or larger main stem dams on about a 15- to 20-year cycle. The smaller main stem dams we try to do on a ten- to 12-year cycle provided we have the funding to do so. Smaller reserviors, we try to get them on less than a ten-year cycle out there.
Q And it's constrained by funding?
A Right.
Q So do you have a complete data set according to that schedule ever since those monuments and range lines were installed?
A Not entirely.
MR. GETTE: Objection. The question is vague. I don't understand what you mean by -- what was the term you used?
Can I hear the question back?
MS. SNYDER-VARNS: He seemed to understand the question. Can we just see if he can answer it?
MR. GETTE: I'd like to put my objection on the record.
MR. SNYDER-VARNS: You did.
MR. GETTE: He'll still be able to answer it in ten seconds.
(Pending question read back by the reporter).
MR. GETTE: Do you know what she means by "data set"? But you can answer the question.
THE WITNESS: No, not on that schedule. We have missed that schedule in the recent years due to budget constraints.
BY MS. SNYDER-VARNS:



Q Can you give me a description of the distribution of the range lines that have been installed?
A Not -- no, I can't, off the top of my head. No.
Q Can you tell me are there more on the reserviors than the tributaries?
A No, I can't tell you that off the top of my head. I'd have to look at the maps.
Q But the Corps has maps that show the location of all the range lines within the Omaha District?
A Yes.
Q Where are those maps kept?
A In this office.
Q Do you refer to these maps in the course of your work periodically?
A Yes.



Q What would cause you to refer to a map to learn where the range lines are in a particular -- when you're working with a particular project?
A We would get the maps out if we have an issue someplace just to see which cross-sections or range lines are appropriate to gather data from. We'd just pull the map up and look at it.
Q So monitoring of sediment in general within the Omaha District is done according to a schedule of surveying range lines that were installed after the reserviors were built; right?
A Either when the reserviors were built or shortly after.
Q And then the range lines are also surveyed as other specific projects or matters come up?
A We have done special surveys of specific range lines in response to a special request, yes.
Q What sorts of special requests would generate that?
A Real estate claims would generate that; lawsuits would generate special surveys of specific cross-sections; if there's a water supply issue with one of the many intakes on the reserviors, we would do a special survey if it were appropriate; if there were recreational access problems, we may do a

Page 30

special survey of a range line. That's all I can think of right off the top of my head.
Q When you do a special survey of the range line, it's to do what, to learn what?
A It's to add to our knowledge so that we can answer specific questions asked at that particular location.
Q When you survey the cross-section to add to your knowledge, what are you doing? What are you using this data for? What is -- I'm trying to make my questions specific so that you can give me responses. And so when you do a survey for a particular situation such as this case, what data are you gathering?
A We're gathering just a survey of that section, an additional survey.
Q And it's a survey of a cross-section?
A A survey of that range line.
Q And do you compare it with other surveys of that range line?
A Yes.
Q And what do you use that information for?
A We use that information to develop trends, if there's a certain trend in something happening out there; we use that to develop hydraulic parameters

Page 31

out there; it can be used in models if somebody wants to do some modeling. Those are the primary uses of that.
Q When you say "trends," trends of what?
A Trends of either aggradation or degradation or bank erosion.
Q And can you define for me aggradation?
A Aggradation is a general filling of the channel and/or floodplain.
Q And degradation?
A Is a general lowering of the floodplain and/or channel.
Q So in layman's terms, aggradation would be filling in the channel; is that accurate?
A In layman's terms, yes.
Q Very basic. I understand.
And degradation would be a scouring or a deepening of the channel?
A Yes.
Q You also mentioned that you used the surveys of the cross-sections for hydrologic parameters for modeling?
A Hydraulic parameters.
Q Hydraulic.
Tell me the difference between hydraulic

Page 32

and hydrologic.
A Hydrologic is quantity of water, when does it come, where does it come from, how much is there. Hydraulics is the physics of moving the water through a channel.
Q And when you use the cross-section information to develop hydraulic parameters for modeling, can you tell me what that means?
A We would develop a cross-sectional area, hydraulic parameters; we can use a series of cross-sections up and down the river to develop slopes; we can develop average bed elevations; we can develop top width calculations; all elements that can be used in determining hydraulic deficiency or any inefficiency of a channel.
Q Now, apart from monitoring reservoir sedimentation using the range lines, what programs exist in the Omaha District to address sedimentation in the main stem system including its tributaries?
A Address -- can you be more specific? What do you mean "address"?
Q You mentioned that sedimentation is occurring.
A (Nods head).
Q What tools are available to the Corps to

Page 33

address sedimentation?
A Again, what do you mean by "address"?
Q Do something about it.
A Something physical about it?
Q Something physical.
A We have an O&M program, which is an Operation and Maintenance program, which we have authority to maintain the project purposes under that. So if there's a sediment issue that is diminishing or preventing us from having a project meet the authorized project purposes, we can use that. There are a number of what we call Continuing Authorites programs, which are programs that are authorized and funded by Congress. Usually they require a cost-share local sponsor to address some of the sedimentation problems in there. On the Missouri River in North and South Dakota they have a Title 7 and a Title 9 -- Title 7 is for North Dakota, Title 9 is for South Dakota -- where it is authority to do studies and develop projects to address sedimentation issues on the Missouri River in each of those states.
Those particular programs are just in their infancy. We have not done any projects under there. It requires a committee of local and tribal members on each one of those, and we're just now setting

those up.
Q Can you tell me -- well, please continue.
A That's all I had to say on that question.
Q So the tools to address sedimentation consist of programs. These Continuing Authoriites programs are just one set of the programs that the Corps has to address sedimentation in the main stem reservoir system. You have O&M.
What other programs besides the O&M and the Continuing Authoriites programs?
A That's it.
Q That's it?
Why did the Title 7 and 9 programs come into being?
A What's that?
Q Did Congress authorize the Title 7 and 9 programs?
A Yes, they did.
Q Through specific legislation?
A Yes.
Q Do you know the title of that legislation by chance?
A I do not know.
Q You just know it as Title 7 or Title 9?
A Right.



Q When did that -- when was that implemented?
A I don't know. I can't remember that.
Q Is it 20 years old or ten years old or very recent?
A I would say it would be less than ten years, but I'm not sure.
Q What has your personal involvement been with these particular programs?
A The Title 9 and Title 7 or all of them?
Q Well, Title 9 specifically since we're talking about South Dakota.
A I have very little involvement in that. Title 9, they have not got their committee formed yet, so we really have not done anything.
Q Who's responsible for forming the committee?
A We have a project manager for that here for the Corps end of it, but we need nominations from the governor, and then those nominations have to be approved at our headquarters level.
Q Who is the Corps individual responsible for Title 9?
A Laura Bentley.
Q And what is her title?



A She's a project manager in our Civil Works Project Management office.
Q So these are the tools that -- or the programs that you have to address sedimentation within the system. What are -- well, I can even see from your web page that services that the branch, if you will, or the Section for Sedimentation and Channel Stabilization, it says that you can provide services related to sediment and erosion design.
A Uh-huh.
Q And I'll show you this. I don't know that we need to mark it. If you want to, we sure can.
But these look more like your physical or technical types of tools that you use to address sedimentation in the system; is that right?
MR. GETTE: Objection.
Actually, first, let's go ahead and mark it if we're going to show it to the witness, and then address questions related to it.
(Exhibit No. 2 marked for identification).
(Pending question read back by the reporter).
MR. GETTE: Go ahead.
THE WITNESS: These items on this web



page here are basically the types of engineering services we in the branch provide. These are very general in their nature as represented on this page. We would use any number of combinations of these types of engineering services to address sedimentation issues.
I don't know how else to answer that question.
BY MS. SNYDER-VARNS:
Q So sedimentation is addressed using engineering expertise to physically modify or -- and I'll say modify -- the river or reservoir configuration for the purpose of addressing sedimentation?
MR. GETTE: Objection.
THE WITNESS: Can you rephrase that? I'm not sure what you're asking me for.
BY MS. SNYDER-VARNS:
Q Your branch provides engineering services?
A Yes.
Q I asked what tools, physical tools or technical tools, are available to address sedimentation. I pointed to this. And you recognize this as services provided by the branch to address sedimentation and erosion.

A Uh-huh.
Q So are these services what the Corps uses to address sedimentation and erosion in the system?
A Yes.
Q And they include analysis of soil erosion rates?
MR. GETTE: Objection. The last question you used the word "these" without any clarity as to what was being referred to. I'm assuming you're still referring to Exhibit No. 2 and the highlighted items on Exhibit No. 2; is that correct?
MS. SNYDER-VARNS: Yes, I am.
MR. GETTE: Okay.
BY MS. SNYDER-VARNS:
Q I'm looking at Exhibit No. 2 and referring to the services that are listed on this Exhibit No. 2 which is part of your web page. And you talked about that there is a listing under the Omaha district web page of services provided by the Hydrologic Engineering Division, Sedimentation and Channel Stabilization Branch. And there is a listing under the title "Sediment/Erosion Design." And the list includes "Analysis of Soil Erosion Rates, Sediment Deposition and Scour Analysis, Sizing of Sediment



Retention Structures." The exhibit speaks for itself.
And my question to you is, these are services that the Corps provides or utilizes to address sedimentation in the basin?
A Yes.
Q And backing up a little bit to understand what tools the Corps uses to address sedimentation, my understanding from your testimony is that the primary tool that the Corps uses is engineering services --
MR. GETTE: Objection.
BY MS. SNYDER-VARNS:
Q -- engineering expertise. Is that true or not?
MR. GETTE: You can answer if you --
THE WITNESS: I'm still not really sure what information you're after. We use our engineering expertise to address sedimentation issues and any issues that come up related to water in the branch. Yes, we use our engineering expertise.
BY MS. SNYDER-VARNS:
Q And within the realm of your engineering expertise are these specific types of engineering services; correct?



A Yes.
Q And these services include analysis of soil erosion rates, et cetera, as listed on this exhibit; right?
A Yes.
Q Included in this list is sediment deposition and scour analysis. What is that?
A That includes any number of things, but the primary thing that we do in sediment deposition and scour analysis is to project either through -- projecting trends into the future or through mathematical modeling, projecting either a deposition on a scour area, what it will do over time.
Q And deposition is where sediment is deposited?
A Right.
Q And scour is where it is removed?
A Yes.
Q By the movement of the water?
A Right.
Q So you do an analysis of that? You can?
A We can do that.
Q And you have done that?
A We have.
Q You do analyses of soil erosion rates?



A Yes.
Q You do sizing of sediment retention structures?
A Yes.
Q What are sediment retention structures?
A They're small impoundments usually upstream of a larger impoundment to prevent sediment from entering the smaller -- or the larger impound. Excuse me.
Q Do sediment retention structures exist --
A Yes.
Q -- along the main stem system?
A Not that I'm aware of along the main stem system.
Q Where do they exist in the Omaha District?
A Our tributary reserviors have sediment retention structures associated with them. Most of them, not all, but most.
Q Why is that?
A They're primarily for water quality purposes rather than sediment depletion purposes.
Q What's the difference?
A Soils -- depending on the type of soil, some soils -- contaminants are going to be attached to some soils. Smaller reserviors have a smaller

volume of water and therefore contaminants -- water quality standards can be more easily violated.
Q Another of the services is design of stream bed erosion protection. What is that?
A It's bed stabilization designs.
Q And I would guess that that includes the installation of the riprap to stabilize the channel? It sounds like there may be others.
A Yes.
Q And what do those include?
A It would be -- you could have something that's not built out of riprap. It could be a concrete structure or a metal sheet piling wall or something like that.
Q Dredge plans are also listed here. What are dredge plans?
A If you have a project that requires dredging, a dredge plan is not just the area where you're dredging, but what are you going to do with the material that you dredge out, the disposal of that material, the management of the excess water from that material.
Q What is dredging?
A Dredging is the removal of material from a waterway.



