IN THE UNITED STATES COURT OF FEDERAL CLAIMS

* * * * * * * * * * * * * * * * * * * * * * * * * *

CHEYENNE RIVER SIOUX TRIBE, et al.,

Plaintiffs,

-vs-

THE UNITED STATES,

Defendant.

Davenport, Evans, Hurwitz & Smith
Sioux Falls, South Dakota
February 14, 2007
12:30 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

D E P O S I T I O N O F

TODD MORTENSON

* * * * * * * * * * * * * * * * * * * * * * * * * *

APPEARANCES:

Mr. J. Crisman Palmer
Ms. Pamela Snyder-Varns
Gunderson, Palmer, Goodsell & Nelson
P.O. Box 8045
Rapid City, South Dakota 57709-8045

for the Plaintiffs;

Ms. Susan V. Cook
United States Department of Justice
Environment & Natural Resources Division
601 D. Street, N.W.
Washington, D.C. 20004

for the Defendant.

ALSO PRESENT: Dr. Paul Schwartz



INDEX TO WITNESS

| | Examination |
|---|---|
| by Ms. Cook: | P. 3 |

INDEX TO EXHIBITS

| | Marked for Identification | Offered into Evidence |
|---|---|---|
| Exhibit No. 1 (Notice of Taking Oral Deposition of Todd Mortenson) | P. 3 | |
| Exhibit No. 2 (12/4/06 Letter to Mr. Todd Mortenson from Ms. Pamela Snyder-Varns) | P. 10 | |
| Exhibit No. 3 (Todd Mortensons's Report) | P. 13 | |

(Original transcript given to Ms. Susan V. Cook.)

COPY



S T I P U L A T I O N

It is stipulated and agreed by and between the above-named parties, through their attorneys of record, whose appearances have been hereinabove noted, that the deposition of TODD MORTENSON may be taken at this time and place, that is, at the offices of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, on the 14th day of February, 2007, commencing at the hour of 12:20 p.m.; said deposition taken before Pat L. Beck, Registered Merit Reporter and Notary Public within and for the State of South Dakota; said deposition taken for the purpose of discovery or for use at trial or for each of said purposes, and said deposition is taken in accordance with the applicable Rules of Civil Procedure as if taken pursuant to written notice. Insofar as counsel are concerned, the reading and the signing of the transcript by the witness are waived, as is the notice of the filing of the original with counsel for the Defendant in the above-entitled action.

TODD MORTENSON,

called as a witness, being first duly sworn, deposed and said as follows:

(Mortenson Deposition Exhibit No. 1 was marked for identification.)

EXAMINATION BY MS. COOK:

Q Can you give us your full name, please, and



spell your last?
A Todd Russell Mortenson, M-O-R-T-E-N-S-O-N.
Q And where do you reside?
A On a ranch on the Cheyenne River near Hayes, South Dakota.
Q And approximately how far -- where is that located in relation to the Moreau River?
A Oh, probably as the crow flies 35 miles.
Q And what is your occupation?
A I'm a rancher.
Q And how long have you been a rancher?
A All my life. I was born on the ranch.
Q And when were you born?
A 1961, March 16th.
Q Nineteen --
A -- sixty-one.
Q And what's your first memory of ranching as a child?
A First one?
Q I assume they gave you the first couple years off.
A They start you pretty young. The scariest one is being chased by a cow when I was, you know, too small to really get the heck out of the way.
Q When did you start actually --



EXHIBIT
tabbies
6

Q And how many head of cattle do you run?
A Eleven hundred head of cows and then four to five hundred head of yearling heifers. And I've got cattle in the feedlot.
Q Tell me what knowledge you have of the history of the Moreau River before the Oahe Dam was closed.
A Really no -- no knowledge of it.
Q What knowledge do you have of the history of the Moreau River since the creation of the Oahe Reservoir?
A Just by what I've read through the depositions that were provided to me about the case.
Q What depositions were provided to you?
A You want this box?
Q No. I need you to list them for the record.
MR. PALMER: Yup, that's fine.
A Do you need that?
Q Let me go ahead --
MS. COOK: Is it okay if I mark the original of this, counsel?
MR. PALMER: That's fine.
MS. COOK: This is a letter dated December 4, 2006, and let's mark it as Deposition Exhibit 2.