Q And by "material," you mean sediment or dirt?
A Sediment, dirt, rocks.
Q That have accumulated in the water?
MR. GETTE: Objection.
BY MS. SNYDER-VARNS:
Q Is that true?
A That are in the water.
Q That are in the water.
Is dredging going on in the main stem system?
A Not at this time above -- in the main reservoir system. We have done some dredging below Sioux City in recent years.
Q What is drainage structure erosion protection?
A That is protection of possibly like a landfill cap to prevent the cap from eroding off the top.
Q Is this a complete list of tools that the Corps can use to address sedimentation?
A May I see the list again, please?
No.
Q So there are other services available?
A That would come under the other part of



Exhibit 2 there, just above it, under the -- see "River, Environmental Restoration.
Q So there's quite a variety of responses available to the Corps to address sedimentation?
A Yes.
Q Getting back to monitoring -- actually, I think we've covered that adequately at the moment.
MR. GETTE: If you're going to go into a new area, can we take a short break?
MS. SNYDER-VARNS: Sure.
(10:00 a.m. - Recess taken)
(At 10:10 a.m., with all parties present as before, the following proceedings were had, to wit:)
BY MS. SNYDER-VARNS:
Q Mr. Remus, we've been talking about sedimentation and the tools available to address it. If we might for a moment back up to just the programs and policies within the Omaha District that exist specific to sedimentation.
Does the Corps have an overall policy -- and I know this is a very broad general question. Does the Corps have some sort of policy like a mission statement with respect to sedimentation?
A Not specifically just sedimentation.
Q The programs that we discussed earlier come



from legislation; is that correct?
A Which program?
Q Well, the O&M --
A Can we go one at a time with those?
Q Sure. O&M, Maintenance Project Purposes, I'll let you tell me about that.
A Operation and Maintenance, we have been tasked by Congress to operate and maintain these projects. And each project has its own authorized purposes, flood control, hydropower, so on and so forth. We have an O&M program to address maintaining those project purposes which may include sedimentation issues like that.
The Continuing Authoriites programs, each one of those has their own specific purpose. And the ones that we use here are the Environmental Restoration program, Section 1135, Section 206 programs where the issues to address sediment there are environmental restoration focused. Titles 9 and 7 are really up in the air yet. We haven't really defined what we're going to do with those because they're just now getting off the ground.
Q So the development of Corps programs to address sedimentation would come from implementing legislation?

A I guess, yes, in a general sense.
Q What involvement do you have in developing Corps policies within the Omaha District to address sedimentation?
A Could you be more specific than that as to what you mean by "policy"?
Q I understand that you're an engineer, but you're also an administrator. And in that capacity as administrator, do you get involved with policy development with respect to sedimentation?
A I'm not an administrator. I'm a supervisor, which isn't even a manager. However, I do get involved in providing technical input to policies relative to a number of things including sedimentation. But it's a technical input, not necessarily policy development per se.
Q So what types of technical input do you have in determining how sediment is addressed in the Omaha District?
A We identify -- we help to identify the sedimentation issues at particular projects, what are they, what are the impacts, so on and so forth. We also would identify a course of action that we might recommend. Or if somebody else has recommended a course of action, we may identify the pros and cons,



if we do this, then this happens, so on and so forth, so that the management, the upper level management of the District can make a decision and say we're going to do this or we're not going to do that based on what our legal mandates are, what our resource availabilities are, so on and so forth.
Q I believe your bio says that you worked -- you have worked with CERL in development of condition indices for river control structures. What is CERL?
A It's one of the Corp of Engineers labs. It's stands for Construction Engineering and Research Laboratory. It's in Champagne-Urbana, Illinois. And they do research on construction techniques, construction materials, construction practices, stuff like that.
Q Relative to what?
A To any type of construction.
Q Well, this says "river control structures." What are those?
A Those are our structures that we have placed from Sioux City down to the mouth at St. Louis, a series of wing dikes and revetments. And they were developing condition indices when I was working with them to help support O&M budgets. It was a physical condition that was supporting their



doing maintenance or not doing maintenance on a particular structure.
Q And this was related to downstream areas on the Missouri from the main stem reservoir system?
A Yes, it's downstream of Sioux City, Iowa, downstream of the reservoir system.
Q What programs are you involved with specifically to address sedimentation as Chief of the Sedimentation and Channel Stabilization Section?
MR. GETTE: Objection. I think we've asked and answered this.
But go ahead.
THE WITNESS: Well, any program that would address sedimentation or have a sedimentation component we are involved with in our section, whether it's a O&M program or Continuing Authorities program or a specifically authorized project, if it has a sedimentation program, we're involved in that.
(Exhibit No. 3 marked for identification).
BY MS. SNYDER-VARNS:
Q From your web page, it looks like your section has several projects currently underway.
A Uh-huh.
Q And I'm showing you what's been marked as



Exhibit No. 3, "Current Projects." It lists the Gavins Point project which includes investigating ways to stop the sedimentation into Lewis and Clark Lake. Can you describe that for me?
A First of all, this website has not been updated for a long time because we are presently not working on this particular project. It's completed. The project was a reconnaissance level report, ways to either prevent sediment from getting into Lewis and Clark Lake or get sediment out of Lewis and Clark Lake and moved on downstream.
Q So the sediment was coming into the lake from where?
A From the Missouri River upstream of the reservoir and from the Niobrara River which enters the river just upstream of the lake.
Q So what did the Corps do to get sediment out of the lake?
A We didn't do anything to get it out. The results of the study was that there was nothing feasible. There were no feasible alternatives that we found.
Q Was there any way to prevent it from coming into the lake?
A There are ways of preventing sediment from

coming in if you want to manage sediments out in the basin, the Niobraro River basin. You could reduce the amount of sediment coming in; you could not stop it from coming in.
Q Did the Corps do anything to stop the sediment from coming into the Lewis and Clark Lake?
A No.
Q Why?
A We found nothing that was feasible.
Q And by "feasible," what do you mean?
A Cost effective.
Q Okay. Cunningham Lake 1135 project, is that still underway?
A Yes.
Q It includes design of a sediment trap dam. What is that? Just what it says?
A Yes, a sediment retention structure.
Q Above or below the dam?
A Above the pool.
Q And this project also apparently consisted of construction of an island and/or breakwaters to minimize erosion of the bottom sediments and shoreline erosion protection including jetties.
A Yes.
Q Where is Cunningham Lake?



A It's located on the north edge of Omaha.
Q Is it on a tributary to the Missouri?
A It's on a tributary to a tributary to the Missouri.
Q And why did the Corps undertake this project?
A This project is part of the 1135 program. The City of Omaha and the Nebraska Game and Parks Commission asked us to initiate an 1135 study.
Q Why?
A They wanted to improve the aquatic habitat within the lake.
Q Which was being affectd by sediments?
A It's being affected by sediments in two ways, one is water quality attached to the sediments coming in, and two is the depth diversity within the lake was being diminished due to filling of the reservoir.
Q Was a sediment trap dam installed?
A This project has not been built yet.
Q Is it in its design phase? Or where is it?
A I'm not real sure exactly where it's at. We have completed the design studies, but I do not believe we have completed the plans and specs. But I cannot be sure about that.



Q The last page of this exhibit -- or second to last page -- excuse me -- page three, lists environmental restoration projects on the Missouri River.
A Uh-huh.
Q And included in that list, the third one down is "Examine concepts for reducing the amount of sediment that is being trapped in the Lewis and Clark Lake. Sedimentation continues to fill in parts of the reservoir with sandbars and marsh land reducing the reservior's capacity for flood storage and hydroelectric generation."
A Uh-huh.
Q Just from looking at your web page, it looks like sedimentation on Lewis and Clark Lake is getting the Corps' attention because it's significant.
MR. GETTE: Objection.
THE WITNESS: The Lewis and Clark study that is shown on the first page of this exhibit was a congressionally authorized study. Congress provided us funds and directed us to conduct this study. The local residents there working through their congressman and their senators got that funded and authorized. The projects listed here in the



environmental restoration projects on page three of this are really projects that have grown out of the biological opinion that the Fish and Wildlife Service issued in 2000 to the Corps of Engineers. And one of those things was to conduct sediment bypass studies of all the reservoirs beginning with Lewis and Clark to try and get more sediment in the river reaches below the dams to create sandbar habitat for the birds. And that's what that study is.
BY MS. SNYDER-VARNS:
Q So with respect to Corps policy and Omaha District policy for addressing sediment, the source is, if I understand this right from your testimony, operation and maintenance responsibilities for the dams and then specific legislation which seems to be driven by specific issues concerning sediment within the district; is that accurate?
A Could you rephrase that question?
Q One of the sources for the Corps to do something about sediment or reasons would be its O&M responsibilities for the dams. And sediment is a fact of life when you have dams on a river system; is that correct?
A Yes.
Q Another source that moves the Corps to

become involved in sediment issues is specific projects driven by legislation on I guess whatever level but probably the federal level directing the Corps to do something about a particular problem involving sediment?

(Witness looks at Mr. Gette).

A That's correct.

Q Or addressing environmental impacts from sediment; is that accurate?

(Witness looks at Mr. Gette).

A Yes.

Q And it looks like a lot in recent years is driven by environmental impacts resulting from sedimentation under the Corps' jurisdiction; is that accurate?

MR. GETTE: Objection. A lot of what is driven by --

MS. SNYDER-VARNS: Read back the question.

(Pending question read back by the reporter).

BY MS. SNYDER-VARNS:

Q A lot of the Corps projects addressing sedimentation seem to be driven by environmental concerns arising from the impacts of sedimentation?



A I would say a lot of the projects that we have guilt are driven by environmental restoration concerns, but our program in general is not.

Q If your program in general is not, what are the other components of your program that drive the Corps to take action to address sediment?

MR. GETTE: Objection. I'm going to put a continuing objection on relevance to this whole series of questions that we've had for some time now about the Corps' reactions and methods and procedures for addressing sedimentation. The issue in this case is a taking, which means that the actions of the Corps are assumed to have been legal and lawful and appropriate. You seem to be addressing an issue of how the Corps reacted to certain sedimentation which would be, if anything, an issue of tort liability and not an issue of taking. So I really think that the line of questioning seems to be inappropriate. I'm not going to instruct the witness not to answer, but it seems to me irrelevant to the case, this entire line of questioning regarding the Corps' reaction or methods of dealing with sedimentation.

MS. SNYDER-VARNS: You've got your objection, counsel.

MR. GETTE:



You can go ahead and answer.

THE WITNESS: Could you repeat the question?

(Pending question read back by the reporter).

THE WITNESS: The other components that would drive us to take action or to initiate some type of response would be the Congressionally authorized project purposes for our main stem projects. And those are flood control, navigation, hydropower, water supply, water quality, fish and wildlife, recreation. Those are all the ones I know off the top of my head.

BY MS. SNYDER-VARNS:

Q What projects has the Corps undertaken to address sedimentation on the Moreau River?

A Other than the monitoring, none that I know of.

Q None that you know of?

A None that I know of.

Q I'm going to show you --

MS. SNYDER-VARNS: And we'll mark this, please.

(Exhibit No. 4 marked for identification).



BY MS. SNYDER-VARNS:

Q I'll show you what's been marked as Exhibit No. 4, Mr. Remus. And I'll represent to you that again, I got this from your web page.

My understanding is that this report, which is entitled "Aggradation and Degradation Aspects of the Missouri River Main Stem Dams," is one of the reports prepared by the Omaha District through the years as a part of dealing with sedimentation in the main stem system; is that accurate?

A Yes.

Q Are you familiar with this particular report?

A I have not picked it up for a number of years, but I am familiar with it, yes.

Q Are Alfred Harrison and Warren Mellema, the authors, still around?

A Alfred Harrison and Warren Mellema are both still alive, but they no longer work for the Corps.

Q And the date of this report is May of 1984 it appears.

Now, what I am giving you are pages one and then 23 of this report. And it tells us on the web page that these are the pages that are being provided

Page 58

but that we can obtain the entire report from John Garrison at the Omaha District. And just for the record, I've made a request for the complete report, and it's my understanding that Mr. Gette will provide that to me sometime today if possible. I am more interested in the first page, the introduction, and the conclusions or summary from the report. And I would think that the body of the report would support the conclusions that are stated on page 23 of this report.