(Mortenson Deposition Exhibit No. 2 was marked for identification.)
MS. COOK: Thank you.
Q I'd like to show you what's been marked as Deposition Exhibit 2 which is a letter dated December 4, 2006, and ask you to verify that that's the letter you just handed me?
A Yup. Yes, it is.
Q And how did you happen to receive that letter?
A Ms. Varns sent it to me in the mail as part of -- I guess part of my indoctrination into the case, part of my learning about the Moreau River.
Q Now, when were you first contacted with regard to providing testimony in this case?
A It was in the fall of last year. October or November, I believe.
Q Of 2006?
A Yes.
Q And who contacted you?
A I believe Pam did, Pam Varns.
Q And what did she tell you about the case?
A She gave me I guess an outline of the case briefly, and then said that they would be sending a bunch of material and wanted me to look it all over and give me my opinion on the case.



Q And did she indicate to you at that time that she wanted you to testify as a witness?
A I believe it says in that letter that there's a possibility that I would testify.
Q Now, after you were first contacted in October or November of 2006 was there any further contact up until you received this letter?
A I don't recall. I don't recall if there were any e-mails sent or not. I don't believe there were. I think that was -- I think that was it.
Q And did Ms. Snyder-Varns indicate to you what topics she wished you to present testimony on?
A No, she didn't.
Q Did you have any kind of understanding of what topics you were going to be presenting testimony on?
A Well, I had assumed that since my background is in ranching it would be about the operation of the ranches.
Q What did you do when you received this letter of December 4 and the documents attached or included with it?
A I started reviewing them.
Q And have you looked at everything listed in this letter?
A Yes, I have.



Q Have you subsequently -- have you received other documents in addition to the ones listed in this letter?
A This one I don't know if it's listed. It might be listed. It's the one with Tom Van Norman's -- no, it's included, too. So no.
Q That would be which item?
A The Tom Van Norman deposition. And it's listed on here. I didn't know if it was or not, but it is. It came separate from everything else.
Q And have you been asked to form opinions to testify in this case?
A I haven't been directed as far as what they -- the opinion I should form. Yeah, I was told to read and study the stuff and give them my opinion of what was going on.
Q And what is your opinion on what is going on?
A It's in this report. I mean, I think that those -- that I covered it very well in there.
MS. COOK: Can I mark that copy?
MR. PALMER: Sure. It says, "JCP Work Copy" on it, but you can sure mark it.
MS. COOK: I think you were good enough not to write anything on it so you're safe.

MR. PALMER: I hope not. Hey, good.
MS. COOK: Why don't we make that Deposition Exhibit 3.
(Mortenson Deposition Exhibit No. 3 was marked for identification.)
Q Looking at Deposition Exhibit 3, the first statement -- the report begins, "Flooding and sedimentation along the Moreau River causes numerous problems to ranchers trying to make a living along its banks."
Specifically what problems does flooding and sedimentation along the Moreau River cause to ranchers trying to make a living along its banks?
A Loss of shelter, loss of habitat. Basically loss of grasses that are usable by cows. Bogging is a problem.
Q I'm sorry, what?
A Bogging.
Q Bogging?
A Yeah. Cows getting stuck in the mud, bogged in the mud.
Q Anything else you can think of?
A Well, like I say the loss of habitat, the loss of grazing grass for the cows, and the biggest loss in my opinion is the shelter, the reliable shelter



for calving.
Q Now, I believe you indicated that you yourself have never ranched along the Moreau River.
A Correct.
Q So what is the basis for your opinion that flooding and sedimentation on the Moreau River caused a problem of loss of shelter to ranchers on the river?
A One, my experience on living along a river, and, two, the depositions given by the ranchers that lived -- that do live along the Moreau.
Q And those are the depositions listed in the letter of December 4?
A Correct.
Q Now, there was litigation involving the Cheyenne River, wasn't there?
A Yes, there was.
Q And when was that?
A I couldn't tell you. It was four or five years ago, I'm guessing. I don't know for sure though.
Q Were you involved in that litigation?
A I was not.
Q What knowledge do you have of that litigation?
A I don't really have much. I know there was a case and that the landowners were paid. I guess



that's the extent of my knowledge.
Q Who were the landowners that were involved in that case?
A I couldn't tell you all of them. I know -- seems like the Lesmeisters were involved and the Briggses.
Q As you go could you spell those names so we get them clearly on the record?
A B-R-I-G-G-S. That's the easy one.
MR. PALMER: You went with the easy one first.
A Lesmeister, L-E-S-M-E-I-S-T-E-R.
Q Anyone else that you recall being involved?
A I don't know -- Fischers may have been. F-I-S-C-H-E-R. I don't know for sure if they were or not.
Q And what's the source of your information as to what landowners were involved; just general knowledge or what?
A Could you --
Q What is the source of your information as to what landowners were involved in the Cheyenne River litigation? How do you know?
A How do I know? They're my neighbors.
Q And they've told you --
A Yeah.