Now, in this report it says that "The Army Corps of Engineers, Missouri River Division, has constructed six multi-purpose dams along the main stem of the Missouri River." And then it lists the purposes for these projects, which are I guess several and can be competing.

How does the Corps manage the system for all of these purposes?

MR. GETTE: Objection. Under -- I don't have a problem with the question itself that came at the end, but I have a problem with the entire lead-in that suggested that -- and assumed that there was the potential for competing interests among the purposes of the dam.

You can answer if you can.

Page 59

THE WITNESS: Our main stem reservoir system is managed through the criteria laid out in our Master Manual, which is a master guidance manual for operation of the main stem dams that has release criteria from the reserviors set out based on storage, needs, so on and so forth. I do not get involved with management of the main stem dams. The management of our main stem reservoirs is done at our Division office.

BY MS. SNYDER-VARNS:

Q And the Master Manual is developed through a process that is outside of your area of responsibility; is that what you're saying?

A That is correct, yes.

Q But you follow the Master Manual in carrying out your responsibilities within the Hydrologic Engineering Division?

A The Master Manual does not have really any impact on the sedimentation program.

Q There's nothing in the Master Manual to address sedimentation?

A Not to my knowledge, no.

Q The report here says that "These dams now intercept the sediment from one of the largest and most productive sediment producing regions in the Continental United States."

Page 60

Do you agree with that?

A Yes.

Q And it actually gives a number in the report. "Sediment measurement records indicate that an average of 1.35 X 10 to the 8th tons of sediment per year" -- which I understand is 13.5 billion tons of sediment per year -- "was transported by the river," the Missouri River, "as suspended load prior to construction of the dams, but that the amount of sediment passing through the system has been reduced to virtually zero."

Where does the sediment stop within the system? Where does it accumulate?

A Sediment accumulates in the pool areas of the reserviors.

Q Where in the pool areas?

A It accumulates primarily in the head waters of the main stem of the river, the Missouri River, and in the tributary arms.

Q And the tributary arms are where tributaries to the Missouri flow into the Missouri or the reserviors behind the dams?

A That's correct.

Q The report says that the fact that the

Page 61

amount of sediment passing through the system has been reduced to zero has far reaching influence.

Can you tell me what that means to you in your capacity as head of the Sedimentation Branch within the Hydrologic Engineering Division?

A Could you be more specific there?

Q Sedimentation within the Missouri River basin is significant; right?

MR. GETTE: Objection.

BY MS. SNYDER-VARNS:

Q According to this report?

A It can be.

Q And all of the sedimentation that formerly flowed down the Missouri has been stopped by the main stem reservoir system according to this report; is that true?

A Yes.

Q And sediment is accumulating within the reservoir system; right?

A Yes.

Q And that accumulation has far reaching influence; correct?

A Yes.

Q And you told me that this sediment accumulates at the head waters of the Missouri. And

by that, do you mean head waters of each reservoir?
A Right, the head waters of the main stem reserviors.
Q And is that where the Missouri flows into the reservoir?
A Right.
Q And then it's also accumulating where the tributaries flow into the reserviors?
A Yes.
Q What is the far reaching influence that this is talking about?
A Without having the report in front of me, I don't think I can answer that question because they probably discuss that more in detail between pages one and 23.
Q On page 23 it does talk about it in a little bit more detail. It says that "Sediment deltas are forming in the upstream end of each reservoir resulting not only in the loss of reservoir storage capacity but also in higher water surface elevations for flows entering the backwater reaches of the pools."
So the influence that it's talking about is that the reserviors lose storage capacity as sediment accumulates?



A That's correct.
Q Has Oahe lost storage capacity as a result of the accumulation of sediment?
A Yes.
Q Another of the far reaching influences of sediment accumulating within the main stem reservoir system is higher water surface elevations for flows entering the backwater reaches of the pools. So water surface elevations in the backwater reaches of the pools are higher as a result of sediment?
A Yes, as water enters the pool area, sedimentation causes increased water surface elevation.
Q And "as water enters the pools," you mean from the tributaries?
A From the tributaries or the main stem.
Q And where it enters the pools again is -- or the pool, by that do you mean the Oahe reservoir pool, if we talk specifically about Oahe?
A Yeah.
Q Okay. And the tributaries to Oahe includes the Moreau River; right?
A Yes, the Moreau River is a tributary to the Oahe reservoir.
Q So is it fair to say then that higher water



surface elevations for flows entering the backwater reaches of Oahe exist where the Moreau flows into Oahe?
MR. GETTE: Objection. Can you put a time period on it?
BY MS. SNYDER-VARNS:
Q Do higher water surface elevations exist in the backwater areA now where the Moreau flows into Oahe?
A In the delta area, yes.
Q Has the water surface elevation in this area increased over time since construction of Oahe?
A In the delta area, yes.
Q Has it been a gradual process?
A Yes.
Q Have the water surface elevations ever decreased as opposed to increased?
A Not to my knowledge, no.
Q When we're talking about loss of reservoir storage capacity, to put it into layman's terms, does that mean that the reservoir can store less water because it's filling with sediment?
A That's right.
Q And when you have higher surface water levels in the backwater reaches of Oahe's pool, does



that mean the sediment is pushing the water upward physically?
MR. GETTE: Can I hear that question back?
(Pending question read back by the reporter).
MR. GETTE: Go ahead.
THE WITNESS: No.
BY MS. SNYDER-VARNS:
Q What does it mean?
A The water -- the higher water surface elevation is caused by a backwater effect of the reservoir. If you raise the pool of the reservoir, the water can't flow out as easily, so the water is backed up by the pool of the reservoir and the sediment drops outs because of the backwater effect.
Q When you talk about the backwater effect slowing the water and the sediment dropping out of the water, what other effects does the backwater effect have on the Moreau River?
THE WITnESS: Read the question back.
(Pending question read back by the reporter).
THE WITNESS: I don't know of any other effects.

Page 66

BY MS. SNYDER-VARNS:
Q Would it be fair to say that the sediment accumulating in the Oahe reservoir displaces the water in the reservoir so that the pool moves outward horizontally into the backwater reaches of the pool?
A No.
Q Why not?
A The pool is a level elevation. You can't stack water.
Q And you maintain the pools at certain elevations?
A The pool at Oahe varies over a year -- varies seasonal over a year and cyclic over a hydrologic cycle. So it's not maintained at a constant elevation.
Q So the backwater effect in the tributary arms of the reservoir is a separate situation from the pool of the reservoir itself?
A No.
Q Can you explain that?
A The backwater effect in any of the tributary arms is a function of the pool elevation. The higher pool elevation would have a greater backwater effect on the tributary, a lower pool elevation would have less of a backwater effect.

Page 67

Q When the backwater effect comes into play and sediment drops out in the delta, how does that affect the river or tributary upstream of the delta?
A It depends on the situation of the tributary. But upstream of the delta area it can raise water surface elevations if the pool effect is high enough.
Q When the delta forms in the arm of Oahe reservoir where a tributary flows into the reservoir, does the sediment accumulation over time just move upriver from the delta?
A You'll need to put a time frame on that. Deltas initially build in both an upstream and downstream direction. As they mature and the river reaches a new equilibrium slope, they will only develop in a downstream direction.
Q So how long does it take to reach equilibrium? How long do these tributaries on Oahe take to reach equilibrium?
A We don't know.
Q You've not done any studies about that?
A We've not done detailed enough studies to know that.
Q So as far as you know, the deltas are still developing in the tributary arms on Oahe?

Page 68

MR. GETTE: Objection.
THE WITNESS: The deltas will always continue to develop as long as you have sediment and a lake there. So they develop until such time as the lake is completely full or completely drained.
BY MS. SYNDER-VARNS:
Q Completely full of what?
A Of sediment.
Q I'm going to give you a piece of paper, Mr. Remus, if I might. And I'm going to ask you to draw for me the Missouri River and Oahe and --
MS. SNYDER-VARNS: Would you mark that, please?
(Exhibit No. 5 marked for identification).
BY MS. SNYDER-VARNS:
Q And I don't expect you to be an artist. But if you could draw a crude diagram if you will of the river flowing into the lake, where the dam is on the lake, and where the sediment accumulates in the reservoir.
MR. GETTE: Objection. I'm not going to have this witness engage in an art endeavor. I mean, we have maps of the reservoir; we have maps of the dam; we have maps of the tributaries. If you

Page 69

want an indication of where there's been delta formation, why don't we get out a map and let him indicate on the map where the formation is. I'm not going to let him sit here -- force him to sit here and go through an exercise of drawing.
MS. SNYDER-VARNS: Let's go off the record.
(Discussion had off the record).
BY MS. SNYDER-VARNS:
Q We'll switch gears here a little bit, Mr. Remus.
I'm going to draw the Missouri River as a line on Exhibit No. 5. And then I'm going to draw a circle on this exhibit representing Oahe reservoir. Then I'm going to draw a line at the bottom of the circle to indicate Oahe dam. Then I'm going to draw another line continuing to the bottom of the page from the circle to indicate the Missouri River flowing out of Oahe dam.
Can you mark for me with a red pen --
MR. GETTE: Objection.
BY MR. SNYDER-VARNS:
Q -- where the sediment accumulates in Oahe?
MR. GETTE: Objection. Same objection. We have maps. We've produced them in

this litigation --

MS. SNYDER-VARNS: I'm entitled to present the evidence anyway I want, Jim. And I'm entitled to ask this witness to designate on the diagram I've provided to him where sediment accumulates in this reservoir.

MR. GETTE: I'll object to that and instruct him not to do it on this crude hand drawing on a map. I mean, we've got maps, we've got reports, we've got measurements about this. Let him look at those, let him make indications on the maps. That's appropriate. But this kind of crude presentation is not appropriate and the witness shouldn't have to do it.

MS. SNYDER-VARNS: Just so that I understand, you're instructing your witness not to be responsive to my question here?

MR. GETTE: No. My objection is on the record.

MS. SNYDER-VARNS: I'll certify the question. Thank you.

BY MS. SNYDER-VARNS:

Q Can you tell me what effects on a tributary the backwater effect generally has?

MR. GETTE: Objection; asked and



answered.

Go ahead.

THE WITNESS: In general, a backwater effect when it's on the tributary of a main stem would result in a higher water surface elevation for a given discharge, an increased incidence of flooding and sediment deposition.

Q And where on the tributary does this occur?

A It would depend on the location of the pool, what the elevation of the pool would be.

Q How else does the accumulation of sediment in a delta of a tributary to a reservoir affect the tributary?

MR. GETTE: Objection; asked and answered.

Go ahead.

THE WITNESS: It's the same answer to the last question.

BY MS. SNYDER-VARNS:

Q So the backwater effect and the deposition of sediment in the delta of a tributary are the same thing?

MR. GETTE: Objection.

But go ahead.

THE WITNESS: The backwater effect on



a tributary or the main stem is what I said before, they cause sediment deposition -- that causes sediment deposition.

BY MS. SNYDER-VARNS:

Q So the backwater effect causes sediment deposition, and that sediment deposition is the delta?

A That's the delta.

Q Okay. Is sediment deposition in a tributary limited to the delta?

A Yes.

Q When the delta has matured, the sediment I understand drops out or the delta moves further down stream as opposed to up?

A When the delta initiates, the deposition will be in both directions, both upstream and downstream, due to the backwater effect. Once it establishes its new what we call equilibrium slope or the ability to carry sediment, the upstream growth of a Delta will stop. It will only grow in the downstream. We call that a mature delta.

Q And you haven't done any modeling of the tributaries to Oahe to determine what level of maturity they're at?

A That's correct.



Q Have you done any modeling of the Moreau responsive to this matter or otherwise to look at that issue?

A The maturity of the delta?

Q The movement of the delta.

A The movement or the maturity?

Q The maturity.

A No.

Q What do you know about sediment accumulation in the Moreau River?

A I know what has been presented in the report that we did in response to this lawsuit. And I know what we have in our Oahe aggradation assessment. And in general, we have seen fairly standard accumulations of sediment in the tributary arm, the Moreau tributary arm.