Q -- about it?
A Yeah.
Q And you remember any other landowners that were involved in the Cheyenne River litigation?
A No, I don't.
Q Were -- were any entities or individuals involved with your ranch involved in the Cheyenne River litigation?
A No.
Q Why not?
A Why weren't they involved in the Cheyenne River litigation? They were never asked, I guess. I don't know.
Q Has your ranch on the Cheyenne River experienced any problems with sedimentation or flooding?
A I live on the Lake Oahe -- technically the Lake Oahe portion of the Cheyenne River. So it's -- when the pool is full we're really on Lake Oahe.
Q And have you experienced any problems with flooding or sedimentation at your property?
A Yeah.
Q And what problems are those?
A Well, our ranch borders on the mud flat. There's 40-foot of sediment out there, 40-foot of

mud.
Q Have you ever lost cows in that mud?
A Yes.
Q Have you made a claim with the Corps of Engineers to recover money for those cows?
A The cattle that I ran on the reservation side, yes, because you can only get reimbursed for cattle if they are on the reservation side. On the side that I live on you don't get any reimbursement. You're just out.
Q And the reservation side would be the land you graze pursuant to grazing leases?
A Right. I also own land on the Cheyenne River Sioux Reservation.
Q So your reservation land would include both deeded land and grazing leased land?
A Right. The deeded land on the reservation is not adjacent to the Cheyenne River, however.
Q So your property must be adjacent to one of the takelines for Lake Oahe as they call it?
A The home place is, yeah. Yes.
Q About how many cows have you gotten money for from the Corps of Engineers?
A One.
Q And when was that?



A Oh, probably -- let's see. The lake went away in 2000. It was probably 2000 -- probably six years ago.
Q Now, since your property doesn't border the Cheyenne River what is the source of your information concerning problems ranchers have had with sedimentation of flooding on the Cheyenne River or do you -- I guess I should ask you first of all do you have any knowledge concerning problems ranchers have had with sedimentation and flooding on the Cheyenne River?
A No.
Q You were born in 1961. Correct?
A Correct.
Q So basically do you remember anything about either the Cheyenne River or the Moreau River before Oahe Reservoir was created?
A No, I do not.
Q Now, in the first paragraph of your report -- and let me number the sentences so we have a clear record. Sentence three, "Before the Oahe Dam was built and for a time afterward, those that made a living along its banks" -- and it says "it" but I assume "it" isn't needed there -- "could rely on the protection of a healthy river bottom ecosystem."



What is the basis for -- strike that. Is that one of the opinions you intend to testify to in this case?
A Yes.
Q And what is the basis for that opinion?
A My family has lived there on the ranch that we have now since 1942, and my grandpa before that ran the Diamond A on the -- the Diamond A Ranch on the Cheyenne River Reservation.
Q And how does that support the statement?
A Well, they used those river bottoms for wintertime protection and for calving.
Q So your opinion there is based on information they've told you?
A Yes.
Q Is there any other information that that statement is based on other than information that your father and grandfather have told you?
A Well, that and -- no.
Q Now, you state in sentence four, "That reliance has gradually waned as the frequency and length of flooding events increased." Is that an opinion you intend to testify to in this litigation?
A Yes.
Q And can you tell me what that opinion is based



on?
A On the testimony of the other plaintiffs, Lyle Anderson and Gregg Mowrer, Dick and Mary Jane Anderson.
Q So it's essentially based on what you've read in their depositions?
A Correct.
Q Sentence five reads, "The flood of 1997 forever changed the Moreau River." Is that an opinion you intend to testify to in this litigation?
A Yes.
Q And what is that opinion based on?
A The same, of reading the depositions of the people that have lived along it and the changes that they've indicated they've gone through.
Q Now, there's a number of statements in your report, and I can go through them one by one, but let me see if we can resolve it with an overall question. Essentially all the opinions in this report are based on the materials you were provided in the letter of December 4, 2006?
A Majority of it is, yes.
Q Okay. What opinions are based on something else and what is that something else?
A My experiences ranching.