Q And what do you consider standard accumulations?

A The delta is forming approximately as we would expect as far as shape of the delta.

Q What is the shape of the delta?

A It's a basic triangular delta with a steeper face and a flat top set.

Q Steeper face, what do you mean by that?

A The downstream edge of it is a steeper face

than the top of it.
Q And the downstream edge is where, in Oahe as opposed to the tributary?
A At the downstream end of the tributary, which is in Oahe.
Q What do you mean by a steeper face?
A It has kind of a -- I don't want to say a cliff because it's not that extreme, but you have a river slope and then you have a fairly steep face to the delta as it moves downstream.
Q So you have a drop off from the delta into the reservoir?
A Basically. But it's not a cliff type drop off, but it's a noticeable change in slope.
Q And you consider that a standard shape of a delta?
A Right.
(Exhibit No. 6 marked for identification).
BY MS. SNYDER-VARNS:
Q Can you identify this Exhibit No. 6, Mr. Remus?
A Yes, this is our sedimentation analysis that we did in August of 2002.
Q By "we," who do you mean?



A Our section.
Q Who specifically within the section prepared it?
A John Garrison did this.
Q Did you have any involvement in this report?
A I was involved in the scoping, the study and review of the results.
Q Scoping of the study is what?
A Determining what information we wanted to analyze, how we wanted to analyze it, what information we maybe needed to collect to answer the questions and developing the budget and schedule.
Q Can you go back through those? You said that you decided what to study and the budget for it. How did you decide what to study?
A We were posed a question. And I can't off the top of my head tell you exactly what we were asked. So we looked at our data that we had and our past reports if we had them and decided on a course of action of study, what analyses were going to be performed, what data was going to be used, what data did we need to collect, and then put together a budget and schedule to do that.
Q Did you keep notes of that decision-making



process?
A I don't have any notes, no.
Q Did you have meetings about the scope of this study?
A Yes.
Q Who did you meet with?
A John Garrison; Larry Morong, who is a technician in our section; we had conversations with both Operations Division and Office of Counsel as to what we needed to do.
Q And it was those individuals who ordered the study?
A They asked for the study.
Q What did you decide to study?
A It's in the report. We decided to look at the range line data and conducted trends analysis basically.
Q What do you mean by trends analysis?
A Look at the trends over time as far as how things had changed as far as bed elevations, cross-sectional areas and so on.
Q This is what you decided to study?
A This is how we decided to go, yes.
Q What else did you decide to study?
A We did a specific gauge analysis for the



White Horse gauge.
Q What's a gauge analysis?
A Just a historical analysis of the gauge over time, whether or not you have an increase or a decrease in the water surface elevation at that gauge.
Q And is the gauge a physical instrument?
A A gauge is a stream gauge that the USGS maintains at White Horse. I believe it's on the bridge, but I'm not sure.
Q Anything else you studied or decided to study in the course of this -- of generating this report?
A No.
Q So if I have it right, you decided to study the cross-sections of the channel and the gauge at White Horse to determine water levels?
A We did not use the cross-sections to determine water levels in this study, just the gauge record for the water levels.
Q Okay. The report on page one says that you looked at six sediment range lines.
A Uh-huh.
Q Are those designated by M-37.7 through M-59.2?

Page 78

A Yes.
Q And those are the range lines installed -- or some of the 2600 range lines installed by the Corps after construction of the main stem reserviors?
A 2600 monuments, not 2600 range lines. But these are the range lines that we had established either during the construction of the project or shortly thereafter.
Q The report summarizes the data that you gathered -- or I should rephrase.
Does this report summarize the data that you gathered when you surveyed these six range lines? Does the report summarize the data you gathered when you surveyed the range lines?
A Well, yes, I guess so.
Q If that's not --
A Well, I'm not really --
Q If that's not the case --
A We looked at the data. It doesn't really summerize the data. It presents the data we put together. The summary of our data is really in our Oahe Degradation Report which summarizes all the data for Lake Oahe.
Q What is the Oahe Aggradation Report?
A It's just a data report we produced -- and

Page 79

I don't know the date off the top of my head -- that summarizes all the cross-section data for all the tributary arms, the main stem, the whole complete project.
Q How often is that report issued?
A We've only done it once.
Q When was that?
A I don't know off the top of my head.
Q Is it in the last ten years?
A I don't believe so, no.
Q Looking at page one of the report, it says that the floodplain at sediment range line M-37.7. And this is located 2.3 river miles downstream of the Corps property boundary. So that's within the project boundary I take it?
A Yes.
Q Okay. 2.3 miles within the project boundary?
A Yes.
Q On the Moreau River?
A Yes.
Q And it says that the deposition in the floodplain since the original survey in 1962 is between two and a half and 9.2 feet, on page one, second to the last paragraph.

Page 80

A Uh-huh.
Q And that's obviously referring to deposition of sediment?
A Yes.
Q And that's the floodplain of the Moreau River?
A Well, it would be the historic floodplain of the Moreau River.
Q At this range line?
A Yes, at that range line.
Q It also says that the thalweg of the channel has stayed about the same since 1976 but is at about 13 feet higher than in 1962.
What is a thalweg?
A It's the very deepest point of the cross-section.
Q And the elevation of the thalweg of the Moreau River channel at this range line is 13 feet higher than it was in 1962?
A According to the data, yes.
Q It also says that the channel has continued to narrow over the years and the channel cross-sectional area in 2003 was about -- was less than half of that in 1962.
A Yes.

Page 81

Q You then do a paragraph in this report -- or the paragraph includes a report discussing the data at M-41.4. That's one of the six range lines?
A Yes.
Q And is that immediately upstream from M-37.7?
A It's not immediately upstream. Those -- the M stands for Moreau, and the 41.4 and the 37.7 refer to river miles. So it's roughly three and a half or so river miles upstream.
Q Were there any range lines in between these two?
A No.
Q So it's the next range line up from 37.7?
A It is the next range line up.
Q And at this range line it says that the deposition of sediment on the left bank is between one and 3.4 feet since 1962.
A That's what it says.
Q And I'm paraphrasing a little bit and trying to understand what the report is saying. So if the way I paraphrase isn't correct, please correct me.
And then it also says with respect to the right bank, you have deposition of two to ten feet;

Page 82

is that right?
A Yeah.
Q And then again it talks about the thalweg. And here it is five feet higher -- it doesn't say it, but is it five feet higher than it was in '62?
A Yes.
Q And it also says that the channel has been reduced by more than half. And would that also be since 1962?
A Yes.
Q Why are you using 1962?
A That's the first range line that we have, first survey.
Q And then the next paragraph on page two talks about range 44.1. Is that the next range line up from 41.4?
A Yes, it is.
Q And here the deposition of sediment is zero to one feet for the left bank; is that correct?
A Yes.
Q And the deposition of sediment on the right bank is anywhere from 2.6 to four and a half feet?
A Yes.
Q Now, this talks about how the sediment is distributed and in what depths; is that right? This

Page 83

paragraph (indicating), how it describes the depths of the sediment?
A Yes, it's depth and distribution of the cross-section.
Q And here again, the thalweg of the Moreau River was three feet higher in 2003 than in 1962?
A Yes.
Q Now, Mr. Remus, it looks like the last page of -- or excuse me -- the last sentence of this paragraph referring to range M-44.1 may not have been completed. It says, "The cross-sectional area of the channel shows little change over time, however. . ."
A Yeah, that -- that "however" should not be there.
Q Okay. Just the cross-sectional area of the channel shows that it has not changed or has changed little?
A Yeah.
Q Okay. And then the final paragraph on page two discusses the same information as far as deposition of sediment, thalweg elevation and channel area for range 47.8.
A Right.
Q And then the next paragraph on page three discusses the same information for the next two

Page 84

ranges, 52.7 and 59.2.
A Right.
Q The report then moves on to discuss the channel cross-sectional area changes on page three. And it summarizes it appears what the changes have been on the Moreau. Is that a fair conclusion?
A Yes.
Q And one of the points made is that, "In 1962 the two most downstream sections, M-37.7 and M-41.1, had the greatest cross-sectional areas, but by 1976 they had the smallest."
What does that mean?
A It means that their cross-sectional area had reduced in that time period in those 14 years.
Q The cross-sectional area of the channel?
A Of the channel below our reference elevation. As you can see, in each column there, each year they have an area and an elevation. That's our reference elevation that is based on either a top of bank or a certain flow depending on what it takes to capture the entire cross-section.
Q So you're moving ahead of me a little bit in the table.
But just going back to the text above it talking about the fact that these sections of the

Page 85

Moreau River channel had the greatest cross-sectional areas in 1962, in other words, is that saying that the channel was the widest in 1962?
A Not necessarily.
Q What does it mean?
A It may be the widest, it may be the deepest, or may be the widest --
Q Just the overall area?
A -- area.
Q Okay. And then by 1976, the overall area of the Moreau River channel at those two sections was the smallest of the range lines?
A Yes.
Q And then the second point there in the text is that all the channel sections showed a decrease in cross-sectional area from 1962 to 2003.
A Yes.
Q So the area of the Moreau River channels at these cross-sections all showed a decrease?
A Yes.
Q So then moving to the table, this summerizes the channel area for 1962, '76, '89 and 2003 at these range lines?
A Yes.
Q And when you look at 1962, the capacity

column, and you look at 2003, the capacity column, that shows you the difference in area of the channel?
A Yes.
Q And what caused the change in the size of the channel or the area of the channel?
A At which location?
Q All of them.
A The deposition at 37.7 and 41.4 we attributed to our operations of our reservoir. 44.1, we believe that it's probably attributable to our operations of our reservoir. The other ones we have not identified a reason for that.
Q What are possibilities for that?
A These are all snapshots in time. There is natural change in reservoir -- or channel area over time. These are just snapshots. If we took it the next day, it could be different; you know, a month later or a year later it could be more or less. So those fit pretty much -- if you look at the areas, they're not that much different over time.
Q Now, I understand from Mr. Stasch that he has been out and surveyed these range lines in 2005 and early 2006.
A Uh-huh.
Q Have you seen the data from those?



A Yes, I have.
Q What do they tell you?
A I have to look at them to tell you anything. But I don't think our conclusions would be any different.
Q So for the upper three range lines, it's your testimony that you don't know what has caused the reduction in the channel area on the Moreau?
A We couldn't identify anything out there specific.
Q And for that reason, you can't rule out that it's attributable to Oahe, can you?
A There's no indication that it was from our reservoir operations.
Q What indication do you need -- or what would be an indication that it's from Oahe?
A Some consistency in trend and some consistency in the distribution of the sediments with the ones that we are confident are being impacted by our reservoir.
Q Moving to the gauge data, help me understand what you mean by stage trends. You obtained data from the gauge as to stage trends. What are those?
A A stage at a gauge is basically the



elevation of the water for a given discharge. The USGS maintains this gauge. They go out and measure the stream flow periodically. I don't know whether they do it on a weekly basis or monthly basis. They measure how much water is coming through and assign an elevation to that discharge and they build what they call a rating curve. Sometimes they publish these; sometimes they don't. And we look at that rating curve over time. Each year we'll take a year's worth of data, build a rating curve for that year, and we look at a specific discharge. Here I think we looked at a thousand and 500 CSF.
Q Where do you get the discharges?
A Those are just two discharges that we picked out to look at on over time. The 500 represents a fairly -- pretty much the base flow. The thousand I think represents the annual flood.
Q For the Moreau specifically?
A For the Moreau specifically.
Q And CFS is cubic feet per second?
A Yes.
Q Where do you get that data?
A Which data?
Q The 500 and a thousand being representative of the Moreau.



A We just look at the discharge record. There was no hydrology analysis done here. It's just a couple of discharges that we just pulled off of the gauge record as being approximate.
Q So the discharge information comes from the gauge at White Horse?
A Correct.
Q Okay. And this is the U.S. Geological Survey that has collected this data?
A Right.
Q Okay. And so you take those two discharges and determine the trend for that stage?
A For that discharge, the trend in the stage for that discharge over time.
Q And there was a flood in 1997 that had some influence on the stage determination that you made?
A No.
Q Then what does the '97 flood have to do with this?
A I'm not so sure the '97 flood has anything to do with this.
Q It says in the last sentence on page three that after the record peak discharge in '97, the stage rose slightly more than a foot for the 500 foot

discharge and slightly less than a foot for the thousand foot -- or CFS discharge. Help me understand that.

A That was just in 1997. When we plotted the data, they noticed there was a shift in the gauge at that particular time. It's just a statement of -- a summary of the data.

Q So that was just limited to that particular time?

A I'm not sure what you're after there.

Q The fact that you saw just minor movement of the stage has what influence on your conclusions in this report?

A Our conclusions are because we did not see a real trend in the specific gauge analysis, that there was nothing attributable to our project at White Horse. While you did see fluctuation, there's nothing that could match up with a trend downstream.

Q Did you do any gauge analysis or gather any data from any gauges downstream at White Horse?

A No, there are no gauges downstream at White Horse.

Q So the only stream flow data or gauge that you had was the White Horse gauge?

A Yes.



Q And that's at -- I'm not seeing what river mile that's at, but I'm sure that's obtainable.

A Well, if you look at the map on page two, it's well beyond the river mile 59.2.

Q So looking at that map, and based upon your testimony, it's your opinion that Oahe operations have had an effect on the Moreau River channel at the two lowest range lines -- actually, not the two lowest. I guess it's the 41.4 and 44.1, which is the second and third range lines from the bottom.

MR. GETTE: Objection. I don't think that quite captures his testimony or accurately captures his testimony.

BY MS. SNYDER-VARNS:

Q Let me just start over with this question.

Actually, let's go back to the stage trend first, and then we'll come back to that one.

Talking about the stage trends on the Moreau, you weren't able to see any trend at the White Horse gauge of any significance to help you do what for this study?

MR. GETTE: Objection. The question seems vague to me.

But if you can answer.

THE WITNESS: Well, we looked at the



gauge data to see if there was a discernible trend at that gauge that would match up with a trend that we saw downstream. We did not see a trend here at all, and certainly not one that matched up with anything downstream. So our conclusion was our operations of the Oahe project were not influencing whatever was happening at the White Horse gauge. We did not say that things weren't happening there, but our operations were not influencing it.

BY MS. SNYDER-VARNS:

Q Do you have any knowledge of what the progression is from where Oahe is having an impact on the Moreau River, in your opinion, the range lines 44.1 and 41.4? What in your opinion is the line to be drawn for where Oahe does have an impact on the Moreau above those two range lines?

MR. GETTE: Objection. Again, I think you mischaracterized his testimony. He talked about 37.7 and 41.4. and addressed uncertainty about 44.1. And that's not what your question captured.

BY MS. SNYDER-VARNS:

Q In preparing this study and drawing your conclusions, it's clear to you that Oahe has had an influence on the two lowest range lines. And as Mr. Gette said, you have expressed that it's probably



that Oahe has influenced the Moreau River channel at 44.1.

What is your understanding of the impact of Oahe upstream of 44.1?

A We did not see comparable trends as far as the type and distribution of sedimentation or changes in the cross-section above that. We just didn't see anything that was consistent with where we actually know or are very, very confident that the Oahe is impacting. So whatever changes are happening above that were not consistent with the types of the distribution of the changes below that.

Q How are they different?

A You didn't see deposition in the same places; you didn't see it with the same percent of change; you didn't see the same time frames or a lagged time frame there. They were inconsistent.

Q But there were changes?

A There are changes.

Q Would you consider those changes from the natural condition of the Moreau if Oahe didn't exist?

A There are changes in the geometry of a river all the time. A natural alluvial river changes its cross-section, changes its slope around a median or an average in response to floods, in response to

dry periods, any other type of hydrologic input into that system. So we would expect to see changes in a natural river. In fact, we've documented those a number of times on other rivers.
Q When you say we would expect to see a number of changes, what do you mean, changes that are natural and not attributable to Corps activity or reservoir operation?
A Right. Changes in a cross-sectional area top lift, thalweg elevation that come and go, bounce around, get more, less, higher, lower.
Q So in order for you to attribute or to be confident in attributing changes on the Moreau to Oahe operations, what sorts of changes are you looking for?
A We would look for changes that are consistent in, like I said before, distribution of the changes, if there's sedimentation occurring, is it occurring in roughly the same areas of the channel and the overbank, is it occurring at the same rate or at a lagged rate that you could point to over time on. And we just didn't see that.
Q Do you think it's a gradual transition from where you believe Oahe has had an influence to where you don't or is it a line? Can you draw a line



based upon your understanding of the data?
A A line --
Q Where the influence of Oahe stops on the Moreau?
A Not based on this cross-sectional data, no.
MR. GETTE: If you're at a good point, can we --
MS. SNYDER-VARNS: Let me just see if I'm finished with this report. If I'm not, we're close. Then we can just stop for lunch if you want to.
MR. GETTE: Okay.
MS. SNYDER-VARNS: I have just a few more questions related to this sedimentation report.
BY MS. SNYDER-VARNS:
Q Looking at the data from this report that shows that the channel area has been reduced at at least some of these range lines, can you tell me where does the water go when the area of a channel is reduced?
A The water will do one of two things. It will either back up and have its own backwater effect there, or it will speed up due to a slope change and become shallower and faster.
Q And remain within the channel?



A Remain within its new channel that it's building.
Q So it will leave the established channel and go into a new channel?
MR. GETTE: Objection.
THE WITNESS: Well, when sediment deposits, it builds a new channel geometry.
BY MS. SNYDER-VARNS:
Q So it will change the geometry of the channel as it exists?
A The backwater effect will cause the sedimentation to cause a new channel and the water -- the water -- I have to qualify that. The normal flow will stay there. The rivers, even in a degraded sense, will experience floods like they always do. Rivers flood. That's a fact of life as well.
Q And I understand that the flows on the Moreau will always be the same in the sense that they'll always exist and always continue and they'll go into Oahe. What happens as the Moreau joins the Oahe reservoir is how the -- I guess is what affects the channel and the floodplain and the movement of water through the basin; is that accurate?
MR. GETTE: Objection. I think it's vague.



THE WITNESS: Yeah, I'm not -- can you break that into components?
BY MS. SNYDER-VARNS:
Q How about if I just go back to questioning?
With the backwater effect and the water levels being higher, you mentioned -- or you testified that the sediment drops out of the water. Tell me what impacts on the floodplain and the surrounding lands that sedimentation has on them.
MR. GETTE: Objection; vague.
BY MR. SNYDER-VARNS:
Q What are the impacts on lands of sedimentation?
A I don't think I'm qualified to answer that question.
Q Why?
A The impact of the land depends on what the land is used for. And I'm not a soil scientist, I'm not an agronomist, I'm not a -- I just don't think I can answer that question. And impact is a -- I need more definition.
Q In your experience with sedimentation in the Omaha District, what have you seen to be the cause -- or to be the effect on land of sedimentation

Page 98

within the basin?

MR. GETTE: Objection.

THE WITNESS: The effects, as we've said earlier, it's higher water surface elevation, increased incidence of flooding in the backwater areas. You do have sediment deposition in the overbanks which, again, I don't know how to answer the impact there because depending on the land use, when it happens and so forth, it has different impacts, different consequences.

BY MS. SNYDER-VARNS:

Q Is there someone in the Corps that addresses those issues?

A Not in the Omaha District to my knowledge. We may have some experts in the Corps in some of our labs, but I don't know of any.

Q Are you aware of the existence of the Promise Bridge and the railroad causeway that is next to it?

A Yes.

Q Did that factor into this study at all?

A Into this study here?

Q (Nods head).

A No.

Q Did it factor into any of the investigation

Page 99

of the claims in this matter in which you were involved?

A No.

Q Why?

A We were looking at the data that we had, the range line data, the gauge data. And none of it was approximate to the bridge abuttment.

Q Does the bridge abuttment or the causeway have any impact on the deposition of sediment in the Moreau River?

A I couldn't tell you that based on the data we have.

Q So you don't look at a physical characteristic like that? You rely solely on the range line data?

MR. GETTE: Objection. I don't think that characterizes his testimony.

BY MS. SNYDER-VARNS:

Q Well, tell me what does.

A You need to ask a question.

Q So the causeway -- the existence of a structure like the railroad causeway and the bridge has no influence on your examination of sediment in the Moreau River and of Oahe or the river itself?

MR. GETTE: Objection.

Page 100

BY MS. SNYDER-VARNS:

Q Is that what your testimony is?

A No. The testimony is we did not consider that in this analysis because we were looking at trends over time. And we do not have data -- historic data to address the Moreau River -- or the Promise River bridge and the railroad abuttment.

Q Did you -- did the bridge or the railroad abuttment factor into any of the investigation into the claims in this matter?

A Not that I was directly involved in.

MR. SNYDER-VARNS: Okay. I think that's a good stopping point.

MR. GETTE: Okay.

(12:00 p.m. - Recess taken)

(At 12:50 p.m., with all parties present as before, the following proceedings were had, to wit:)

BY MS. SNYDER-VARNS:

Q We're back on the record. I'm just going to ask a few questions just to clean up where we were before our lunch break.

Can I clarify, Mr. Remus, of the six range lines that you surveyed in preparation of the sedimentation study from 2003, how many of them are within the project boundaries?

Page 101

A Just the downstream one, 37.7.

Q Okay. Have additional range lines been installed on the Moreau in recent years?

A No.

Q Okay.

A We have taken some additional cross-sections just this last year or two in the vicinity of the bridge, the Promise Bridge, but they're not established range lines.

Q So you've done surveys, but you haven't installed range lines?

A (Shakes head).

Q Have any been -- have any cross-sections been taken above the White Horse gauge?

A No.

Q We talked about the fact that you looked at the data from the six range lines from 1962 through 2003 in preparing the 2003 sedimentation report. And you mention in your testimony that the surveys that you took of the cross-sections were like snapshots at the time of the survey.

A Uh-huh.

Q What impact does flooding have on deposition of sediment on a river?

A Could you be more specific?

Q Well, you have -- you talked about trends in your testimony, and you talked about the fact that the cross-sections are surveys. And I'm trying to find out about what you mean by a trend and what you require for a trend with respect to your conclusions in the study.

A The trend would be seeing a similar change or a similar rate of change over a long period of time, you know, continued in one direction. If you were looking at expecting aggradation and we saw continued aggradation with each successive survey, that would be a trend; whereas if we had aggradation one time, degradation, another aggradation, degradation, that would not be a trend, that would be some variability. It may be natural, it may be man-made, but it's not a trend.

Q So what you're really looking for is consistency.

MR. GETTE: Objection.

THE WITNESS: That's probably not a fair characterization, consistency. You're looking for a trend, a general trend in some parameter.

BY MS. SNYDER-VARNS:

Q What impact then does flooding have, if any, on the cross-section surveys that are a part of



the data set that you used in preparing this report?

A I can't answer the question. A flood, depending on how big and how long, what time of year, it could do different things. It's just way too wide open of a question.

Q A flood -- well, let's back up.

A survey of a cross-section is -- or indicates or shows the condition of the channel at the time the survey is done. If you've had a flood the day before, what effect will that have on the data that you gathered?

A Again, it would depend on the size of the flood, the duration of the flood, the timing of the flood. It could go any direction.

Q Then let's back up and just talk about the general question of how does flooding affect deposition of sediment on a tributary.

A The answer is still the same. It depends on the magnitude of the flood, the duration of the flood, the timing of the flood as to what it does on the tributaries.

Q What you're talking about is degree. I'm asking what it does.

A No, I'm talking about --

MR. GETTE: Objection.



THE WITNESS: I'm talking about the process. Whether you have aggradation or degradation depends on the magnitude ever the flood, the timing of the flood, the duration of the flood, all of those things.

BY MS. SNYDER-VARNS:

Q And what I'm looking for is you have aggradation and degradation. And the rate or the amount or how it is deposited is affected by the flood; right?

A It can be.

Q It can be. And it can -- the flood can affect deposition of sediment by either aggradation or degradation depending upon the timing, nature or extent of the flood; right?

A It can cause either.

Q Would you say that a flood causes a change in the deposition of the sediment from your more stable, typical deposition patterns?

A Depending on the timing, duration, so on and so forth. There's no set answer that I can give you there.

Q Then can you just describe for me what the deposition of sediment in a river consists of, including floods? This is a general question. I'm



asking you to describe for me your knowledge of how sediment is deposited in a river system and how flooding factors into that deposition.

MR. GETTE: Objection; overly broad.

BY MS. SNYDER-VARNS:

Q This is a fact question. And I can ask a broad question asking for what you know based upon your experience and training.

A In a river, floods deposit sediment in the floodplain and they scour sediment from the floodplain. They can happen in equal amounts or they can happen in unequal amounts depending on the timing, duration, magnitude of the flood. I mean, you can't -- there's no one rule that you can apply and say floods aggrade or floods degrade.

BY MS. SNYDER-VARNS:

Q Over time, with sedimentation in a river system or a river, does sedimentation -- apart from a reservoir or an obstruction like a delta to sedimentation, it naturally flushes through a river; right?

MR. GETTE: Objection.

THE WITNESS: Could you restate that?

BY MS. SNYDER-VARNS:

Q Apart from the reservoir system or the deltas existing, the sediment would naturally flow down the Moreau River as it has for however long a period of time before the Oahe dam was constructed.
Now, when you overlay on that the construction of the Oahe dam and the formation of the delta, how does that change the deposition of sediment in the Moreau?
MR. GETTE: Objection. I think the question has a predicate that is not accurate.
BY MS. SNYDER-VARNS:
Q Has it changed it?
A Well, you really asked three different questions there.
Your first question was would the reservoir, as I understand your question, under natural conditions, no dam, the sediment in would equal the sediment out. Is that a fair characterization of your question?
Q (Nods head).
A And over a time period of sufficient length, yes. And by a time period, I'm talking geologic time. It would take two or three floods to flush those sediments or to restore the sediments, whichever.



The other one is -- and I'm not real sure on the second half what you were after there as far as the reservoir --
MR. GETTE: If you're not sure --
THE WITNESS: So I would like to have you clarify that part of the question.
BY MS. SNYDER-VARNS:
Q So when a reservoir is built on the Missouri downstream of this tributary to the Missouri, and then the delta forms in the backwaters of the Oahe reservoir, what impact does that have on the natural deposition of sediment on the Moreau apart from the existence of the dam?
(Witness looks at Mr. Gette).
MR. GETTE: I'm going to object.
If you think you can --
THE WITNESS: I think I can answer the question.
As we discussed earlier, the dam presents a backwater effect; the elevation of the pool presents a backwater effect which causes sediments to deposit. And over the time that it takes the delta to mature and begin just depositing in the downstream direction, it will have a net aggradation effect, meaning that not all the sediment



that comes into the upstream end of this reach will go into the downstream, until such time as it equalizes. And then you will assume the natural river equilibrium there or a new natural river equilibrium.
BY MS. SNYDER-VARNS:
Q So it changes the river?
A It does change the river's ability to transport sediment in the backwater area.
Q And it's your testimony that it's just limited to the backwater area?
A Well, once you're out of the backwater areas, you're in the riverine condition again.
Q And that riverine condition is identical to what it was prior to construction of the dam? And here we're talking about Oahe and the Moreau.
A The Moreau River, upstream of the backwater effect, it is still the river that was there before the dam.
Q Can you help me understand what you're talking about as far as a trend in your conclusions to your report? When you said that you felt that the deposition of the sediment constituted a trend for the lower range lines, that is what enabled you or was the basis for your concluding that the changes in



the Moreau River channel were affected by Oahe's operations.
MR. GETTE: Objection. I don't think that was a question.
BY MS. SNYDER-VARNS:
Q Not yet. He's right.
Now, with respect to the trend, you testified that there was a trend involved there in the deposition of the sediment that made you able to conclude that Oahe affected the river at those range lines.
Now, help me understand, you have a thalweg that's two or three feet higher at the upper range lines, you have sediment deposition above the range lines that you said are affected by Oahe, and you have some changes in the channel, some reduction according to the table in your study.
A (Witness nods head).
Q It begs the question then what are you talking about as far as a trend, because the trend seems to exist upstream as well as at the range lines that you say are clearly affected by Oahe's operations.
MR. GETTE: Objection; vague.
THE WITNESS: Well, the lower two

Page 110

cross-sections showed similar trends in both where the deposition was taken place as far as portions of the channel, portions of the floodplain, as well as rate of change. When you got up to the third cross-section there, we still saw deposition there, but it wasn't happening in the same pattern as far as distribution in the different areas and/or not in the same rates in those same areas. That's where the trends did not -- were not consistent. And above that they were even less consistent. But we did see some aggradation in the channel above there, but it was not consistent with what we saw at the lower end.
BY MS. SNYDER-VARNS:
Q What are you talking about as far as the distribution?
A Deposition in the channel, deposition on the sides of the channel, deposition in the floodplain.
Q And so because the deposition of the sediment in these areas was clear and was significant, that constituted a trend to you?
MR. GETTE: Objection. I don't know what you mean by "clear" or "significant."
BY MS. SNYDER-VARNS:
Q Is that what you're talking about as far as

Page 111

a trend?
A "Clear" and "significant," you'll need to define those.
Q Are you serious?
A Yes, I'm serious. Your definition of "significant" may have different than mine.
Q So you're talking about amount -- are you talking about amount?
A I'm talking about amount; I'm talking about geographic distribution or spacial distribution across the cross-section; I'm talking about time line, either consistently in the same time frame or a generally lagged time that you could pick off of a time.
Q So the simple fact of sediment deposition in the depths that exist at the upper range lines coupled with the raised elevation of the thalweg and the reduction in channel area, though not as great, those do not indicate to you that sedimentation on the Moreau at those range lines has been affected by the Oahe reservoir?
MR. GETTE: Objection. You gave a general description of the range line that may or may not exist. But --
BY MS. SNYDER-VARNS:

Page 112

Q I believe you know what I'm talking about as far as -- I can give you the numbers of the upper three or four range lines if you like, but I thought I would save time.
A I know the numbers. And it did not show a consistent -- the same depositional patterns in space and time that the ones further down did. And for that reason we could not attribute those to the operations of the Oahe reservoir.
Q Okay. What do you know about the 1997 flooding on the Moreau River?
A Nothing.
Q Okay. Do you know about flooding on the Moreau then prior to '97?
A No.
Q Do you have any idea of how the Corps responded to flooding on the Moreau in 1997?
A No.
MR. GETTE: Objection.
BY MS. SNYDER-VARNS:
Q At any time?
MR. GETTE: Objection.
MS. SNYDER-VARNS: I'm asking what he knows, Jim. And I'm entitled to know what he knows or doesn't know.

Page 113

MR. GETTE: And I'm entitled to --
MS. SNYDER-VARNS: And you're obstructing this deposition, and I'm about ready to continue it and to either call the Court or just continue the deposition, because this has become so obstructionistic, you're clearly coaching the witness with your objections, you're clearly obstructing the examination and the gathering of discoverable evidence. And if you want to continue with this pattern, then I will continue the depositions and we'll file our motions with the court and go from there.
MR. GETTE: That's fine. I'm going to continue to put my objections on the record, which I'm fully entitled to do and which the Court will ultimately obviously allow. My objection here is to relevance. We're talking about the Corps' responses to flooding on the river. And again, as I said this morning, I believe it gets into areas that relate to the actions of the Corps and the appropriateness of its actions which may have relevance in some tort arena but not in a taking.
MS. SNYDER-VARNS: They absolutely do have --
MR. GETTE: So my objection having

Page 114

been put on the record, I'm not going to suggest the witness can't answer, but I have a right to put that on the record.

MS. SNYDER-VARNS: The examination of what the Corps did or did not do on the Moreau River before or after 1997 is absolutely relevant to this matter, because the fact is that we're looking at a taking of property for a public purpose without compensation. The taking arises from flows on the Moreau River and sedimentation on the Moreau River that affects the properties along the Moreau River. And when the government utilizes these properties for the benefit of the public without compensation, then you're talking right squarely about the claims that are involved in this action. And it's absolutely relevant what the Corps did or did not do with respect to the Moreau. And I'm going to continue my examination of that.

MR. GETTE: That's fine. And I'll continue to disagree. I mean, what the Corps did or didn't do is of no relevance. Whether the property was or was not used in some way by the Corps may be relevant, but what the Corps did in a takings claim is assumed to be lawful and appropriate.

MS. SNYDER-VARNS: And I'm entitled to

Page 115

build my case to the effect that it wasn't.

MR. GETTE: It's irrelevant whether it was or it wasn't. If it wasn't, it's not a taking, it's a tort.

BY MS. SNYDER-VARNS:

Q Moving along with the 1997 flooding, are you aware at all of the impacts of the 1997 flooding on the Moreau?

A No.

Q Are you -- did you have any involvement whatsoever in addressing any sedimentation issues arising from the 1997 flooding within the Omaha District?

A No.

Q Based upon your involvement with the sedimentation study, do you have any knowledge of whether or not the '97 flooding had any impact on the properties along the Moreau?

A No.

Q So I would take it that you personally didn't respond in any way on behalf of the Corps to the 1997 flooding on the Moreau?

A That's right.

Q Do you know of any individuals within the Corps or the Omaha District that did respond to that

Page 116

flooding on the Moreau?

A No.

MR. GETTE: Objection.

BY MS. SNYDER-VARNS:

Q Did you talk to anybody about flooding on the Moreau --

A No.

Q -- in '97? Have you talked to anybody in the course of your investigation or involvement in the response to the claims in this action about how the 1997 flooding is involved or implicated by the claims?

MR. GETTE: Could I have the question back?

(Pending question read back by the court reporter).

MR. GETTE: Go ahead.

THE WITNESS: No.

(Exhibit No. 7 marked for identification).

BY MS. SNYDER-VARNS:

Q Can you identify Exhibit No. 7?

A Yes.

Q What is it?

A It's the hydraulic study that was performed

Page 117

on the Moreau River in response to this action.

Q When was it performed?

A 1993 -- or 2003.

Q And this report was generated by or as a result of that study?

A I'm not sure what you -- what the question is.

Q Is this a report that summarizes the study that was done or is this a study?

A This is the report of the study.

Q Who ordered it done?

A I'm not sure who ordered it done.

Q Was it someone above you or below you or lateral to you?

A I don't know.

Q Did you have any involvement in this study?

A Only providing data for the model.

Q What kind of data?

A The cross-sectional data.

Q Who did you give it to?

A I gave it to Neil Vohl.

Q And who is he?

A He's a Hydraulic Engineer in the Hydraulics Section.

Q Did he prepare this report?
A To the best of my knowledge, yes.
Q Was anyone else involved in the aggradation study?
A His supervisor, Jeff McClenathan, was involved, and possibly some other people, but I don't know.
Q And where does Jeff McClenathan work?
A He's the Chief of the Hydraulics Section, Hydrology Engineering Branch in the Omaha District.
Q So would Jeff McClenatan be the better person to talk to about this aggradation study?
A Yes.
Q Have you seen this study before?
A Yes.
Q Were you aware that the Federal Emergency Management Agency did a flood insurance study on the Cheyenne River Sioux Reservation in 2004?
A No.
Q Have you ever seen the FEMA flood insurance study?
A No.
Q In the course of your work with sedimentation in the Omaha District, what involvement does ice formation and movement have? What do you



know about that?
MR. GETTE: Objection. It's vague.
THE WITNESS: Could you be more specific? Ice formation and movement of what?
BY MS. SNYDER-VARNS:
Q How does ice in the system and the development of ice, movement of ice, affect sedimentation in the system?
A I don't think there's been any studies in any detail on that that I know of.
Q Why?
A Just hasn't been done. I don't know why.
Q Does ice movement affect sedimentation?
A I don't know.
Q Do you have any knowledge of ice jams on the tributaries to the main stem reservoirs?
A No specific knowledge. I know that they happen, but that's all.
Q You've never studied it?
A No.
Q It's not a major factor as far as your work with sedimentation in the main stem system?
A No.
Q Or below it?
A No.



Q Do you have any knowledge about how ice movement in the wintertime is affected by sediment?
A No.
Q Is there any connection whatsoever between increased water levels due to the backwater effect on the tributaries and ice movement on the tributaries?
A I don't know anything about that.
Q So ice jams are not a big factor in what you do with sediment or sedimentation in the Omaha District?
A That's correct.
Q Not enough for you to do any studies about them?
MR. GETTE: Objection; asked and answered.
THE WITNESS: We haven't done any studies relative to ice, ice jams and sediment transport, no.
BY MS. SNYDER-VARNS:
Q Is there anybody in the Omaha District whose responsibility it is to -- or part of whose responsibility is to address ice movement within the reserviors or the tributaries?
A I don't believe so.
Q Would anybody be concerned about them at



all in the system?
A About what?
Q Ice jams.
A We're very concerned about ice jams.
Q What do you do about them?
A I don't know that we do anything about them.
Q If anybody does, who in the Omaha District would?
A We would probably go through our Emergency Management Office.
Q What about the project managers?
A They would go through the -- the response would be through the emergency response I believe.
Q So ice jams are related to flooding; is that why it would go through Emergency Management?
MR. GETTE: Objection.
THE WITNESS: The only time I have ever seen us deal with ice jams is through the Emergency Management.
BY MS. SNYDER-VARNS:
Q When have you dealt with ice jams?
A We dealt with ice jams during the ice break-up periods.
Q Every year?

Page 122

A We monitor for them every year. We don't necessarily deal with them every year.
Q What does the monitoring consist of?
A Look to see where they're forming.
Q Where do they form?
A They can form anywhere.
Q They can. But where do they?
A I can't tell you where they do. They form everywhere. It depends on whether the conditions are right.
Q Why are you concerned about them?
A They can cause flooding.
Q Where?
A Upstream of an ice jam.
Q Do ice jams form in the reservoirs?
A I couldn't answer that. I don't know whether you get a full ice jam in the reservoir.
Q But they form in the tributaries?
A They form on rivers.
Q Which would include the Missouri and the tributaries?
A (Nods head).
MR. GETTE: You have to say yes.
THE WITNESS: Yes.
BY MS. SNYDER-VARNS:

Page 123

Q Are records kept of the monitoring?
A We do not keep records of ice jams in the Omaha District that I'm aware of.
Q So when you monitor, what does that consist of?
A We monitor -- we basically look for stage changes around where ice jams may form or have formed in the past. We rely on other agencies to provide us information. We use the weather service or local government agency as to the formation of an ice jam.
Q What action does the Corps take as a result of the monitoring that it does? What triggers action by the Corps?
A I really can't tell you that. I don't really know what triggers the action.
Q What action does the Corps take when it does take action with respect to ice jams?
A It depends on where the ice jam is.
Q Does the Corps take action?
A Yeah.
Q What does the Corps do?
A It depends on where you're at.
Q Can you give me some examples of what the Corps has done with respect to ice jams?
A If we see ice jams forming below one of our

Page 124

dams, we may increase the flow in order to try to wash the ice jam out before it gets stuck in the mud relieving that problem. Or if it's already stuck, we may cut back flows if it's below our reservoir. If they're upstream of the reservoir, I don't know that there's anything we really can do once it starts to form.
Q Are any records kept of these particular actions?
A Our reservoir operations -- our Reservoir Control Center has records of daily releases and what they do. I don't know how detailed their decision documentation is.
Q Why are you involved with ice jams?
MR. GETTE: Objection. He's already testified he hasn't been involved in ice jams.
BY MS. SNYDER-VARNS:
Q Where does this knowledge that you're testifying about today come from?
A It comes from reading situational reports, after-action reports that are published.
Q So there are records that document the existence of ice jams and what the Corps does?
A There are some after-action reports.
Q What other types of records?

Page 125

A That's all I know of.
Q Who maintains the after-action reports?
A Don't know.
Q How often do you get them?
A Whenever there's a significant ice jam. There's no particular frequency.
Q What is significant?
A When we take an action I guess.
Q Can you tell me how often you get these reports a year?
A No. Maybe a couple a year; there may be several years between them. Depends on the weather.
Q And why do you get them?
A I don't get them. They're just there to be read.
Q Where are they?
A Usually just posted maybe on a web page for a while.
Q What web page?
A The Corps' web page. The Omaha District web page.
Q It's a big web page.
A I can't tell you where they're at exactly. I usually just pick them up here and there.
Q Physically around the office?

A No, just off the web. Just things that you might be interested in reading.
Q You can't tell me where on the web page they would be?
A No, I can't tell you where on the web page. They're usually very short-lived things. It happens, somebody writes them, there may be a trib report or something to that effect, and then it's put in a file someplace. I don't know where those files are.
Q Are you aware that anybody in the Omaha District ever meets about ice jams --
A Not that I'm aware of.
Q -- to develop any strategies to address them prospectively?
A Not that I'm aware of.
Q Does anybody meet after having addressed a particular ice jam situation?
A Not that I am aware of.
Q You're not aware of what personnel within the Omaha District deals with ice jams other than projects themselves or River Control?
A Well, we in the Hydro Branch support our Water Control Center. But any individual would be, whoever is available to do the work at the time.
Q Individual within the Hydrologic



Engineering Branch?
A Hydrologic Engineering Branch.
Q So individuals within the Hydrologic Engineering Branch are called upon at least on occasion to deal with ice jams?
A Yes.
Q And would that include you?
A I've never dealt with ice jams.
Q Who within the Division has?
A Jeff McClenanthan and his people in his section have dealt with them.
Q What is his section?
A The Hydraulics Section.
Q It seems that you're interested in ice jams and in following or in receiving or reading these reports. Have you seen any trends in ice jams or any pattern that you can identify?
A No, I never went that deep into it.
Q Have any of the reports that you've read ever addressed ice jams on Oahe or any of its tributaries?
A I have read some briefings on ice jams in the Pierre/Fort Pierre area which is associated with Oahe.
Q Has the Corps done anything to address



sedimentation on the Moreau?
A Not that I'm aware, no.
Q Has the Corps done anything to address sedimentation on any of the tributaries of Oahe?
A Not that I'm aware of, no.
Q So all of the projects that you testified about earlier were on other reservoirs or their tributaries?
MR. GETTE: Objection.
THE WITNESS: Yeah, the others that we talked about.
BY MS. SNYDER-VARNS:
Q Why not Oahe?
A We haven't been either tasked by Congress to do so or it hasn't interfered with our project operations.
Q You testified earlier about collecting data for the sedimentation report or your involvement with the sedimentation report. And then you also provided the cross-section surveys to others within the Corps to prepare the aggradation study -- or to do the aggradation study.
What other role did you have in responding to the claims in this action?
A Oh, me and people that work in my section



have given data to other experts that the Department of Justice has retained. And that's all that I'm aware of.
Q So your role has been to provide data?
A After the production of the sedimentation report, yes.
Q And the aggradation study was done by the Hydraulic Branch of the --
A Hydraulics Section --
Q -- of the Engineering Division?
A Of the Hydrologic Engineering Branch.
Q Of the Engineering Division?
A Yes.
Q Are the claims in this action unique?
MR. GETTE: Is that the end of the question?
MS. SNYDER-VARNS: Yep.
MR. GETTE: Objection.
BY MS. SNYDER-VARNS:
Q Have you seen other claims like this?
A I'm not -- I don't think I can really answer that question because I'm not really sure what the nature of the claims are in this particular one.
Q Well, let's talk about real estate claims. Have real estate claims been brought by Plaintiffs on

other tributaries within the main stem system?
A Yes.
Q Have you been called upon to respond?
A We have done studies in support of real estate claims.
Q Similar to these reports?
A In general, similar to these reports, yes.
Q Can you give me examples of the other claims and how you responded?
A We had claims, and still have some pending claims, on the Niobrara River which is a tributary to Lewis and Clark Lake. We've performed similar studies to this, and we have done some more in depth studies in some of those areas. We have had claims on the Cheyenne River where we did a very detailed model, but we did that as part of our regular O&M routine program, the model itself, but it did end up supporting the real estate actions there.
Q And by "real estate claims," what is your understanding of what they are?
A They're claims for damages. Some claims are just damage due to a single event, some are continuing damage due to a changed condition, say increased groundwater or increased incidence of flooding. I'm not really sure. I'm not a lawyer or



a real estate specialist, so I couldn't really classify these as one or the other.
Q So the studies that you've done have been similar to the sedimentation study?
A Similar in concept. Some have been more detailed or more in depth and covered a wider area, but in general, yes.
Q Which ones were more detailed?
A The Niobrara River studies and Cheyenne River studies are more detailed.
Q And covered a broader area?
A A larger area.
Q Why were they more detailed? And why did they cover larger areas?
A Well, one, the data that we have covers a larger area. And two, the resources were provided either through Congressional direction or through the O&M budgeting process for those studies.
Q To support the Corps' defense of those claims?
A Some are in direct response to the claims; some are part of our routine program that we put in budget requests for. And some of those budget requests are fulfilled and some are not.
Q Are you talking about the Cheyenne River



there as far as the funding available to do the study in the normal course of business?
A The Cheyenne River, the detailed sedimentation study was part of a routine O&M budget request, yes.
Q When you did the studies on the Niobrara and the Cheyenne, what were the results of those studies?
A The results were in general very similar to the results here. We attributed some of the deposition in the lower end of those reservoirs -- or those rivers to our reservoir operations, and the upper reaches we could not attribute that.
Q I notice from your website that you did a backwater study on Ponca Creek, Bazil Creek and the Niobrara tributaries to Lewis and Clark Lake.
What is a backwater study?
A Just a study to determine the effect of the backwater effect of our pool or the operations on the Lewis and Clark Lake.
Q And what sort of data did you gather to do that study?
A Cross-sectional data on Bazil Creek and Ponca Creek, we gathered a few cross-sections. And we have some historic range line data on the Niobrara



River very similar to the range line data we have for the Moreau.
Q And what did the study show?
MR. GETTE: Objection; asked and answered.
THE WITNESS: Can you be more specific?
BY MS. SNYDER-VARNS:
Q Well, you wanted to study the existence, the nature, the extent of the backwater effect; is that what it was about?
A Right.
Q And did the study do that?
A Yes.
Q And can you summarize that for me?
A Well, there are three separate studies.
A The Niobrara River study was more detailed because we had the data to do that. It showed very similar results in general as here; at the lower end we were impactin, the upper ends we weren't. The Ponca and the Bazil Creek did not -- we didn't have a historic record there, so we simply did a "this is the condition today." We did not develop trends there. And we just determined where the backwater effects were on those tributary streams.

Q Did you determine there was a backwater effect?
A There was a backwater -- we knew there was a backwater effect at Bazil because it empties into the pool. Ponca Creek does not empty into the pool of Lewis and Clark Lake. It is upstream of the Niobrara River.
Q Do you know what happened with the studies or what happened -- strike that.
What happened with the real estate claims after you did the studies on these other tributaries?
A I don't know.
Q You weren't involved at all after that?
A We turned the information over to Real Estate, and they processed the claims and either paid them or denied them. That -- I don't know exactly what went where.
MS. SNYDER-VARNS: Why don't we just take a break?
(1:35 p.m. - Recess taken)
(At 1:45 p.m., with all parties present as before, the following proceedings were had, to wit:)
BY MS. SNYDER-VARNS:
Q During the course of your testimony today, we've talked about the backwater effect. And early



on you testified that the backwater effect raises water levels where the tributaries flow into the reservoirs on the main stem system; is that accurate?
A Yes.
Q And as you have the backwater effect, part of that is the formulation of the delta of the tributary where it flows into the reservoir?
A Yes.
Q Are they part of the same thing or are they separate things in your mind, the formation of the delta and the backwater?
A The backwater causes the delta to form.
Q As the delta forms -- or does the -- do the water levels increase before the delta becomes mature?
A Yes.
Q It's like -- I'm trying to think of a simple example. But the water comes in and it kind of bunches up where it comes in until it has a chance to move out into the pool? Would that be a fair description or --
A No.
Q How is that not accurate?
A The water comes in, and it -- the pool is there. It doesn't bunch up. It just -- the energy



gradient is less, so it cannot flow as fast. It doesn't bunch up.
Q Because of the backwater effect, the surface waters go up. How is groundwater affected in the backwater areas?
A Again, that really depends on the local geology that you're dealing with and the extent of the backwater effect. I guess there is no one-size-fits-all here.
Q Is there -- is it fair to say that generally you'll have some alluvial aquifers along the tributary where it flows into the reservoir?
A I would say you probably have a connection between your groundwater and the river under natural conditions. But whether that's a drought connection, that's not always --
Q And I understand that.
In doing your backwater studies that you testified about earlier, was groundwater considered?
A No.
Q Is groundwater ever studied or modeled in the backwater areas of the reserviors?
A Yes.
Q Who does that?
A We have some monitoring wells in the



Pierre/Fort Pierre area and in the Niobrara, Nebraska area.
Q Is that all?
A That's all we have in the backwater area.
Q Is groundwater monitored elsewhere in the Omaha District?
A Yes. We have some wells at Fort Peck in the dam area, and then we have some wells in Williston, North Dakota. Where we have a levy there, we have some groundwater wells to monitor.
Q Why do you monitor groundwater wells?
A We monitor the groundwater wells in Niobrara and the Pierre/Fort Pierre area to try to determine if our project is having any impacts on the local infrastructure there vis-a-vis groundwater.
Q What generated that monitoring?
A We relocated the city of Niobrara back in the early 1970's due to groundwater problems. We just continued to monitor there. We had a number of residents complain about water in their basement in the southeast Pierre area, and we installed some pezometers and groundwater monitoring wells there to try to determine if our project was having an impact on it.
Q When you're talking about groundwater

projects, what do you mean?
A Increased levels of groundwater causing water in basements, damage to foundations.
Q No other groundwater monitoring or problems that you're aware of?
A No.
MS. SNYDER-VARNS: Okay. I have no further questions.

CROSS EXAMINATION

BY MR. GETTE:
Q Mr. Remus, I'd like to begin with asking you to look at Exhibit No. 6. And if you could, turn to page three of that document.
You'll see that there is a table presented on page three. And in the table there are columns under various years that are labeled "Capacity." Is that a correct label for those columns?
A Probably not. It probably should just read "Area."
Q Are capacity and area the same thing?
A They're not the same thing.
Q Okay. What variables do you need in order to calculate capacity?
A Area is one of those variables. Other variables are slope, channel roughness or floodplain



roughness, you need to have -- channel geometry plays a lot into that, the wetted parameter. Those are the things that you need.
Q Now, is it fair to say that the report that has been marked as Exhibit 6 does at certain places on the river calculate area?
Q And it's the area of specific cross-sections on the river; is that correct?
A It's the area of the cross-sections below a certain elevation. It's not necessarily the total area of the cross-section. It's an area that is assigned in our analysis to calculate the area below that roughness elevation.
Q And are those elevation levels presented in that report?
A Yes. That's what the elevation is.
Q In the column on the table on page three?
A Yes, sir.
Q Now, in addition to area, you mentioned slope. Did this study take slope into account in its analysis?
A No.
Q You discussed channel roughness. Did this study that's been marked as Exhibit 6 take channel roughness into account in its analysis?



A We did not assess roughness, no.
Q If you'll flip to page four of Exhibit 6, there is a heading, "Conclusions," and following that there are four bulleted items. I'd like to ask you with respect to bullet item No. 1 which reads, "Sediment deposition that can be related to the operation of the main stem system of dams is definitely impacting the channel and the lower floodplain up to sediment range line M-44.1."
Do you continue to agree with this conclusion in its entirety?
A Not in its entirety.
Q In what way do you no longer agree with this conclusion?
A I would not include the lower floodplain. In further looking at the cross-sectional data and discussing what is and isn't a floodplain, what we've included as lower floodplain is really historical channel, channel fringe area, not necessarily the floodplain in the strict sense of the word.
Q All right. With respect to the second bulleted item in the conclusions which reads, "Sediment range line M-47.8 shows some narrowing and some floodplain deposition that can probably be explained by the operations of the main stem system



and some of the overbank deposition that was probably caused by the 1997 flood," do you continue to agree with this conclusion in its entirety?
A Not in its entirety, no.
Q How do you -- in what way do you no longer agree with this conclusion?
A I would not say "probably be explained by the operations of a reservoir." Maybe I would replace that with "possibly." Because of the inconsistency between the trends, this cross-section and the lower three, I don't think that we would make that strong of a statement.
Q With respect to --
A And the '97 flood, that's probably -- the data does not necessarily support or refute that. That was more of a judgement statement.
Q So concluding the phrase of the sentence after the word "and" which says "Some of the overbank deposition that was probably caused by the 1997 flood" is not the portion of the conclusion that you were referring to at the end of the previous answer?
A Right.
Q With respect to the third bulleted item, "Sediment range lines M-52.7 and M-59.2 show only minor amounts of the channel narrowing and the

Page 142

floodplain deposition," do you continue to agree with this conclusion?
A Yes.
Q And finally, with respect to the fourth bulleted item, which is fairly long so I won't read it in its entirety, do you continue to agree with the conclusion in that bulleted item?
A Yes.
Q Mr. Remus, I've heard the report that's been marked as Exhibit No. 6 referred to as a recon-level study. Is that accurate?
A Yes.
Q And what is a recon-level study?
A A recon-level study uses existing information supplemented by a very small amount of additional information, maybe filling in some gaps in the data, or if you can gather data quickly, you do that. We use very cursory or preliminary type analyses, some of them are quantitative, some are qualitative, to come to some -- they're used to make a decision on which way to go next. They're not used for final decision-making support.
Q Would you consider a recon-level study to be a robust analysis?
A No.

Page 143

Q Does the study that's been marked as Exhibit 6 measure the effect of the operation of the main stem system on the frequency of flooding on the Moreau River?
A No.
Q Does the study that's been marked as Exhibit 6 measure the effect of the operation of the main stem system on the severity of flooding on the Moreau River?
A No.
Q Does the study that's been marked as Exhibit 6 measure or assess the effect of the operation of the main stem system on property adjacent to the Moreau River?
A No.
Q During your testimony regarding Exhibit No. 6, with respect to range lines M-37.7 and M-41.4, you indicated that the data showed some deposition at those range lines; is that correct?
A Uh-huh. Yes.
Q Did this study analyze whether that deposition caused more frequent flooding on the Moreau River?
A No, it did not.
Q Did this study analyze whether that

Page 144

deposition increased the severity of flooding on the Moreau River?
A No.
MR. GETTE: That's all the questions that I have.
MS. SNYDER-VARNS: I have a few just follow-up ones to those.

REDIRECT EXAMINATION

BY MS. SNYDER-VARNS:
Q It's pretty clear, Mr. Remus, that the sedimentation study from 2003 is not a detailed report. Are there any plans to do any further studies along the same lines on the Moreau?
A Not at this time that I'm aware of.
Q Any plans to flush out this report itself?
A Not that I'm aware of, no.
Q You testified that the study didn't take into account the slope or the roughness of the channel of the Moreau. Why not?
A It was not designed to do that. It was just a study to determine the trends in the channel cross-sectional changes.
Q So why is slope and roughness -- why are they factors at all?
A They get to the river's ability to

Page 145

transport water through a particular cross-section. A steeper slope, everything else held equal, has a higher capacity; flatter slope, less capacity.
Q So the parameters that were established for this study were more general than -- well, they were somewhat general at least because they didn't take into account these two factors at least; is that right?
MR. GETTE: Objection.
THE WITNESS: For this study, yes.
BY MS. SNYDER-VARNS:
Q And why weren't they included?
A The scope of this study was really just a sedimentation study. Those are hydraulic parameters that -- in a more in-depth study, both a sedimentation and a hydraulic study, would flush out the changes in slope.
Q So it's possible to be more detailed in this report, or a sedimentation study?
A We could have done a more detailed study providing the proper resources to do so.
Q If you had no budget constraints whatsoever, what factors would be taken into account to do a very thorough detailed sedimentation analysis on the Moreau?

A We would get into some type of aerial monitoring of that, try to tie whatever differences we saw in channel cross-sections by hydrological events, either wet years or wet number of years in a row or dry number of years, drought cycles, flood cycles. We would try to tie these into specific operational changes in the pool for Oahe. But we just didn't do that because of the constraints on time and money.

MS. SNYDER-VARNS: I have no further questions.

MR. GETTE: No questions.

(2:10 p.m. - conclusion of deposition.)



CERTIFICATE OF REPORTER

STATE OF NEBRASKA )
) ss.
COUNTY OF DOUGLAS )

I, SUSAN M. McKENZIE, General Notary Public within and for the State of Nebraska, do hereby certify that the foregoing testimony of JOHN REMUS was taken by me in shorthand and thereafter reduced to typewriting by use of Computer-Aided Transcription; that the foregoing one hundred forty-six (146) pages contain a full, true and correct transcription of all of the testimony of said witness to the best of my ability;

That I am not a kin or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

IN WITNESS WHEREOF, I hereunto affix my signature and seal this 29th day of August, 2006.

____________________________
SUSAN McKENZIE
General Notary Public

MY COMMISSION EXPIRES:



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHEYENNE RIVER SIOUX ) CIVIL NO. 03-600-L
TRIBE, ET AL., )
)
PLAINTIFFS, ) DEPOSITION OF
) JOHN REMUS
VS. )
)
THE UNITED STATES OF )
AMERICA, ) TAKEN ON BEHALF OF
) PLAINTIFFS
DEFENDANT. )
__________________________)

COST CERTIFICATE

I, SUSAN M. MCKENZIE, General Notary Public within and for the State of Nebraska, do hereby certify that the following costs should be assessed in the above-entitled matter to:

PLAINTIFFS
DEPOSITION OF: JOHN REMUS
DATE TAKEN: AUGUST 23, 2006
AMOUNT: $ __________
DELIVERED TO: PAMELA SNYDER-VARNS
ATTORNEY FOR: PLAINTIFFS
DATE DELIVERED: ____ day of _________, 2006.

____________________________
SUSAN M. MCKENZIE,
General Notary Public

My Commission Expires:



August 29, 2006
MR. JOHN REMUS
c/o Mr. James D. Gette
601 D Street NW
Washington D.C. 20004

Dear Mr. Remus:

You have elected to read and sign your deposition taken on the 23rd day of August, 2006. Enclosed please find a transcribed copy of your deposition. THIS IS A VALUABLE DOCUMENT, so please take a few minutes at this time to do the following:

1. Read your deposition thoroughly. Photocopying or other reproduction of this document without the expressed consent of Thomas & Thomas Court Reporters is strictly prohibited;

2. Make corrections only on the page entitled: AMENDMENT TO DEPOSITION. Do not make corrections on the Original Deposition or smaller condenses transcript.

3. Sign in the spot indicated as "Witness" on the page entitled "Amendment to Deposition" and have that page notarized by a duly licensed Nebraska Notary Public;

4. Please return the separate correction page with or without corrections within 30 business days to the office of Thomas & Thomas Court Reporters, 3861 Farnam Street, Omaha, Nebraska, 68131.

5. Failure to read, sign and return the Amendment to Deposition page within 30 days will result in delivery of the Original Deposition without signature, and the signature will have been deemed waived by the witness.

Sincerely,

Susan Mckenzie

cc: Pamela Snyder-Varns

AMENDMENT TO DEPOSITION

I, JOHN REMUS, wish to make the following changes in the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
| --- | --- | --- | --- |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |
| ____ | ____ | ________________________ | ____________ |

________________________

WITNESS

IN WITNESS WHEREOF, I hereunto affix my signature and seal this ____ day of __________, 2006.

________________________

GENERAL NOTARY PUBLIC

My Commission expires: